**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ANTHONY MITCHELL,

Plaintiff,

v.

EMORY ANDREW TATE III, an individual,
also known as "Andrew Tate,"
also known as "Cobra Tate,"
also known as "Top G";

NEW ERA LEARNING LLC,
d/b/a "The Real World";

THRIFTY CONSULTING LLC,
a Delaware limited liability company;

LEGENDARY COURSES, INC.,
a Delaware corporation; and

DOE DEFENDANTS 1–10, inclusive,
including the entity operating the
website fundraiser.com,

Defendants.

Case No.: _____

**COMPLAINT**

(1) Breach of Contract (Unilateral
    Contest Contract)
(2) Promissory Estoppel
(3) Unjust Enrichment
(4) Fraudulent Misrepresentation
(5) Violation of the Nevada Deceptive
    Trade Practices Act
    (NRS 598.0903 *et seq.*)

**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

INTRODUCTION ¶ 1

THE PARTIES ¶ 4

    Defendants' Collective Operation and Control of the Platform ¶ 10a

JURISDICTION AND VENUE ¶ 11

PLAINTIFF'S STANDING ¶ 15

FACTUAL ALLEGATIONS ¶ 21

    A. Defendants' Promotion of the Hackathon ¶ 21

    B. The Contest Terms ¶ 25

    C. The Scale and Organization of the Contest ¶ 33

    D. Plaintiff's Participation (Nevada) ¶ 34

    E. Defendants' Complete Failure to Perform ¶ 39

    F. Additional Circumstances Surrounding the Contest ¶ 44

    G. Defendant New Era's Operational Role ¶ 45

CAUSES OF ACTION ¶ 47

    First — Breach of Contract (Unilateral Contest Contract) ¶ 47

    Second — Promissory Estoppel ¶ 54

    Third — Unjust Enrichment ¶ 61

    Fourth — Fraudulent Misrepresentation ¶ 66

    Fifth — Violation of Nevada Deceptive Trade Practices Act ¶ 74

PRAYER FOR RELIEF

DEMAND FOR JURY TRIAL

LIST OF EXHIBITS

    Exhibits A through AC

DECLARATION OF ANTHONY MITCHELL IN SUPPORT OF COMPLAINT

DECLARATION OF BRYAN MITCHELL IN SUPPORT OF COMPLAINT

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 956 P.2d 1382 (1998) ¶ 71

*Betsinger v. D.R. Horton, Inc.*, 126 Nev. 162, 232 P.3d 433 (2010) ¶ 75b

*Calder v. Jones*, 465 U.S. 783 (1984) ¶¶ 13(a), 13(f)

*Certified Fire Prot. Inc. v. Precision Constr.*, 128 Nev. 371, 283 P.3d 250 (2012) ¶ 64

*Cobaugh v. Klick-Lewis, Inc.*, 561 A.2d 1248 (Pa. Super. 1989) ¶ 48

*Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 592 U.S. 351 (2021) ¶¶ 13(a), 13(g)

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ¶¶ 72a, 72c

*Holton v. Physician Oncology Educ. Network*, 2012 WL 1980516 (D. Nev. June 1, 2012) ¶ 53(b)

*In re Cathode Ray Tube Antitrust Litig.*, 911 F. Supp. 2d 857 (N.D. Cal. 2012) ¶ 10

*In re First Alliance Lending Corp.*, 471 F.3d 977 (9th Cir. 2006) ¶¶ 72a, 72c

*Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) ¶¶ 5a, 11

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ¶¶ 67(g), 71

*Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276 (9th Cir. 1983) ¶ 10b

*Laird v. Capital Cities/ABC, Inc.*, 68 Cal. App. 4th 727 (1998) ¶ 10

*Las Vegas Hacienda, Inc. v. Gibson*, 77 Nev. 25, 359 P.2d 85 (1961) ¶¶ 48, 52

*Leasepartners Corp. v. Robert L. Brooks Trust*, 113 Nev. 747, 942 P.2d 182 (1997) ¶ 64

*Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009) ¶ 75

*Poole v. Nev. Auto Dealership Invs., LLC*, 135 Nev. Adv. Op. 31 (Ct. App. 2019) ¶¶ 75a, 75b

*Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 793 (9th Cir. 2012) ¶ 48

*Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) ¶ 67(g)

*Topaz Mut. Co. v. Marsh*, 108 Nev. 845, 839 P.2d 606 (1992) ¶ 62a

*Vancheri v. GNLV Corp.*, 105 Nev. 417, 777 P.2d 366 (1989) ......... ¶ 58

*Walden v. Fiore*, 571 U.S. 277 (2014) ......... ¶ 13(a)

*Welfare Div. of State Dep't of Health, Welfare & Rehab. v. Washoe Cty.* ......... ¶ 75b
*Welfare Dep't*, 88 Nev. 635, 503 P.2d 457 (1972)

**Statutes**

28 U.S.C. § 1332(a) ......... ¶¶ 5, 5a, 5c, 11

28 U.S.C. § 1391(b)(2) ......... ¶ 14a

28 U.S.C. § 1746 ......... Declarations (Exhibits M, X)

NRS 14.065 ......... ¶ 13

NRS 598.0903 *et seq.* ......... ¶¶ 74, 75

NRS 598.0915(1), (2), (9), (15) ......... ¶¶ 75, 76

NRS 598.0963 ......... ¶¶ 12, 53, 75a, 78, Prayer

NRS 602.010 ......... ¶ 10b

**Rules**

Fed. R. Civ. P. 8(d)(2)–(3) ......... ¶ 10b

**Other Authorities**

Restatement (Second) of Contracts § 45 ......... ¶¶ 48, 49

Restatement (Second) of Contracts § 90 ......... ¶ 58

**INTRODUCTION**

1.     This action arises from Defendants' operation of a prize contest variously referred to across Defendants' promotional platforms as "the Hackathon" on social media posts (*see* Exhibit AA), the "AI Hackathon" or "Solana AI Hackathon" on the fundraiser.com website and on the Google Form submission page (*see* Exhibit AC), and the "AI-G Hackathon" on an associated Telegram channel (*see* Exhibit AB) (hereinafter "the Hackathon"). In January 2025, Defendants launched and promoted an online artificial-intelligence hackathon through the website fundraiser.com that publicly offered over one million dollars in prizes to participants who developed and submitted qualifying projects. Defendants published specific prize amounts, detailed judging criteria, defined deadlines, and announced that winners would be declared approximately two weeks after the contest closed. Participants invested substantial time and resources developing projects and submitting them through a Google Form accessible via the hackathon page at fundraiser.com/hackathon. Plaintiff Anthony Mitchell — a citizen and resident of North Las Vegas, Nevada — developed and submitted a single project titled "Bangchain."

2.     The hackathon submission period closed on February 15, 2025. Plaintiff's submission, titled "Bangchain," appeared as the first-listed project on Defendants' official hackathon showcase page at fundraiser.com/hackathon/showcase. As of the filing of this Complaint — more than twelve months after the submission deadline — the hackathon website at fundraiser.com/hackathon remains live, Plaintiff's Bangchain project remains publicly displayed as the first-listed showcase entry, the prize representations totaling over $1,000,000 remain published, and the G DAO Treasury Wallet address remains displayed — yet Defendants have not announced any winners, have not conducted the announced judging process, and have not paid any portion of the promised prize pool to any participant. Defendants have continued to use Plaintiff's submitted project as promotional content on the live website for more than twelve months without compensation, without conducting any judging, and without any public explanation for their complete failure to perform. Because the Bangchain project shares its name with a cryptocurrency token minted by an unknown third party on January 30, 2025 — a token

whose price history is consistent with a pump-and-dump pattern (*see* Paragraph 44(m)) — Defendants' continued display of the project as the lead showcase entry for more than twelve months keeps public attention directed toward the associated cryptocurrency, effectively serving as an ongoing promotional vehicle for the token while Defendants never pay out the advertised prizes.

3.    Defendants also promoted the hackathon using the logo of the Solana Foundation — a prominent blockchain organization — without authorization. The Solana Foundation publicly disavowed any involvement on January 13, 2025, two days before the hackathon's official launch date. Defendants — acting collectively through the website fundraiser.com and the related promotional ecosystem — nonetheless launched and continued the contest, collecting submissions and personal data from participants under false pretenses.

## THE PARTIES

4.    Plaintiff ANTHONY MITCHELL is a natural person and citizen of the State of Nevada. Plaintiff resides at 618 Painted Opus Place, North Las Vegas, Nevada 89084. Plaintiff is and was at all relevant times domiciled in Nevada. Plaintiff participated in the Hackathon by developing and submitting a qualifying artificial intelligence project titled "Bangchain" while located in North Las Vegas, Nevada, before the February 15, 2025 deadline.

5.    Defendant EMORY ANDREW TATE III, also known as "Andrew Tate," also known as "Cobra Tate," also known as "Top G" ("Tate"), is a natural person and citizen of the United Kingdom. A December 2024 ruling of the United Kingdom judiciary confirmed that Tate is the Chief Executive Officer of New Era Learning LLC. (*See* CCDC v TTJ, judiciary.uk.) An authorized marketing partner of New Era, New Age Endeavour Ltd (UK Companies House No. SC761264), publicly states on its website therealworld.co that "Andrew Tate is the CEO of New Era Learning LLC and the creator of The Real World platform." Tate personally promoted the Hackathon on the X/Twitter platform beginning January 12, 2025, when he posted links to the hackathon website and directed his followers to "GET STARTED" (*see* Exhibit AA), and on January 13, 2025, when he posted a promotional video. Tate personally sent a direct message on January 30, 2025 to Bryan Mitchell (Plaintiff's brother), initiating a chain of communication

that led to coordinated promotional activity around a cryptocurrency token that an unknown third party had minted bearing the name of a hackathon participant's showcased project — a token not minted by the participant or his brother (*see* Paragraph 44(m)–(n)). The following day, January 31, 2025, Tate publicly replied to Bryan Mitchell on X/Twitter, endorsing the hackathon project Bangchain as "perfect for the average crypto trader" — a post viewed 71,400 times. (*See* Exhibit W.) Tate is named as a defendant in his individual capacity based on his personal participation in the acts and omissions alleged herein. Upon information and belief, Tate resides in Romania but is domiciled in the United Kingdom. Tate is a citizen of a foreign state for purposes of 28 U.S.C. § 1332(a)(2).

5a.     Defendant NEW ERA LEARNING LLC ("New Era") is the entity that holds itself out as a limited liability company operating the online platform known as "The Real World" (accessible at jointherealworld.com and university.com). New Era's Terms of Service, Privacy Policy, and website footer on jointherealworld.com, university.com, therealworldapp.com, and joinonlineuniversity.com each state that the platform is "Owned and Managed by New Era Learning LLC." (*See* Exhibit Q.) New Era's Better Business Bureau profile (BBB ID 92033280, opened May 9, 2024) lists New Era Learning LLC at two addresses: 800 North State Street, Suite 403, Dover, Delaware 19901, and 221 North Broad Street, Middletown, Delaware 19709. The BBB profile lists the following alternate business names: "Legendary Courses, Inc," "The Real World," "Millionaire Mindset," "Astromarketing," and "Thrifty Consulting LLC." New Era has an F rating from the BBB based on failure to respond to consumer complaints. New Era's Terms of Service on therealworldapp.com (effective January 1, 2025) state that the terms are "governed by the laws of the State of Delaware" and consent to "the exclusive jurisdiction and venue of courts in Delaware." However, the Terms of Service on neweralearning.net for the same platform state that terms are "governed by United Arab Emirates law," and the Terms of Service on therealworldeducation.com state that terms are governed by "the laws of Delaware and US for US persons, and the laws of Poland for non-US persons." Upon information and belief, New Era holds itself out as a Delaware LLC but may not be registered as a limited liability company in Delaware or in any other jurisdiction. Regardless of its formal formation status, New Era has conducted business, entered contracts, collected personal data, and made

representations to consumers under the name "New Era Learning LLC" and is subject to suit under that name. Upon information and belief, based on the December 2024 UK court ruling identifying Tate as CEO, the absence of any other publicly identified officer, director, or principal of New Era, and the BBB profile identifying no other individual in management, Tate holds a controlling membership or ownership interest in New Era. New Era's citizenship for diversity purposes is determined by the citizenship of each of its members. *See Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). Because Tate is a citizen of a foreign state (the United Kingdom), and because no member of New Era is, upon information and belief, a citizen of Nevada, New Era is a citizen of a foreign state for purposes of 28 U.S.C. § 1332(a)(2). In the alternative, if New Era was never formally organized as a limited liability company, it is an unincorporated association or de facto entity whose principals — including Tate — are personally liable for its obligations, and its citizenship is that of its principals, none of whom is a citizen of Nevada.

5b.     Defendant THRIFTY CONSULTING LLC ("Thrifty") is a limited liability company organized under the laws of Delaware (Delaware Division of Corporations File Number 7280246, formed February 6, 2023, status: Good Standing). Thrifty's registered agent is Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, Delaware 19904. Every consumer-facing website associated with "The Real World" and New Era — including jointherealworld.com, university.com, therealworldapp.com, therealworldportal.com, and realworldventures.ltd — identifies Thrifty as a distribution partner with the address 800 North State Street, Suite 403, Dover, Delaware 19901. The BBB profile for New Era Learning LLC lists "Thrifty Consulting LLC" as an alternate business name and lists Thrifty's address (800 North State Street) as the primary business address of New Era. The privacy policy on therealworldportal.com states: "The Real World is distributed on behalf of New Era Learning LLC by: Thrifty Consulting LLC." Upon information and belief, Thrifty is the entity through which New Era's commercial operations are conducted in the United States, including the distribution of "The Real World" platform, the processing of subscriber payments, and the maintenance of the U.S. business presence that New Era holds itself out as having. Thrifty's

citizenship for diversity purposes is determined by the citizenship of each of its members. Upon information and belief, no member of Thrifty is a citizen of Nevada.

5c.    Defendant LEGENDARY COURSES, INC. ("Legendary") is, upon information and belief, a corporation organized under the laws of Delaware, with an address at 221 North Broad Street, Middletown, Delaware 19709. Every consumer-facing website associated with "The Real World" and New Era identifies Legendary as a distribution partner. The BBB profile for New Era Learning LLC lists "Legendary Courses, Inc" as an alternate business name and lists Legendary's address (221 North Broad Street) as a second location of New Era. Upon information and belief, Legendary participates in the distribution and commercial operations of "The Real World" platform on behalf of New Era. Legendary is, upon information and belief, a citizen of Delaware for purposes of 28 U.S.C. § 1332(a)(1), and no principal of Legendary is a citizen of Nevada.

6.    Defendants New Era, Thrifty, and Legendary are named as defendants because they collectively operate the commercial enterprise through which "The Real World" is distributed to consumers, and because the Hackathon was structured as an extension of that enterprise. The relationship among New Era, Thrifty, and Legendary is not that of independent contracting parties operating at arm's length — it is that of a single integrated enterprise operating under three legal names. The following specific facts demonstrate this unity: (a) the BBB profile for New Era Learning LLC identifies "Thrifty Consulting LLC" and "Legendary Courses, Inc" not as partners or affiliates but as *alternate business names* for New Era itself — meaning the BBB reports that Thrifty and Legendary are names under which New Era operates; (b) the only two U.S. business addresses listed for New Era are Thrifty's address (800 North State Street, Suite 403, Dover, Delaware 19901) and Legendary's address (221 North Broad Street, Middletown, Delaware 19709), indicating that New Era's entire U.S. physical presence consists of Thrifty's and Legendary's locations; (c) the privacy policy on therealworldportal.com states that "The Real World is distributed on behalf of New Era Learning LLC by: Thrifty Consulting LLC," confirming that Thrifty acts as New Era's agent for U.S. distribution; (d) every consumer-facing website associated with The Real World identifies both Thrifty and Legendary as "distribution partners" in the footer, meaning that every consumer who purchases a Real World subscription

— including Plaintiff — transacts through an ecosystem in which Thrifty and Legendary are prominently identified as the entities distributing the service; and (e) upon information and belief, Thrifty and Legendary share common ownership, control, or management with New Era, as evidenced by the BBB's identification of them as New Era's own alternate names, the use of New Era's only business addresses, and the absence of any publicly identified officer, director, or principal of Thrifty or Legendary who is independent of the New Era enterprise. The hackathon was structured as an extension of this integrated enterprise. The Real World was designated as a "Main Sponsor" of the hackathon, with its logo hosted on the fundraiser.com server. (*See* Exhibit L.) The hackathon's competition rounds — "Undergrad (Hustlers Round)," "Graduate," and "PhD" — directly mirror The Real World's membership tier structure. The depth of New Era's integration into the broader fundraiser.com ecosystem is further evidenced by the investment application page at fundraiser.com/apply — a page unrelated to hackathon project submission — which bore a "THE REAL WORLD STUDENT EXCLUSIVE PERIOD" banner, required a "Real World Username," and directed its users: "After Submitting You Will Be Required To Log Into The Real World To Verify Identity." (*See* Exhibit F.) That identity verification through New Era's platform was embedded within the fundraiser.com ecosystem confirms that New Era authorized and facilitated the integration of its platform throughout Defendants' operations. Because Thrifty and Legendary are the U.S. entities through which New Era distributes the platform designated as "Main Sponsor," and because they are identified by the BBB as alternate business names of the same enterprise, Thrifty and Legendary are liable for the enterprise's obligations on the same basis as New Era itself.

6a.    In addition, The Real World was listed as a "Main Sponsor" of the hackathon, with its logo (filename: therealworld.png) physically hosted on the fundraiser.com server. (*See* Exhibit L.) The apply page banner advertised a "THE REAL WORLD STUDENT EXCLUSIVE PERIOD," indicating that New Era directed its subscriber base to participate in the hackathon and restricted at least one phase of the contest to New Era's paying subscribers. (*See* Exhibit F; Wayback Machine capture, Sep. 27, 2024.) The hackathon's competition rounds — "Undergrad (Hustlers Round)," "Graduate," and "PhD" — directly mirror The Real World's membership tier structure (formerly branded "Hustlers University"), further demonstrating that the contest was

designed in coordination with New Era's commercial platform. (*See* Exhibit C.) Additionally, the page at fundraiser.com/apply displayed live purchase notifications for The Real World subscriptions (e.g., "[Name] from [Country] has purchased The Real World"), confirming that the hackathon ecosystem's infrastructure was commercially integrated with New Era's subscription sales pipeline. (*See* Exhibit F.)

7.     DOE DEFENDANT 1 is the entity — whose true name, legal form, and state or country of organization are presently unknown to Plaintiff — that owns, operates, or controls the website fundraiser.com, the subdomain deck.fundraiser.com, and the verified X/Twitter account @fundraiser_com (joined January 2025; approximately 1,400 followers). Doe Defendant 1 directly administered the Hackathon: it published all contest rules and prize terms, operated the hackathon submission page at fundraiser.com/hackathon — which routed project submissions to a Google Form — and the investment application page at fundraiser.com/apply, hosted the project showcase at fundraiser.com/hackathon/showcase, and displayed submitted projects including Plaintiff's "Bangchain." The domain fundraiser.com is registered through GoDaddy with WHOIS privacy enabled via Domains By Proxy, LLC; no terms of service, privacy policy, or legal entity disclosure appears on the website. Upon information and belief, based on: (a) the WHOIS privacy registration through a proxy service consistent with foreign operators; (b) the shared DNS and mail infrastructure with domains associated with Tate, a United Kingdom citizen; (c) the absence of any U.S. entity disclosure on the website; and (d) the personal branding of the platform around a foreign national's identity — Doe Defendant 1 is owned, controlled, or operated by persons who are citizens or subjects of foreign states, none of whom is a citizen of Nevada. In the alternative, pursuant to FRCP 8(d)(2), if the entity operating fundraiser.com is one or more of the named Defendants or an unincorporated division thereof, liability for the operation of the hackathon platform is alleged against that Defendant or those Defendants. The precise corporate form and identity of the entity or entities controlling fundraiser.com are matters within Defendants' exclusive knowledge and control — no terms of service, privacy policy, or legal entity disclosure appears anywhere on the website — and Plaintiff is entitled to plead in the alternative pending discovery. Plaintiff will seek leave to

amend this Complaint to identify Doe Defendant 1's precise legal name and form upon completion of targeted discovery. (*See* Exhibits A, E, F, G.)

8. Technical infrastructure analysis supports the inference that New Era and Doe Defendant 1 are part of a unified enterprise. The domains fundraiser.com, university.com (operated by New Era), and cobratate.com resolve to the same Cloudflare nameserver pair (bob.ns.cloudflare.com and heidi.ns.cloudflare.com), which, upon information and belief, Cloudflare assigns at the account level. (*See* Exhibit R.) Three of the four domains — fundraiser.com, university.com, and jointherealworld.com (New Era's marketing domain) — point to the same Zoho mail servers (mx.zoho.com, mx2.zoho.com, mx3.zoho.com), and the fourth — cobratate.com — authorizes Zoho to send email on its behalf through SPF records. New Era's mail infrastructure at therealworld.ag is explicitly authorized via SPF DNS records to send email on behalf of university.com, cobratate.com, and jointherealworld.com. Fundraiser.com and jointherealworld.com are both hosted on Vercel's platform. These shared infrastructure elements — common DNS management, shared mail infrastructure with cross-domain SPF authorization, identical email providers, and common web hosting — support a plausible inference that New Era and the entity operating fundraiser.com are part of a single enterprise operating under common control.

9. DOE DEFENDANTS 2 through 10 are individuals and entities whose true names and capacities are presently unknown to Plaintiff. Plaintiff is informed and believes that each Doe Defendant participated in organizing, funding, promoting, or administering the Hackathon and is therefore liable for the acts and omissions alleged in this Complaint. Plaintiff will seek leave to amend this Complaint to state their true names and capacities when ascertained.

10. Upon information and belief, Tate, New Era, Thrifty, Legendary, and Doe Defendant 1 operated the Hackathon as a joint venture or integrated enterprise. The following facts support this inference: (a) shared DNS infrastructure — fundraiser.com and university.com (New Era) resolve to the same Cloudflare nameserver pair, indicating a single administrative account; (b) shared mail infrastructure — three of the four core domains share the same Zoho mail servers, the fourth authorizes Zoho via SPF, and New Era's mail servers at therealworld.ag are authorized via SPF records to send email on behalf of university.com, cobratate.com, and

jointherealworld.com; (c) cross-platform integration — the fundraiser.com/apply investment page within the hackathon ecosystem required identity verification through New Era's platform and a "Real World Username," and the hackathon listed The Real World as "Main Sponsor"; (d) shared branding — the hackathon was structured around New Era's product hierarchy ("Hustlers Round," "Graduate," "PhD") and the personal brand of New Era's CEO; (e) mutual commercial benefit — New Era received subscriber engagement and new registrations, while Doe Defendant 1 received contest content and promotional value; and (f) common management — New Era's CEO personally promoted the hackathon and the hackathon uses his personal brand trademarks. These facts satisfy the integrated enterprise test applied by courts in this Circuit, which considers interrelation of operations, common management, centralized control, and common ownership. *See Laird v. Capital Cities/ABC, Inc.*, 68 Cal. App. 4th 727, 737 (1998); *In re Cathode Ray Tube Antitrust Litig.*, 911 F. Supp. 2d 857, 871 (N.D. Cal. 2012). Upon information and belief, each Defendant authorized, facilitated, or benefited from the acts and omissions of each other Defendant as set forth herein. In addition: (g) Thrifty and Legendary are identified on every consumer-facing website associated with New Era as the "distribution partners" for "The Real World," and the BBB profile for New Era Learning LLC lists "Thrifty Consulting LLC" and "Legendary Courses, Inc" as alternate business names — not as independent entities — indicating that Thrifty, Legendary, and New Era operate as a single commercial enterprise; and (h) Tate is the sole identified executive of New Era and personally promoted the hackathon, coordinated communications with Issa regarding a cryptocurrency token that an unknown third party had minted bearing the name of a hackathon participant's showcased project (*see* Paragraph 44(m)), publicly endorsed a hackathon project as "perfect for the average crypto trader" on X/Twitter on January 31, 2025 (*see* Exhibit W), and directed his brand and personal influence to drive the contest, demonstrating that the hackathon was an extension of the Tate-New Era-Thrifty-Legendary enterprise.

***Defendants' Collective Operation and Control of the Platform***

10a.    Defendants collectively owned, operated, controlled, managed, directed, or materially participated in the operation of the fundraiser.com hackathon platform, the related

promotional ecosystem, and the Hackathon. The following publicly observable facts demonstrate that Defendants held themselves out to consumers as the operators of the platform ecosystem: (a) Defendant New Era's Terms of Service, Privacy Policy, and website footers on jointherealworld.com, university.com, therealworldapp.com, and joinonlineuniversity.com each state that the platform is "Owned and Managed by New Era Learning LLC" (*see* Exhibit Q); (b) the privacy policy on therealworldportal.com states: "The Real World is distributed on behalf of New Era Learning LLC by: Thrifty Consulting LLC" (*see* ¶ 5b); (c) every consumer-facing website associated with The Real World identifies both Thrifty and Legendary as "distribution partners" (*see* ¶¶ 5b, 5c); (d) the BBB profile for New Era Learning LLC lists "Thrifty Consulting LLC" and "Legendary Courses, Inc" as alternate business names — not as independent third-party partners — and lists the addresses of Thrifty (800 North State Street) and Legendary (221 North Broad Street) as the only U.S. business locations for New Era (*see* ¶ 5a); (e) Defendant Tate, identified by a UK court ruling and by New Era's authorized marketing partner as CEO of New Era, personally promoted the hackathon on social media and personally coordinated promotional activity around a cryptocurrency token that an unknown third party had minted bearing the name of a hackathon participant's showcased project (*see* Paragraph 44(m)), and publicly endorsed that project as "perfect for the average crypto trader" (*see* ¶¶ 5, 44(h)–(k), 44(o); Exhibit W); (f) the domain fundraiser.com — which hosted the hackathon — shares DNS infrastructure, mail infrastructure, web hosting platform, and domain registrar with domains operated by New Era, supporting the inference that all domains are controlled through a single administrative account (*see* ¶¶ 8, 10); and (g) no terms of service, privacy policy, corporate disclosure, or legal entity identification appears anywhere on fundraiser.com, preventing Plaintiff and all other participants from identifying the formal operator of the platform through publicly available information. The precise corporate structure, ownership chain, and internal allocation of control among Defendants over the fundraiser.com platform and the Hackathon are matters within Defendants' exclusive knowledge and control and are not publicly disclosed.

10b.    Plaintiff alleges, in the alternative pursuant to FRCP 8(d)(2) and 8(d)(3), that: (a) the entity operating fundraiser.com is Defendant New Era, acting through Doe Defendant 1 as a trade name, d/b/a, or unincorporated division; or (b) the entity operating fundraiser.com is

Defendant Tate, acting personally or through an unregistered entity; or (c) the entity operating fundraiser.com is a separate legal entity controlled by Tate and/or New Era that has not been publicly identified, in which case that entity is included among Doe Defendants 1 through 10 and Plaintiff will seek leave to amend upon discovery of its identity. To the extent that any named Defendant is later determined not to be the formal operator of the platform, liability is alleged in the alternative against the remaining Defendants who participated in, controlled, or materially benefited from the scheme. To the extent that any Defendant named in this Complaint is later determined not to be a formally registered legal entity, or to be an alias, trade name, or d/b/a used by another Defendant, the natural persons and entities that conducted business, made representations, and incurred obligations under that name remain liable for those obligations. An entity that holds itself out to the public as a business, enters contracts, collects personal data, and makes representations to consumers under a specific name is subject to suit under that name regardless of its formal registration status. *See* NRS 602.010 (persons transacting business under assumed name subject to suit under that name); *see also Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1283 (9th Cir. 1983) (unincorporated association may be sued as an entity).

**JURISDICTION AND VENUE**

11. **Subject-Matter Jurisdiction.** This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) (diversity of citizenship). Plaintiff is a citizen of the State of Nevada. Defendant Tate is a citizen of the United Kingdom, a foreign state, for purposes of 28 U.S.C. § 1332(a)(2). Defendant New Era is, upon information and belief, a citizen of a foreign state because its controlling member, Tate, is a citizen of the United Kingdom, and no member of New Era is a citizen of Nevada. *See Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) (LLC's citizenship is determined by the citizenship of each of its members). In the alternative, if New Era was never formally organized, it is an unincorporated association whose principals — including Tate — are citizens of foreign states. Defendant Thrifty is a Delaware LLC; upon information and belief, its members are citizens of foreign states and none is a citizen of Nevada. Defendant Legendary is, upon information and belief, a

Delaware corporation; upon information and belief, it is a citizen of Delaware and none of its principals is a citizen of Nevada. Upon information and belief, Doe Defendant 1 is an entity whose members or principals are citizens or subjects of foreign states, none of whom is a citizen of Nevada. No Defendant is a citizen of Nevada. Complete diversity of citizenship exists between Plaintiff and all Defendants.

12.    The amount in controversy exceeds $75,000, exclusive of interest and costs. The Hackathon advertised a prize pool of over $1,000,000, with the grand prize alone valued at $500,000. Plaintiff invested approximately 200 hours over several weeks developing and submitting Bangchain, including time spent on artificial intelligence development, pitch deck preparation, and Solana blockchain integration. At the prevailing market rate for freelance AI development services of approximately $150 per hour — a conservative estimate consistent with published industry surveys for AI and machine learning freelance developers — Plaintiff's reliance damages alone are approximately $30,000. When combined with treble damages available under NRS 598.0963(2) for willful deceptive trade practices, Plaintiff's damages exceed $75,000. Plaintiff seeks compensatory damages, reliance damages, restitution, and treble damages under NRS 598.0963 exceeding the jurisdictional threshold.

13.    **Personal Jurisdiction.** This Court has specific personal jurisdiction over each Defendant under Nevada's long-arm statute, NRS 14.065, which extends jurisdiction to the full extent permitted by the Due Process Clause. Defendants are subject to personal jurisdiction in Nevada because:

a.    Defendant Tate personally directed promotional activity into Nevada by: (i) posting a promotional video for the hackathon on the X platform on January 13, 2025, which was directed at Tate's follower base and at The Real World's subscriber base — a consumer audience that includes Nevada residents, including Plaintiff — and which was viewed by Plaintiff in Nevada. The video's explicit purpose was to drive viewers to fundraiser.com to participate in the hackathon, which was structured as an extension of Defendants' Real World ecosystem; Tate thus directed commercial promotional activity at a consumer base he knew included Nevada residents, not merely at the internet generally; (ii) personally sending a direct message via X/Twitter on January 30, 2025 to

Bryan Mitchell (Plaintiff's brother), who was located in Nevada at the time. Tate knew or had reason to know that Bryan Mitchell was located in Nevada based on multiple independent sources of information: (A) Plaintiff Anthony Mitchell was a paying subscriber to The Real World, and upon information and belief, The Real World's subscriber registration records — accessible to Tate as CEO of New Era — contained Plaintiff's Nevada address and contact information, establishing Tate's access to data linking the Mitchell family to Nevada; (B) Bryan Mitchell's X/Twitter account @prince_of_fakes, which Tate necessarily reviewed before sending the direct message (Tate identified Bryan Mitchell by name and selected him for contact in connection with a specific hackathon submission), contained publicly available information from which Bryan Mitchell's Nevada location was ascertainable; (C) Tate's DM to Bryan Mitchell referenced "Head of hackathon wants to reach out" in connection with a project displayed on the hackathon showcase page — the showcase page itself displayed project information submitted through the Google Form, which collected contact information from participants, providing Defendants with data linking the project's participants to their physical locations; and (D) Issa, the individual Tate directed to contact Bryan Mitchell within minutes of Tate's DM, told Bryan Mitchell that "andrew told me to text you" and that his project would be added to the showcase — confirming that Tate had personally reviewed and selected this specific participant for contact, a process that necessarily involved reviewing participant-identifying information. Tate's direct, personal initiation of this communication with a known Nevada resident — not a random social media interaction but a targeted, purposeful outreach to a specific individual regarding a specific hackathon submission — constitutes purposeful direction of activity into the forum state. This is distinguishable from *Walden v. Fiore*, 571 U.S. 277 (2014), because Plaintiff is not the sole link to Nevada: Tate's contacts include (1) the personal DM to a known Nevada resident, (2) Tate's role as CEO of New Era, which collects subscription revenue from Nevada consumers including Plaintiff, (3) the continued display of a Nevada resident's project on Defendants' commercial platform for over twelve months, and (4) Tate's public endorsement of a hackathon project to 71,400

viewers after receiving a response from a Nevada resident, with knowledge that the project and its participants were connected to Nevada. These are Tate's own contacts with the forum, not contacts manufactured solely by the unilateral activity of the plaintiff; (iii) publicly replying on X/Twitter on January 31, 2025 to Bryan Mitchell's post featuring the hackathon showcase page, endorsing a hackathon project as "perfect for the average crypto trader," a post that received 71,400 views, 488 likes, and 84 retweets, thereby directing promotional activity into the forum through his personal platform (*see* Exhibit W) — Tate posted this endorsement after receiving Bryan Mitchell's response from Nevada, and thus knew or had reason to know that the project and its promoters were connected to Nevada; moreover, Tate's personal initiation of the DM to Bryan Mitchell — whom Tate identified by name and selected for contact in connection with a hackathon submission displayed on Defendants' own showcase page — demonstrates that Tate had reviewed the showcase and identified the project's participants, including their connection to the forum state; (iv) serving as CEO of Defendant New Era, which operates a nationwide subscription platform that has paying subscribers in Nevada, including Plaintiff, a Nevada resident who purchased a subscription to The Real World in connection with the hackathon; and (v) committing intentional tortious acts whose effects were felt in Nevada: Plaintiff, a known Nevada resident, suffered the economic injury of his fraudulently induced development labor, out-of-pocket costs, and denied prizes in Nevada. Under the *Calder* effects test, Tate's conduct was (a) intentional, (b) aimed at the forum state through direct communications with a known Nevada resident and promotional activity arising from those communications, and (c) caused harm felt primarily in Nevada. *See Calder v. Jones*, 465 U.S. 783 (1984);

b.    Defendant New Era designated its platform The Real World as "Main Sponsor" of the hackathon, directed its own subscribers to participate through the "Student Exclusive Period," structured the hackathon's competition rounds around its own membership tiers, and collected subscription revenue from Plaintiff, a Nevada resident who purchased a Real World subscription in connection with the hackathon from North Las Vegas,

Nevada. By sponsoring, structuring, and commercially benefiting from the hackathon — and by affirmatively directing its subscriber base, including Nevada subscribers, to participate — New Era purposefully directed its activities into Nevada and established minimum contacts with Plaintiff;

c.    Defendants Thrifty and Legendary, as the entities through which New Era's platform "The Real World" is distributed to U.S. consumers — including Nevada residents — purposefully directed their commercial activities into Nevada. The privacy policy on therealworldportal.com states: "The Real World is distributed on behalf of New Era Learning LLC by: Thrifty Consulting LLC." (*See* ¶ 5b.) Every consumer-facing website operated by the enterprise identifies Thrifty and Legendary as the distribution partners for the platform, and the BBB profile for the enterprise lists both entities' addresses as the primary business locations. Because New Era has subscribers in all fifty states including Nevada (¶ 13(h) below), Thrifty and Legendary — as the entities distributing the platform "on behalf of" New Era to U.S. consumers — necessarily direct their commercial distribution activities into Nevada. Upon information and belief, Thrifty and Legendary process subscription payments from Nevada residents and participate in the distribution of the platform designated as the hackathon's "Main Sponsor" and integrated throughout the fundraiser.com ecosystem, including through identity-verification requirements on the investment application page at fundraiser.com/apply;

d.    Defendants directed their contest offer — including specific prize representations totaling over $1,000,000 — into Nevada via their website and social media, knowing or having reason to know that participants nationwide, including in Nevada, would receive and rely on those representations;

e.    Defendants entered into a contractual relationship with Plaintiff, a citizen of Nevada, by accepting Plaintiff's hackathon submission through their online portal and displaying Plaintiff's project "Bangchain" on their showcase page, thereby purposefully availing themselves of the privilege of conducting activities in Nevada;

f.       Defendants committed intentional tortious acts — including fraudulent misrepresentation — that were directed at and caused injury to Plaintiff in Nevada.

Under the *Calder* effects test, Defendants' conduct was intentional, aimed at a known Nevada resident, and caused harm felt primarily in Nevada. *See Calder v. Jones*, 465 U.S. 783 (1984);

g.     Plaintiff's claims arise directly out of Defendants' forum-directed contacts — the contest representations received in Nevada, the subscription revenue collected from a Nevada consumer, the submission accepted from Nevada, and the injury suffered in Nevada. Under *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 592 U.S. 351, 362 (2021), specific jurisdiction exists when there is an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." *Ford* rejected the requirement that a plaintiff's specific claim must arise out of the defendant's forum contacts in a strict but-for sense; instead, it is sufficient that the claim "relate[s] to" the defendant's contacts with the forum. *Id.* at 362. Here, Defendants' contacts with Nevada are extensive and directly related to Plaintiff's claims: Defendants (a) operated a nationwide subscription platform that collected recurring revenue from Nevada consumers, including Plaintiff, who paid approximately $49.99 per month from Nevada; (b) directed the hackathon contest offer into Nevada through the internet and social media, knowing that their subscriber base included Nevada residents; (c) accepted Plaintiff's hackathon submission from Nevada and displayed the resulting project on their commercial platform for over twelve months; (d) through Tate, personally initiated a direct message to a known Nevada resident (Bryan Mitchell) regarding a hackathon submission, and the following day publicly endorsed the submission to 71,400 viewers; and (e) collected Plaintiff's personal data and subscription payment from Nevada through their integrated commercial ecosystem. Plaintiff's claims for breach of the contest contract, fraud, and NDTPA violations "relate to" each of these Nevada-directed activities within the meaning of *Ford*; and

h.     Upon information and belief, Defendant New Era has subscribers and paying customers in all fifty states, including Nevada, as The Real World is marketed and sold nationwide through online advertising without geographic restriction. New Era directed the "Student Exclusive Period" promotion to all of its subscribers, including those in

Nevada, affirmatively channeling its Nevada customer base into the hackathon. By directing its subscribers — including its Nevada subscribers — to participate in the hackathon, New Era purposefully directed commercial activity into the forum state.

14.    **Forum-Selection Clause Inapplicability.** Any forum-selection or choice-of-law clause contained in Defendant New Era's Terms of Service for The Real World platform does not govern Plaintiff's claims. Plaintiff's claims arise from the Hackathon — a prize contest operated through the website fundraiser.com, which is a separate website with no terms of service, no privacy policy, and no legal entity disclosure of any kind. The Real World's Terms of Service govern the use of that subscription platform; they do not govern third-party prize contests operated on separate domains. The hackathon offer was published on fundraiser.com, the submission was made through fundraiser.com/hackathon via a Google Form hosted at docs.google.com, the project was displayed on fundraiser.com/hackathon/showcase, and the prizes were advertised on fundraiser.com/hackathon. No term of The Real World's Terms of Service purports to govern prize contests operated on third-party websites, and no reasonable construction of a platform's subscription agreement extends its forum-selection clause to disputes arising from an independent contest hosted on a different domain. Moreover, as set forth in Paragraph 5a, New Era maintains contradictory forum-selection clauses across its own websites — specifying Delaware courts on therealworldapp.com, United Arab Emirates law on neweralearning.net, and "the laws of Delaware and US for US persons, and the laws of Poland for non-US persons" on therealworldeducation.com — undermining any claim that a single, enforceable forum-selection clause governs these claims.

14a.    **Venue.** Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Specifically: (a) Plaintiff received Defendants' contest offer and prize representations while located in North Las Vegas, Nevada; (b) Plaintiff relied on those representations in Nevada; (c) Plaintiff developed the Bangchain project and prepared submission materials while located in Nevada; (d) Plaintiff submitted the project through Defendants' hackathon page while located in Nevada; (e) Plaintiff suffered economic injury — including the loss of development time, opportunity costs, and the denial of promised prizes — in Nevada.

**PLAINTIFF'S STANDING**

15.    Plaintiff has standing to bring this action. Plaintiff suffered a concrete, particularized injury (described in Paragraphs 16–18 below) that is fairly traceable to Defendants' conduct (Paragraph 19) and redressable by this Court (Paragraph 20).

16.    Plaintiff personally developed and submitted a qualifying artificial intelligence project titled "Bangchain" to the Hackathon before the February 15, 2025 deadline. In reliance on Defendants' published prize representations, Plaintiff invested substantial time, labor, and resources developing Bangchain and preparing a pitch deck — resources Plaintiff would not have expended but for Defendants' contest promises. Plaintiff's submission was received by Defendants and is displayed as the first-listed project on the official hackathon showcase page at fundraiser.com/hackathon/showcase, confirming Defendants' receipt and public use of Plaintiff's work. (*See* Exhibit G.)

17.    Plaintiff reasonably expected that Defendants would conduct the announced judging process and award prizes in accordance with the published terms. Plaintiff's expectation was based on: (a) the specificity of the prize amounts (enumerated dollar values for each category); (b) the detailed judging criteria; (c) the professional appearance and operation of the contest website; (d) the promotion by a verified social media account; (e) the listing of named sponsors including Defendants' platform The Real World; and (f) Defendant Tate's personal pledge that "I'll be sponsoring everything myself."

18.    Plaintiff suffered economic injury when Defendants failed to conduct any judging process, failed to announce any winners, and failed to pay any prizes. Plaintiff's injury includes: (a) lost prize opportunity — Plaintiff was deprived of the chance to compete for prizes valued at up to $500,000 in a contest with only two genuine submissions displayed on the showcase page, meaning Plaintiff was among a minimal field of eligible competitors; (b) reliance damages — the value of approximately 200 hours of time, labor, and direct development costs (including cloud computing, development tools, and Solana integration resources) that Plaintiff invested in creating and submitting Bangchain, which Plaintiff would have directed to other productive endeavors; (c) opportunity costs — freelance AI development work that Plaintiff declined during

the contest period; (d) personal data provided to Defendants' commercial ecosystem under false pretenses; (e) the cost of a paid subscription to The Real World (approximately $49.99 per month) that Plaintiff purchased in connection with the hackathon; and (f) unauthorized commercial exploitation — Defendants have displayed Plaintiff's project Bangchain as the first-listed entry on the showcase page continuously from on or about January 30, 2025 through the date of filing of this Complaint — a period of more than twelve months — using Plaintiff's work as promotional marketing content for the hackathon platform without compensation.

19.    Plaintiff's injury is fairly traceable to Defendants' conduct: Defendants published the contest offer that induced Plaintiff's participation, accepted Plaintiff's submission, displayed Plaintiff's project on their showcase page for more than twelve months as promotional content, and failed to perform their obligations. Defendant New Era facilitated the scheme by serving as the hackathon's designated "Main Sponsor," directing its subscribers to participate, and commercially benefiting from the hackathon-driven subscriber engagement.

20.    Plaintiff's injury is redressable by this Court through an award of compensatory damages, restitution, treble damages under NRS 598.0963, and other relief.

## FACTUAL ALLEGATIONS

### A. Defendants' Promotion of the Hackathon

21.    On or about January 16, 2025, the verified X/Twitter account @fundraiser_com — operated by Doe Defendant 1 — publicly announced the Hackathon, describing it as a "$1,000,000 prize pool (the largest Solana AI hackathon)" running from "January 15th - 30th." (*See* Exhibit E.)

21a.    On or about January 12, 2025, Emory Andrew Tate III personally posted on the X platform: "ALL YOU NEED TO GET STARTED: fundraiser.com/hackathon deck.fundraiser.com discord.gg/fundraiser" (399,000 views, 63 retweets, 759 likes). The following day, Tate replied to his own post: "Community note is correct, this hackathon is run from Fundraiser.com's treasury and is not affiliated with the Solana foundation." (132,000 views, 30 retweets, 566 likes.) (*See* Exhibit AA.) By this reply, Tate personally acknowledged

that the hackathon was not affiliated with the Solana Foundation — yet continued to promote the contest and did not withdraw or correct the unauthorized Solana branding that remained on the fundraiser.com website. Also on January 12, 2025, a Telegram channel titled "AI-G Hackathon" was created (128 subscribers), with its first message linking to Tate's X post. (*See* Exhibit AB.)

22.    On or about January 13, 2025, Andrew Tate — the Chief Executive Officer of Defendant New Era — personally posted a promotional video for the Hackathon on the X platform (accessible at x.com/Cobratate/status/1878595249825828998). In this video, Tate displayed the logo of the Solana Foundation at approximately the five-second mark, conveying the false impression that the Solana Foundation was an official partner of the hackathon. (*See* Exhibit V — Transcription of Tate's Promotional Video.)

22a.    In the promotional video, Tate made the following material representations in his own words: (a) "I decided to put together this hackathon — unprecedented, never done before — over a million dollars in prizes"; (b) "I'll be sponsoring everything myself via fundraiser.com"; (c) "I have access to the top venture capital firms, I have access to celebrities"; (d) "the Real World token is launching once we have SEC approval"; and (e) "the hackathon begins in three days and will last for two weeks." (*See* Exhibit V.) By personally claiming "I decided to put together this hackathon" and "I'll be sponsoring everything myself," Tate represented to his millions of followers that he personally conceived, organized, and funded the contest — representations that were false or made with reckless disregard for their truth, given that the G DAO Treasury Wallet ultimately held less than two percent of the advertised prize pool and no prizes were ever awarded.

23.    On January 13, 2025, Akshay BD, the Chief Marketing Officer of the Solana Foundation, responded publicly on X, stating: "FYI: The Solana Foundation has nothing to do with this. Be careful, DYOR etc." The Solana Foundation confirmed it had no partnership, sponsorship, or association of any kind with the hackathon, and that its logo had been used without authorization. (*See* Exhibit H.)

24.    Despite the Solana Foundation's public denial — issued before the hackathon's January 15 launch date — Defendants launched and continued to operate the Hackathon without

correcting the false association or withdrawing the unauthorized branding. Internet Archive Wayback Machine captures confirm that the hackathon page at fundraiser.com/hackathon displayed the Solana Foundation logo on January 12, 2025, and that this logo was only removed after the Foundation's public denial. (*See* Exhibit P.)

### B. The Contest Terms

25.     Defendants, through the website fundraiser.com/hackathon, published detailed contest terms that constituted the hackathon offer. (*See* Exhibit A.) These terms included the following material representations:

26.     **Prize Pool.** Defendants represented that the total prize pool was "[o]ver 1 million dollars" and "$1M+ in prizes." Defendants specified individual prize amounts as follows:

a.     **Main Prize Pool — $800,000:** Top G Grand Prize: $500,000, "[f]or the most dominant, impactful project"; The Matrix Breaker Award: $100,000, "[f]or disruptive ideas breaking conventional boundaries"; Hustler's Runner Up Prize: $200,000, "[r]ewarding near-perfection and relentless effort."

b.     **Tracks Prize Pool — $150,000** across four categories: AI GameFi, Ponzi Innovation, Most Innovative, and Most G ("certified by Top G himself").

c.     **Special Awards — $100,000** across four categories: Most Censored Product, Hustler's Tool, Concierge/Planning Tool, and Trench Scanner Tool.

d.     **Additional Incentives — $50,000** for Early Bird Submission Rewards and Participation Grants. (*See* Exhibit B.)

27.     **Judging Criteria.** Defendants specified that projects would be evaluated based on "[a] variety of factors including product demo and pitch, business viability, AI models used, Solana integrations, potential impact, traction and marketing and innovation (bonus for integrating sponsor solutions and open-sourcing projects)." (*See* Exhibit C.)

28.     **Judging Process.** Defendants stated that the hackathon would proceed in three rounds: "Round 1: Undergrad (Hustlers Round): Open submission. Round 2: Graduate: Vetted projects showcased. Round 3: PhD: Winners finalized and featured."

29.    **Winner Announcement.** Defendants stated that winners would be announced "[a]pproximately two weeks after the hackathon ends."

30.    **Timeline.** The hackathon launched on January 15, 2025, with an original submission deadline of January 30, 2025. The deadline was later extended to February 15, 2025, as reflected in a banner stating: "Extended to Feb 15th. Online hackathon. $1M+ in prizes." (*See* Exhibit A.)

31.    **IP Ownership.** Defendants represented: "It's 100% yours. You and/or your team retain complete responsibility for your idea and project IP."

32.    **Submission Process.** Defendants directed participants to submit hackathon projects through the fundraiser.com/hackathon page, where a "Submit your project" button routed participants to a Google Form hosted at docs.google.com. The Google Form required participants to provide their Project Name, Team Name, primary contact information (Telegram, Twitter, and email), a description of the project, the problem the project solves, details of Solana blockchain integration, AI models and technologies used, and a link to a project demo or prototype. The form included an Intellectual Property Agreement stating: "Do you agree that the project submission remains 100% owned by you or your team?" — to which participants were required to agree. The form also included an Eligibility Confirmation. The Google Form's header described the contest as "the fundraiser.com/hackathon Solana AI Hackathon" and directed participants to a Telegram channel at t.me/ai_g_hackathon — titled "AI-G Hackathon" — for updates on whether their project was selected. (*See* Exhibits AC, AB.) The Google Form thus collected detailed disclosures of each participant's intellectual property — including project descriptions, technical architecture, AI implementation details, and links to working prototypes — while representing that participants would retain full ownership of their submissions. (*See* Exhibit Z.) Notably, the Google Form did not require a Real World username, did not include an identity-verification directive, and did not reference The Real World in any field — confirming that the hackathon submission process and the investment application page at fundraiser.com/apply were separate mechanisms within the same ecosystem.

32a.    **Investment Application Page Within Defendants' Ecosystem.** Separately, Defendants operated an investment application page at fundraiser.com/apply within the same

hackathon ecosystem. The fundraiser.com/apply page invited users to share their business ideas with Tate in the hope that he would invest, and required users to provide their full name, country of residence, email address, and "The Real World Username," and to upload a PDF pitch deck. Beneath this form, a warning stated: "After Submitting You Will Be Required To Log Into The Real World To Verify Identity." (*See* Exhibit F.) The fundraiser.com/apply page also displayed a "THE REAL WORLD STUDENT EXCLUSIVE PERIOD" banner and live purchase notifications for The Real World subscriptions. The Real World is a paid subscription platform within Defendants' ecosystem that Defendant New Era holds itself out as operating. At the time of the hackathon, access to The Real World required the creation of a paid account at a cost of approximately $49.99 per month, billed on a recurring basis until canceled. The fundraiser.com/apply page was part of the same domain and ecosystem as the hackathon, and its identity-verification directive and Real World username requirement demonstrate that New Era's platform was deeply integrated across the fundraiser.com ecosystem. Together, the Google Form hackathon submission and the fundraiser.com/apply investment application operated as parallel data-collection mechanisms within a single integrated commercial ecosystem, each extracting distinct forms of intellectual property and personal data from participants.

### C. The Scale and Organization of the Contest

33.    The Hackathon was not a casual or informal event. It exhibited hallmarks of deliberate commercial organization: (a) a prize pool exceeding $1,000,000 distributed across more than a dozen defined categories; (b) a dedicated website with professional design, navigation menus, sponsor sections, and FAQ; (c) a separate pitch deck hosted on a subdomain (deck.fundraiser.com/aideck); (d) a hackathon submission page at fundraiser.com/hackathon routing to a Google Form for project submissions, and a separate investment application page at fundraiser.com/apply requiring pitch deck uploads in PDF format; (e) named sponsors including Defendants' platform The Real World; (f) a three-round judging process with defined criteria; (g) a dedicated project showcase page; and (h) active social media promotion through a verified X/Twitter account. The scale and specificity of this infrastructure reflects a deliberate commercial undertaking. (*See* Exhibits A through L.)

33a.    **Scheme Overview.** The structure of the Hackathon, viewed in its totality, operated as an integrated acquisition funnel that extracted economic value from participants at each step while promising — but never delivering — over $1,000,000 in prizes. At the first stage, Defendants published specific prize representations, detailed judging criteria, and a two-week winner announcement timeline on the fundraiser.com/hackathon website to induce skilled developers to invest weeks of labor creating functional AI projects. At the second stage, participants submitted projects through a Google Form accessible via fundraiser.com/hackathon, providing detailed project descriptions, technical architecture disclosures, AI implementation details, and links to working prototypes. Separately, the investment application page at fundraiser.com/apply — part of the same ecosystem — collected additional intellectual property from applicants, including written business ideas and pitch deck PDFs, while requiring identity verification through Defendants' paid platform The Real World. Together, these parallel portals delivered project-level and business-level intellectual property and personal identifying information directly to Defendants. At the third stage, submitted projects were displayed on the hackathon showcase page, providing Defendants with a continuously updated portfolio of AI project content that served as promotional marketing material for fundraiser.com's venture capital platform — which separately advertises a "$50M fund" with "$20k - $1M investment allocation per project" and invites visitors to "Apply For Investment From Andrew Tate & The War Room." (*See* Exhibit I.) Through this structure, Defendants obtained: skilled development labor at prevailing market rates; original intellectual property in two forms; promotional project content displayed for over twelve months; and social media engagement expanding the reach of Defendants' brands — all without funding the prize pool at more than two percent of the advertised amount. The hackathon page publicly displayed a "G DAO Treasury Wallet" as the prize fund repository; on-chain records reveal that this wallet contained less than two percent of the advertised prize pool in liquid assets and has never signed an outgoing transaction. (The full wallet analysis is set forth in Paragraph 44(d).) Defendants thus collected all the benefits of participant performance while the sole identified prize fund held less than two percent of the promised amount and without performing any contest obligations. Each Defendant benefited from this funnel: Doe Defendant 1 received project submissions, website traffic, and venture

capital platform credibility; New Era received subscriber engagement and brand exposure through its Main Sponsor designation and the "Student Exclusive Period" promotion; Tate's personal brand trademarks served as the hackathon's naming convention while his personal promotion drove participation; and Thrifty and Legendary distributed the platform that served as the hackathon's designated Main Sponsor. (*See* Exhibits A through G, I, L.)

### D. Plaintiff's Participation (Nevada)

34.     Plaintiff learned of the Hackathon while located in North Las Vegas, Nevada, through Defendants' website and social media promotion.

35.     In reliance on Defendants' published contest terms — including the specific prize amounts, judging criteria, and winner announcement timeline — Plaintiff, while located in North Las Vegas, Nevada, invested approximately 200 hours over a period of approximately four weeks developing an artificial intelligence project titled "Bangchain." The contest's published judging criteria required projects to demonstrate a functional product demo and pitch, business viability, AI model integration, Solana blockchain integrations, and potential impact. To satisfy these requirements, Plaintiff designed, developed, tested, and deployed a working AI application with Solana blockchain functionality. The Bangchain *project* — as distinct from the Bangchain *token* discussed in Paragraph 44(m)–(n) — was an internet-connected AI platform that enabled users to remotely control a physical device over the internet, using cryptocurrency as a payment barrier. Specifically, users could spend approximately 1,000 $BANGCHAIN tokens (approximately $15.30 at the token's all-time high price of $0.0153) to interact with and test the device's functionality in a live use case. Approximately five to ten users paid to use the project's functionality-testing platform with $BANGCHAIN cryptocurrency during the development and testing period. The project incorporated the $BANGCHAIN token — which had been independently minted by an unknown third party on January 30, 2025 — as its payment mechanism because the token was associated with the Bangchain project name and had gained market attention following the Tate-Issa promotional activity described in Paragraph 44(h)–(k). Plaintiff prepared project presentation materials, including a pitch deck presenting the project's technical architecture and business case, to satisfy the contest's announced judging

criteria requiring a "product demo and pitch." Plaintiff relied on the representations published on the hackathon website itself, which at no time displayed any correction, disclaimer, or notice that the Solana Foundation had denied involvement. Plaintiff incurred direct out-of-pocket costs including cloud computing resources, development tools, and Solana integration resources in developing Bangchain and preparing project presentation materials consistent with the announced judging criteria.

36.     Prior to the extended deadline of February 15, 2025, while located in North Las Vegas, Nevada, Plaintiff submitted Bangchain through Defendants' designated hackathon submission process at fundraiser.com/hackathon, which routed to a Google Form where Plaintiff provided the project description, technical details, and a link to the working prototype. (*See* Exhibit Z.) Plaintiff had previously subscribed to The Real World for brief periods in approximately November 2022 and March 2024, each time for approximately one month, but both prior subscriptions had lapsed voluntarily after approximately one month each, and Plaintiff had maintained no active subscription for approximately ten months before the hackathon was announced. (*See* Exhibit Y.) The hackathon was the but-for cause of Plaintiff's January 2025 re-subscription: Plaintiff would not have purchased a new subscription absent the hackathon, as demonstrated by the ten-month lapse during which Plaintiff determined the educational content alone was not worth maintaining a subscription. In connection with the hackathon, Plaintiff purchased a new subscription to The Real World platform at a cost of approximately $49.99 per month.

37.     Plaintiff's submission was timely, made before the extended deadline of February 15, 2025.

38.      But for Defendants' representations regarding the prize pool and contest terms, Plaintiff would not have invested the time and resources required to develop and submit Bangchain. Plaintiff would have devoted those resources to other productive endeavors, including other hackathons, freelance development work, and independent project development.

38a.     The Hackathon was structured as an inducement mechanism designed to extract substantial economic value from participants without compensation. The promise of over $1,000,000 in prizes served as the inducement that caused Plaintiff to develop Bangchain and

caused other developers to create functional AI projects, generate content for Defendants' platform, promote Defendants' brands through social media engagement, drive traffic to Defendants' ecosystem, and increase the perceived legitimacy of Defendants' venture capital and educational platforms. Contrary to any characterization of the contest as "free," the contest required participants to provide consideration of substantial value: weeks of skilled development labor at the prevailing market rate of approximately $150 per hour, original intellectual work product submitted for Defendants' public display, personal data provided to Defendants' commercial ecosystem, and promotional activity that drove traffic and engagement to Defendants' ecosystem. Each of these forms of consideration conferred direct, measurable economic benefits on Defendants — including twelve months of promotional content displayed on the showcase page and social media engagement that expanded the reach of Defendants' brands. Defendants received the full benefit of Plaintiff's performance while performing none of their reciprocal obligations.

### E. Defendants' Complete Failure to Perform

39.    The Hackathon submission period closed on February 15, 2025. Under Defendants' own stated terms, winners were to be announced approximately two weeks after the hackathon ended — i.e., on or about March 1, 2025.

40.    March 1, 2025 passed without any announcement of winners.

41.    As of March 10, 2025 — approximately three and a half weeks after the submission deadline — Plaintiff reviewed the hackathon website from North Las Vegas, Nevada and confirmed that no winners had been announced. The project showcase page (fundraiser.com/hackathon/showcase) displayed Plaintiff's submission "Bangchain" as the first-listed project, alongside only one other submission ("BrokieAI") and seven placeholder entries marked "Coming Soon." No winners were designated. (*See* Exhibit G.)

42.    As of the date of this Complaint — more than twelve months after the submission deadline and more than twelve months after the stated winner-announcement date — Defendants have still not announced any winners, conducted the three-round judging process, or paid any portion of the advertised prize pool to any participant.

43. As of the date of this Complaint — more than twelve months after the submission deadline — the hackathon website at fundraiser.com/hackathon remains live and continues to display the prize amounts and contest terms, including the "$1M+ in prizes" banner, the G DAO Treasury Wallet address, and the full prize pool breakdown. The project showcase page at fundraiser.com/hackathon/showcase continues to display Plaintiff's Bangchain as the first-listed entry, alongside only one other genuine submission ("BrokieAI") and seven placeholder entries marked "Coming Soon." The investment application page at fundraiser.com/apply remains active and continues to require "The Real World" identity verification. Defendants have used Plaintiff's project as the primary display content on the showcase page for more than twelve months, effectively marketing the quality of contest submissions to visitors without compensating Plaintiff, without conducting any judging, and without fulfilling any contest obligations. Internet Archive Wayback Machine captures confirm that Plaintiff's Bangchain appeared on the showcase page as early as January 30, 2025. (*See* Exhibits A through G, P.) The hackathon website has remained live with all prize representations intact, no winners announced, and Plaintiff's project continuously displayed for more than twelve months after the submission deadline. (*See also* Paragraph 44(g).)

### F. Additional Circumstances Surrounding the Contest

44. The following facts, taken together, support a strong inference that the Hackathon was operated as a deceptive scheme to generate promotional value and data rather than as a genuine prize contest, and that Defendants lacked both the intent and the capacity to pay the advertised prizes:

a. Defendants used the Solana Foundation's logo without authorization to lend credibility to the hackathon. The Foundation publicly denied any involvement on January 13, 2025 — before the hackathon even launched — yet the hackathon proceeded. (*See* Exhibit H.)

b. More than twelve months have passed since the submission deadline with no winners announced, no judging conducted, and no prizes paid.

c.   The project showcase page shows only two real submissions — Plaintiff's Bangchain and one other — alongside seven placeholder entries, suggesting minimal genuine participation and no actual evaluation process. (*See* Exhibit G.)

d.   The "G DAO Treasury Wallet" published on the hackathon page — Solana blockchain address 55ZBpYaDnpd9QyENdyVrkYWkm76ee15WRnLaKEDwS7Xq — has never signed an outgoing transaction in its entire on-chain history. The wallet's recorded transactions are all incoming transfers; no SOL, no tokens, and no funds of any kind have ever been sent from this wallet. The wallet's liquid holdings consist of approximately 0.994 SOL (approximately $130–$150) and 16,383.46 USDC — a total of approximately $16,513 in liquid value, representing less than two percent of the advertised $1,000,000+ prize pool. The remaining 35 token holdings are composed of 27 pump.fun memecoins and 8 unidentified custom tokens, none of which, as of the date of Plaintiff's review, had an active trading pair or discernible market liquidity. The wallet was first activated on February 4, 2025 — after the hackathon had already launched — and its last activity other than unsolicited inbound token deposits occurred on or about August 3, 2025. No outgoing transactions consistent with prize distributions have been recorded, and the wallet has been completely dormant since August 2025. The G DAO Treasury Wallet was the only prize fund repository identified anywhere on the hackathon website; no other wallet address, bank account, escrow arrangement, or funding mechanism was disclosed to participants. The complete absence of any alternative prize fund, combined with the wallet's creation eleven days before the submission deadline and its total absence of outgoing transactions, supports the inference that Defendants never allocated funds sufficient to pay the advertised prizes. (*See* Exhibits K, O.)

e.   The investment application page at fundraiser.com/apply — part of the same ecosystem as the hackathon — required users to provide a "Real World Username" and directed: "After Submitting You Will Be Required To Log Into The Real World To Verify Identity." This page also displayed a "THE REAL WORLD STUDENT EXCLUSIVE PERIOD" banner, demonstrating that Defendants' paid subscription platform The Real

World (approximately $49.99 per month) was deeply integrated throughout the fundraiser.com ecosystem. (*See* Exhibit F.)

f.   The entity operating fundraiser.com markets itself as a venture capital platform claiming a "$50M fund" with "$20k - $1M investment allocation per project." Despite claiming to operate a $50M venture capital fund, Doe Defendant 1 failed to fund the $1,000,000 prize pool, failed to conduct any judging, and failed to award any prizes for more than twelve months. (*See* Exhibit I.)

g.   More than twelve months after the submission deadline, the hackathon website at fundraiser.com/hackathon remains live, continuing to display all prize representations, the G DAO Treasury Wallet address, the project submission mechanisms, and Plaintiff's Bangchain as the first-listed showcase entry — yet no winners have been announced, no judging has occurred, and no prizes have been paid. The continued publication of unfulfilled prize promises for over a year is consistent with the website serving an ongoing promotional purpose unrelated to any genuine contest. Because Plaintiff's Bangchain project shares its name with the Bangchain cryptocurrency token described in Paragraph 44(m), the project's continued first-position display on the live showcase page keeps public attention directed toward the associated token, providing an ongoing promotional vehicle that sustains market awareness of the cryptocurrency while Defendants never announce winners or pay prizes. (*See* Exhibits A through G, P.)

h.   On January 30, 2025 — the same day Plaintiff's Bangchain appeared on the hackathon showcase page — Andrew Tate, CEO of Defendant New Era, sent a direct message to Bryan Mitchell (Plaintiff's brother) on the X/Twitter platform. Tate's message stated: "Hey bro," followed by "Head of hackathon wants to reach out," and "whats your telegram." Bryan Mitchell provided his Telegram contact information. Tate then confirmed: "sent you a msg ;)." (*See* Exhibits S, X.) The CEO of Defendant New Era thus personally initiated a chain of communication to the brother of a hackathon participant on the same day that participant's project was showcased.

i.   Within minutes of Tate's X direct message, a Telegram user identified as "Issa" (associated with the X/Twitter account @issathecooker) contacted Bryan Mitchell on

Telegram, stating: "gm," "i'm issa," and "andrew told me to text you." Issa informed Bryan Mitchell that his project would be added to the fundraiser.com hackathon showcase, stating: "You've locked your tokens so we will be adding Orifice to the fundraiser.com/hackathon product showcase." ("Orifice" was an alternate working name used during the development of the Bangchain project.) Issa shared a link to the hackathon page, which at the time still displayed the Solana Foundation logo. Issa identified himself as "x.com/issathecooker," stated that he "made $DADDY," and claimed to have "handled a lot of very successful CTOs." (*See* Exhibits T, X.)

j.      Issa then orchestrated a promotional campaign around the Bangchain token, instructing Bryan Mitchell to: (1) "lock up the rest of [his] tokens"; (2) "announce Twitter spaces" and "do a space in 30 minutes"; (3) discuss "the future of orifice AI, what you guys are doing, what you have done"; and (4) create market excitement. Issa stated: "I'll have Andrew join" the Twitter Space, but instructed: "Don't say andrew's gonna join" and "Just let that come naturally." Issa later provided detailed instructions: "Do the space / Keep recording on / Start space talking about who you are, what this project is / What the future is for your project / Andrew will join mid way through, invite him on, you guys will talk / Then end the space on a high note, make people bullish." (*See* Exhibits T, X.)

k.      Bryan Mitchell proceeded with the Twitter Space announcement as directed. The Space experienced technical difficulties and crashed. A screenshot embedded in the Telegram conversation shows messages from "Tate" to Issa, in which Tate stated: "join his space for 5 mins," "tell him his product is HARAM," "yet efficient," and "it'll be really funny." These messages demonstrate that Tate was actively coordinating promotional activity around a cryptocurrency token — minted that same day by an unknown third party bearing the name of a hackathon participant's showcased project (*see* Paragraph 44(m)) — in real time. (*See* Exhibits T, X.) The following day, January 31, 2025, Tate publicly endorsed the Bangchain project on the X/Twitter platform. Bryan Mitchell (@prince_of_fakes) posted a screenshot of the PROJECT SHOWCASE page at fundraiser.com/hackathon/showcase featuring Bangchain as the first-listed project, and

Tate (@Cobratate) publicly replied: "This product is perfect for the average crypto trader tbh." Tate's reply received 71,400 views, 488 likes, and 84 retweets. (*See* Exhibits W, X.) Tate's characterization of a hackathon submission as "perfect for the average crypto trader" — rather than as an AI project submitted for judging — is consistent with the project being promoted as a cryptocurrency trading opportunity rather than evaluated as a hackathon entry.

l.    Publicly available blockchain data and independent investigations confirm that Issa (@issathecooker) is the verified developer of the "Daddy Tate CTO" ($DADDY) token on the Solana blockchain. A June 2024 investigation by Bubblemaps — a leading blockchain analytics firm — confirmed that Issa launched $DADDY on June 9, 2024, and documented that eleven wallets funded through Binance purchased significant $DADDY supply before Tate's first promotional tweet, that approximately 40% of the token supply was airdropped to Tate's public wallet, and that Issa profited over $400,000 from the token while publicly denying any sales. (*See* Bubblemaps, "Unmasking the Daddy Token," blog.bubblemaps.io (June 2024).) In January 2025 — the same month as the hackathon and the communications at issue — approximately 80% of $DADDY's supply was "rugged" (i.e., liquidated in a coordinated sell-off) after Tate and Issa coordinated a promotional stream. Issa has been publicly documented as participating in the launch and promotion of multiple Tate-associated tokens that followed a pump-and-dump pattern, including $DADDY, $G, $BRUV, and $RNT.

m.    The Bangchain AI token on the Solana blockchain (mint address 8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump) was minted on January 30, 2025 — the exact same day as the Tate direct message and Issa's Telegram communications — by an unknown individual. Neither Plaintiff Anthony Mitchell nor Bryan Mitchell minted or created the token. Upon information and belief, an unknown third party minted the Bangchain AI token and sent a percentage of the token supply to Bryan Mitchell. The token's listing on DexScreener and GeckoTerminal displays @prince_of_fakes as its associated Twitter account. The handle @prince_of_fakes is Bryan Mitchell's pre-existing personal X/Twitter account; it was not created for, and has

no connection to, the minting or launch of the Bangchain token. Upon information and belief, the unknown minter unilaterally set Bryan Mitchell's handle as the token's social media without Bryan Mitchell's knowledge, authorization, or involvement. The token has a total supply of 1,000,000,000 (one billion) tokens. The token hit its all-time high price of $0.0153 on its first day of trading (January 30, 2025) — representing a peak market capitalization of approximately $15,300,000 — and subsequently crashed approximately 99.6%, consistent with a pump-and-dump pattern. GeckoTerminal reports that 15.33% of the token supply was purchased through "bundled buys" — a technique in which multiple wallets simultaneously purchase tokens in the same blockchain transaction block before retail traders can access the token, a well-documented indicator of insider pre-positioning. As of the date of this filing, the token trades at approximately $0.0000645 — representing a total market capitalization of approximately $64,500 — a near-total loss for retail purchasers. (*See* Exhibits U, X.)

n.     Bryan Mitchell is Plaintiff's brother. Bryan Mitchell assisted Plaintiff with certain aspects of the Bangchain project. Bryan Mitchell's personal X/Twitter account is @prince_of_fakes; this handle predates the Bangchain project and has no connection to the minting or creation of the Bangchain token. Plaintiff Anthony Mitchell is the developer who created the Bangchain hackathon submission — the internet-connected AI platform described in Paragraph 35. The Bangchain *project* was the functional AI application submitted through the hackathon submission process at fundraiser.com/hackathon as a hackathon entry. The Bangchain *token*, however, is the separate instrument described in Paragraph 44(m) — minted by an unknown individual, not by Plaintiff or Bryan Mitchell. Plaintiff subsequently incorporated the $BANGCHAIN token into the project as its payment mechanism because the token bore the project's name, was rising in value, and had gained attention from Tate and Issa through the promotional activity described in Paragraphs 44(h)–(k). Upon information and belief, a percentage of the minted token supply was sent to Bryan Mitchell by the unknown minter. Issa then instructed Bryan Mitchell to "lock up the rest of [his] tokens" (*see* Exhibit T; Paragraph 44(j)). As set forth in Paragraph 44(m), the token's price

history — including its first-day peak and subsequent 99.6% decline — is consistent with a pump-and-dump pattern. Plaintiff Anthony Mitchell did not participate in or authorize any bundled token purchases, coordinated trading activity, or pump-and-dump scheme involving the Bangchain token. The 15.33% of bundled buys identified in the token's transaction history were not initiated by or attributable to Plaintiff or Bryan Mitchell. Plaintiff alleges the Tate-Issa communications and the Bangchain token's price history as evidence of Defendants' intent and modus operandi — specifically, that the hackathon showcase was used as a promotional vehicle to generate attention for token trading activity coordinated by persons associated with the hackathon organizers, rather than as part of a genuine contest. (*See* Exhibit X.)

o.       The temporal coordination of these events — Tate's direct message, Issa's immediate Telegram contact, the showcase listing, the orchestrated Twitter Space, and the token's creation and price spike on January 30, 2025, followed by Tate's public endorsement of the Bangchain project as "perfect for the average crypto trader" to an audience of 71,400 viewers the next day, January 31, 2025 (*see* Exhibit W) — supports the inference that the hackathon showcase was used as a vehicle to generate attention and market activity for tokens associated with participant projects, rather than as part of a genuine judging process. Tate's own public characterization of the project as a "crypto trader" product — rather than as an AI or hackathon project — is a party-opponent admission under FRE 801(d)(2) that reveals the hackathon's true purpose as a vehicle for cryptocurrency promotion rather than legitimate AI innovation. The involvement of Issa, a person with a documented history of coordinating pump-and-dump token schemes with Tate, further supports the inference that the hackathon's true purpose was to generate promotional value and facilitate token market manipulation rather than to award legitimate prizes. Moreover, Defendants' continued display of Plaintiff's Bangchain project as the first-listed showcase entry for more than twelve months after these events extends the promotional apparatus: because the project shares its name with the Bangchain token, the showcase page operates as a persistent, publicly accessible advertisement that keeps attention directed toward the associated cryptocurrency,

effectively continuing the pump-and-dump scheme's promotional infrastructure on an ongoing basis while Defendants never announce winners or distribute prizes.

p. The official hackathon pitch deck, hosted at deck.fundraiser.com/aideck, contains a "TEAM" section that displays three identical placeholder entries: each shows "???" in place of a photograph, "Coming Soon" in place of a name, and "Coming Soon" in place of a description. No actual judge, organizer, or team member is identified anywhere in the pitch deck. A contest that purported to conduct a three-round judging process evaluating projects on "product demo and pitch, business viability, AI models used, Solana integrations, potential impact, traction and marketing and innovation" never identified a single person who would perform that evaluation. The absence of any identified judging team — in the very document used to promote the hackathon to prospective participants — supports the inference that Defendants never intended to conduct genuine judging. (*See* Exhibit D.)

q. The same pitch deck contains a "TREASURY WALLET" section that states: "Developers can send tokens to our treasury wallet to grab attention. The treasury tracks high-value tokens, fostering a playful competition and bolstering our event's prestige." The wallet address is listed as "Coming Soon" with the notation "Launching at Event Start." This section reveals that the stated purpose of the G DAO Treasury Wallet was to *receive* tokens from developers seeking to "grab attention" — not to fund or distribute prizes. The pitch deck thus characterizes the wallet as an incoming token collection mechanism, not an outgoing prize distribution fund. This characterization is consistent with the wallet's on-chain history, which shows only incoming transfers and zero outgoing transactions. (*See* Exhibit D; ¶ 44(d).)

r. As of the date of this Complaint, the project showcase page at fundraiser.com/hackathon/showcase displays a disclaimer stating: "None of the featured projects on this page are endorsed by the HACKATHON G-AI. They just participated in the hackathon, they can turn out to be a scam or spam project. DYOR." This disclaimer demonstrates that: (i) Defendants continue to actively maintain and update the showcase page more than twelve months after the submission deadline; (ii) Defendants disclaim

any endorsement of the very projects they solicited, received, and continue to display as promotional content; and (iii) Defendants warn visitors that projects on the page may be a "scam or spam," while Defendants' own contest — which promised over $1,000,000 in prizes and never delivered any — remains the subject of this action. (*See* Exhibit G.)

### G. Defendant New Era's Operational Role

45.    Defendant New Era's involvement in the Hackathon was not passive sponsorship. New Era participated in the operation of the hackathon in at least the following respects:

a.    **Ecosystem Integration and Main Sponsor Designation.** New Era's platform The Real World was designated as "Main Sponsor" of the hackathon. (*See* Exhibit L.) The investment application page at fundraiser.com/apply — part of the same ecosystem as the hackathon — required a "Real World Username" and directed users: "After Submitting You Will Be Required To Log Into The Real World To Verify Identity" (*See* Exhibit F), demonstrating that New Era's platform was deeply embedded throughout the fundraiser.com ecosystem. The Real World is a proprietary platform with proprietary authentication — the integration of Real World identity verification into the fundraiser.com/apply page required New Era's technical cooperation and authorization. Upon information and belief, Doe Defendant 1 could not have implemented this integration without New Era's knowledge and consent. The hackathon's competition rounds — "Undergrad (Hustlers Round)," "Graduate," and "PhD" — directly mirror The Real World's membership tier structure, further demonstrating that the contest was designed in coordination with New Era's commercial platform.

b.    **Main Sponsor.** The Real World was listed as a "Main Sponsor" of the hackathon, with its logo (filename: therealworld.png) physically hosted on the fundraiser.com server. (*See* Exhibit L.) The "Main Sponsor" designation was not an unauthorized use of New Era's brand by Doe Defendant 1 — it was authorized by New Era through multiple independent channels of affirmative conduct that make unauthorized use factually implausible: (i) the logo file was uploaded to fundraiser.com's infrastructure, which required someone with access to New Era's proprietary logo assets to provide the file;

(ii) the hackathon's entire competitive structure was organized around New Era's membership tiers ("Hustlers Round," "Graduate," "PhD"), a level of coordinated design that could not have occurred without New Era's knowledge and participation; (iii) the fundraiser.com/apply page required identity verification through New Era's proprietary platform and a "Real World Username" — a technical integration requiring New Era's API access, authentication infrastructure, and authorization; (iv) New Era's CEO personally promoted the hackathon in a produced video, personally claimed "I decided to put together this hackathon," and personally pledged to fund it, confirming that the entity's highest officer authorized its involvement; and (v) the fundraiser.com and university.com (New Era) domains share the same Cloudflare nameserver pair, indicating common administrative control over the infrastructure on which the "Main Sponsor" designation appeared. No entity would permit its proprietary authentication system to be integrated into a third-party website, its CEO to claim personal authorship of the event, its brand name to be displayed as "Main Sponsor," and its membership tiers to serve as the contest's competitive framework without authorizing the sponsorship designation. If the designation were unauthorized, New Era's obvious and immediate remedy would have been to demand its removal — yet New Era took no such action at any point during the hackathon or in the twelve months since.

c.    **Participant Recruitment.** The apply page banner advertised "THE REAL WORLD STUDENT EXCLUSIVE PERIOD," indicating that New Era used its subscriber base — students of The Real World — to recruit hackathon participants, restricting at least one phase of the contest to New Era's paying subscribers. (*See* Exhibit F; Wayback Machine capture, Sep. 27, 2024.)

d.    **CEO's Personal Promotion and Sponsorship Claim.** Andrew Tate, New Era's CEO, personally promoted the hackathon through a video posted on the X platform on January 13, 2025, in which he stated: "I decided to put together this hackathon — unprecedented, never done before — over a million dollars in prizes" and "I'll be sponsoring everything myself via fundraiser.com." (*See* Exhibit V.) Tate thus personally claimed both authorship of and financial responsibility for the hackathon, directing

viewers to fundraiser.com/hackathon to participate. The hackathon's naming conventions — "Top G Grand Prize," "Most G" category, prizes "certified by Top G himself" — derive directly from the personal brand of New Era's CEO, further indicating that the hackathon was an extension of New Era's commercial enterprise. On January 31, 2025, Tate publicly endorsed a hackathon project on X/Twitter as "perfect for the average crypto trader" — characterizing the project not as an AI innovation but as a cryptocurrency trading product — in a post viewed 71,400 times. (*See* Exhibit W.)

e.  **Shared Infrastructure.** The domains fundraiser.com and university.com (operated by New Era) share the same Cloudflare nameserver pair, indicating common administrative control. New Era's mail servers are authorized to send email on behalf of related domains through shared SPF DNS records. Three of the four core domains share the same Zoho mail servers, and the fourth authorizes Zoho for outbound email via SPF records. (*See* Exhibit R.)

f.  **CEO's Direct Coordination of Promotional Activity.** On January 30, 2025, Andrew Tate — the CEO of Defendant New Era — personally sent a direct message on the X platform to Bryan Mitchell, the brother of Plaintiff Anthony Mitchell, stating that "Head of hackathon wants to reach out" and requesting Bryan Mitchell's Telegram contact information. (*See* Exhibits S, X.) Within minutes, a Telegram user named "Issa" — whom independent blockchain investigations have identified as the developer of multiple Tate-associated pump-and-dump tokens — contacted Bryan Mitchell on Telegram, confirmed that "andrew told me to text you," and coordinated promotional activity around the Bangchain token, including orchestrating a Twitter Space in which Tate was scheduled to participate. (*See* Exhibits T, X.) This direct, personal involvement by New Era's CEO in coordinating promotional activity around a cryptocurrency token minted by an unknown third party bearing the name of a hackathon participant's showcased project (*see* Paragraph 44(m)) — on the same day that project appeared on the showcase — demonstrates that New Era's leadership was not merely aware of the hackathon but actively directing its operations. The following day, January 31, 2025, Tate publicly endorsed the Bangchain project on X/Twitter, replying to a post featuring

the hackathon showcase page: "This product is perfect for the average crypto trader tbh." (*See* Exhibit W.) New Era's CEO was thus publicly promoting individual hackathon submissions as crypto trading products — not evaluating them as contest entries — further demonstrating New Era's operational role in the promotional scheme.

46.     These facts demonstrate that New Era's involvement in the hackathon extended beyond passive sponsorship to operational participation and active coordination. Plaintiff will seek targeted discovery to determine the full scope of New Era's involvement in the hackathon's administration.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## Breach of Contract (Unilateral Contest Contract)

## (Against All Defendants)

47.     Plaintiff repeats and realleges Paragraphs 1 through 10b (Introduction and The Parties), 14 (Forum-Selection Clause Inapplicability), 25 through 38a (Contest Terms and Plaintiff's Participation), 39 through 43 (Defendants' Complete Failure to Perform), and 45 through 46 (Defendant New Era's Operational Role) as if fully set forth herein.

48.     Doe Defendant 1, as the operator of the fundraiser.com website and the @fundraiser_com X/Twitter account, was the primary offeror of the contest: Doe Defendant 1 published the contest terms, specified the prize amounts totaling over $1,000,000, established the judging criteria and timeline, created and operated the hackathon submission page at fundraiser.com/hackathon (which routed submissions to a Google Form) and the investment application page at fundraiser.com/apply, displayed submitted projects on the showcase page, and published the G DAO Treasury Wallet as the designated prize fund. Doe Defendant 1 was the entity with the most direct contractual nexus to Plaintiff: it was Doe Defendant 1 that formulated the specific terms of the offer, specified the consideration required of participants (development and submission of a qualifying AI project), designated the method of acceptance (submission through the Google Form accessible via fundraiser.com/hackathon), and received

Plaintiff's acceptance (the submitted Bangchain project and accompanying materials). Doe Defendant 1 was the offeror in every sense recognized by Nevada contract law: it published the terms, controlled the portal, received the performance, and displayed the results. Defendants Tate and New Era were co-offerors who joined the offer through their personal sponsorship commitments, operational participation, and brand integration as alleged herein. Through the Hackathon, Defendants made a public offer to award specified prizes to participants who developed and submitted qualifying AI projects in accordance with the published contest terms. This public offer constituted an offer for a unilateral contract. Under Nevada law, a promotional prize offer creates a binding contractual obligation enforceable by participants who perform. *Las Vegas Hacienda, Inc. v. Gibson*, 77 Nev. 25, 359 P.2d 85 (1961). *See also* Restatement (Second) of Contracts § 45; *Cobaugh v. Klick-Lewis, Inc.*, 561 A.2d 1248 (Pa. Super. 1989); *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 793 (9th Cir. 2012).

49.     Plaintiff accepted Defendants' offer by performing the acts requested: developing Bangchain — a qualifying AI project — in North Las Vegas, Nevada, preparing project materials, and submitting the project through the Google Form at Defendants' designated hackathon page at fundraiser.com/hackathon, all before the February 15, 2025 deadline. Plaintiff's commencement of performance created an option contract that Defendants could not revoke. Restatement (Second) of Contracts § 45(1). Defendants' receipt of Plaintiff's performance is confirmed by the display of Bangchain as the first-listed project on the hackathon showcase page. Doe Defendant 1's receipt of Plaintiff's submission through the hackathon submission process at fundraiser.com/hackathon that Doe Defendant 1 itself created and operated constituted Doe Defendant 1's receipt of Plaintiff's acceptance; by designating the portal as the exclusive method of submission, Doe Defendant 1 specified the mode of acceptance, and Plaintiff's use of that mode completed the acceptance as to Doe Defendant 1. Under the law of unilateral contest contracts, the offeror specifies the method of acceptance and the required consideration; the participant need only perform accordingly. *See Las Vegas Hacienda, Inc. v. Gibson*, 77 Nev. 25, 359 P.2d 85 (1961).

50.     Plaintiff's performance constituted valid acceptance and adequate consideration, creating a binding contractual obligation on Defendants' part to: (a) evaluate Plaintiff's

submission pursuant to the announced judging criteria; (b) conduct the three-round judging process; (c) announce winners within approximately two weeks after the submission deadline; and (d) pay prizes to qualifying winners. Plaintiff provided consideration by investing approximately 200 hours of skilled development labor creating a qualifying AI project in accordance with the contest's announced specifications — the very performance the contest was designed to elicit. This constitutes the full performance requested by the offer and satisfies the consideration requirement. A unilateral contest contract specifies its own method of acceptance and its own consideration; here, Defendants specified submission through the hackathon page (acceptance) and development of a qualifying AI project (consideration), and Plaintiff performed both. *See* Restatement (Second) of Contracts §§ 45, 71; *Las Vegas Hacienda*, 77 Nev. at 29.

51.     Defendants breached the contract by wholly failing to perform any of their obligations: they did not conduct the three-round judging process, did not announce winners within approximately two weeks (or at any time within twelve months), and did not pay any prizes to Plaintiff or, upon information and belief, to any other participant. This was total non-performance, not the exercise of discretion within the contest terms.

52.     Defendant New Era is liable for this breach because New Era was not a passive sponsor but an active co-operator of the contest. Without New Era's participation, the contest could not have functioned as designed. Specifically, New Era: (a) accepted and performed the role of "Main Sponsor," with its logo hosted on the contest website; (b) directed its own paying subscribers to participate through the "Student Exclusive Period," using the hackathon as an extension of its subscription platform to drive subscriber engagement and new registrations; (c) permitted the contest to be structured around its own product hierarchy ("Hustlers Round," "Graduate," "PhD"), demonstrating coordinated design rather than arms-length sponsorship; and (d) through its CEO, personally promoted the contest on social media and personally coordinated promotional activity around a cryptocurrency token that an unknown third party had minted bearing the name of a hackathon participant's showcased project (*see* Paragraph 44(m)) on the day that project appeared on the showcase. These facts, taken together, establish that New Era exercised operational control over essential components of the contest and used the hackathon to advance New Era's own commercial interests. As alleged in Paragraph 10 above,

New Era and Doe Defendant 1 operated the hackathon as a joint venture or integrated enterprise under common control — sharing DNS infrastructure, mail infrastructure, cross-platform integration, branding, and common management. New Era was an indispensable party to the contest's operation: the hackathon was structured around New Era's branding, directed New Era's subscribers to participate, and commercially benefited New Era through subscriber engagement. Under Nevada law, a party that provides essential operational infrastructure for a prize contest, recruits its own customers into the contest, and structures the contest around its own commercial products assumes the obligations of a contest co-operator and co-obligor. *See Las Vegas Hacienda, Inc. v. Gibson*, 77 Nev. 25, 359 P.2d 85 (1961) (contest offer creates binding obligation on the entity that operates it). New Era's conduct went beyond passive sponsorship to active co-obligation: by designating itself as "Main Sponsor," by directing its paying subscribers to participate through the "Student Exclusive Period," by structuring the contest around its own product hierarchy, and by commercially benefiting from hackathon-driven subscriber engagement, New Era assumed the obligations of a contest co-operator and thereby became a co-obligor. New Era is therefore liable not merely as a sponsor or facilitator but as a co-obligor that assumed the obligations of the unilateral contest contract. To hold otherwise would mean that a commercial entity could designate itself as "Main Sponsor" of a prize contest, direct its paying subscribers to participate, structure the contest around its own product hierarchy, commercially benefit from the contest-driven engagement, and then disclaim any contractual obligation when the contest is never performed — a result that no court applying the unilateral-contract doctrine of *Las Vegas Hacienda* would countenance. New Era's status as co-obligor is further supported by the doctrine of apparent authority: by designating itself as "Main Sponsor," by structuring the contest around its own product hierarchy, and by actively recruiting its own paying subscribers to participate through the "Student Exclusive Period" banner, New Era held itself out to participants as a principal with authority over the contest's operations and obligations. A reasonable participant would understand that an entity designated as "Main Sponsor" that structures the contest around its own platform has assumed responsibility for the contest's performance. *See* Restatement (Third) of Agency § 2.03

(apparent authority exists when a third party reasonably believes the actor has authority based on the principal's manifestations).

52a.   Defendant Tate is personally liable for this breach as a co-offeror and personal guarantor of the contest. Tate did not merely endorse or promote the hackathon; he personally assumed the obligations of an offeror through his own public statements and conduct. Specifically: (a) On January 13, 2025, Tate publicly declared to his millions of followers: "I decided to put together this hackathon" and "I'll be sponsoring everything myself via fundraiser.com" (*see* Exhibit V). These statements were not promotional puffery, not mere endorsements of another party's contest, and not aspirational expressions of future intent — they were unequivocal personal commitments by which Tate represented that he personally conceived the contest, personally organized it, and would personally fund the entire prize pool. By stating "I'll be sponsoring everything myself," Tate held himself out as the personal guarantor of the contest's performance, creating a reasonable expectation among participants — including Plaintiff — that Tate stood behind the $1,000,000+ prize pool with his personal resources and reputation. A reasonable participant who heard Tate state "I'll be sponsoring everything myself" would understand that Tate was personally undertaking an obligation to fund and deliver the prizes, not merely advertising someone else's contest. The statement "I'll be sponsoring everything myself" identifies the individual obligor (Tate), the scope of the obligation ("everything"), and the personal nature of the commitment ("myself"). The word "myself" is the first-person singular reflexive pronoun — it grammatically excludes any reading in which sponsorship is attributed to a corporate entity, a charitable foundation, or an unidentified third party. "Myself" means Tate, personally, and no one else. Combined with the future-tense verb "I'll be sponsoring," the statement is a personal undertaking of a specific financial obligation, not promotional puffery. Puffery is vague, subjective, or unverifiable; Tate's statement is none of those things — it identifies a specific obligor, a specific scope ("everything"), and a specific quantum ("over a million dollars in prizes"), each of which is concrete, verifiable, and falsifiable. This is the language of a personal guarantor, not a celebrity endorser. Under Nevada law, when an identified individual publicly states that he will personally fund a specific prize contest with enumerated dollar amounts, that statement creates a personal

contractual obligation enforceable by any participant who performs in reliance on it — because the statement supplies all elements of an offer: an identified offeror, a defined obligation, and a specified mode of acceptance (participation in the contest). Under Nevada contract law, a person who publicly holds himself out as the sponsor and funder of a prize contest assumes the contractual obligations of an offeror. *See Las Vegas Hacienda, Inc. v. Gibson*, 77 Nev. 25, 359 P.2d 85 (1961). Tate's statement constituted a personal guarantee of performance that made him a co-offeror of the unilateral contest contract alongside Doe Defendant 1 and New Era. (b) On January 31, 2025, Tate publicly endorsed a hackathon submission on X/Twitter as "perfect for the average crypto trader" in a post viewed 71,400 times (*see* Exhibit W), demonstrating that Tate continued to exercise personal authority over the contest and its participants' submissions well after the offer was made — conduct consistent with an offeror, not a passive endorser. (c) Tate served as CEO of the entity whose platform was designated as "Main Sponsor" and integrated throughout the fundraiser.com ecosystem, including through identity-verification requirements on the investment application page at fundraiser.com/apply. (d) Tate licensed or authorized the use of his personal brand trademarks as the hackathon's naming convention — the grand prize is titled "Top G Grand Prize," a track category is titled "Most G," prizes are described as "certified by Top G himself," the competition rounds mirror the tier structure of Tate's educational platform, and the fundraiser.com main page states "Apply For Investment From Andrew Tate & The War Room" and includes a navigation link to cobratate.com — Tate's personal brand website — which in turn links to The Real World. (*See* Exhibits I, J, N.) These facts, taken together, demonstrate that the hackathon was an extension of Tate's personal brand ecosystem over which he exercised direct personal control. Tate's personal sponsorship pledge, combined with his personal brand integration and ongoing personal involvement, establishes that Tate was a co-offeror of the contest — not merely a promoter — and is individually liable for breach. In addition, if New Era Learning LLC was never formally organized as a limited liability company, Tate bears personal liability for all of New Era's obligations because no corporate shield exists.

52b.    Defendants Thrifty and Legendary are liable for this breach as members of the integrated enterprise that operated the hackathon. As alleged in Paragraphs 6 and 10, all

Defendants operated the Hackathon as a joint venture or integrated enterprise under common control. Thrifty and Legendary are liable on three independent bases: First, under the integrated enterprise theory, Thrifty and Legendary are the entities through which the platform designated as the hackathon's "Main Sponsor" is distributed to U.S. consumers. The BBB profile for New Era Learning LLC identifies Thrifty and Legendary as *alternate business names* of New Era — not as independent third-party distributors. Thrifty's address and Legendary's address are the only U.S. business addresses associated with New Era. Upon information and belief, Thrifty and Legendary share common ownership or control with New Era, have no independent business operations apart from distributing The Real World platform, and are jointly responsible for the obligations incurred by the enterprise. When a single enterprise operates through multiple legal entities that share management, addresses, and branding — and when the BBB identifies those entities as alternate names for the same company — each entity within the enterprise assumes the obligations the enterprise incurs. Second, in the alternative, Thrifty and Legendary are liable as the contractual counterparties to Plaintiff's subscription purchase: Plaintiff purchased a Real World subscription in connection with the hackathon, and the privacy policy governing that subscription states that The Real World is "distributed on behalf of New Era Learning LLC by: Thrifty Consulting LLC." As the distribution entity for the subscription that formed part of the integrated hackathon-subscription ecosystem, Thrifty (and by extension Legendary, as the co-distribution partner identified on every consumer-facing page) was a party to the commercial transaction induced by the hackathon representations and is therefore in privity with Plaintiff for claims arising from the hackathon's fraudulent inducement of that transaction. Third, Thrifty and Legendary are liable as participants in the joint venture alleged in Paragraph 10: each joint venturer is jointly and severally liable for the obligations of the venture. The hackathon was a joint venture among all Defendants, and Thrifty and Legendary participated by distributing the platform that served as the venture's designated "Main Sponsor" and, upon information and belief, by receiving a share of the subscription revenue generated by the venture's hackathon-driven subscriber acquisition.

52c.  To the extent any Defendant contends that a forum-selection clause in New Era's Terms of Service for The Real World platform applies to Plaintiff's contract claims, that

contention fails for the reasons set forth in Paragraph 14. The unilateral contest contract at issue was formed through the hackathon offer published on fundraiser.com and accepted by Plaintiff's performance — not through The Real World's subscription agreement. A platform's subscription terms do not govern a separate contest contract formed on a different website, and a forum-selection clause drafted by one party to a subscription agreement cannot be bootstrapped to cover an independent prize contest hosted on a different domain.

53.     As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to:

a.     Reliance damages — the reasonable value of approximately 200 hours of time, labor, and direct development costs that Plaintiff invested in creating and submitting Bangchain over several weeks. At the prevailing market rate for freelance artificial intelligence development services of approximately $150 per hour — a conservative estimate within the range reported by industry surveys for AI and machine learning freelance developers, including published rate data from Upwork, Toptal, and the Bureau of Labor Statistics Occupational Employment and Wage Statistics for software developers specializing in artificial intelligence — Plaintiff's reliance damages equal approximately $30,000. Plaintiff also incurred direct out-of-pocket costs including cloud computing resources, development tools, Solana blockchain integration resources, and the cost of a paid subscription to The Real World (approximately $49.99 per month) purchased in connection with the hackathon, which Plaintiff would have devoted to other productive endeavors;

b.     Lost prize opportunity — in the alternative or in addition to reliance damages, Plaintiff seeks damages under the lost-chance doctrine for the destruction of Plaintiff's opportunity to compete for prizes. Defendants' total non-performance — no judging, no winners, no prizes — eliminated any chance Plaintiff had of receiving a prize. A plaintiff need not prove with certainty that he would have won; rather, the destruction of a substantial chance of winning is itself a compensable injury. *See Holton v. Physician Oncology Educ. Network*, 2012 WL 1980516, at *4 (D. Nev. June 1, 2012) (recognizing lost-chance theory). The hackathon showcase page displayed only two genuine

submissions — Plaintiff's Bangchain and one other project ("BrokieAI") — alongside seven placeholder entries marked "Coming Soon" in a contest advertising a $500,000 grand prize and over $1,000,000 in total prizes, meaning Plaintiff was among a minimal field of eligible competitors with a substantial probability of receiving prizes of significant value; and

c.    Opportunity costs — the value of freelance AI development opportunities during the contest period that Plaintiff declined in order to participate in the Hackathon; and

d.    Unauthorized commercial exploitation — Defendants have displayed Plaintiff's Bangchain project as the first-listed entry on the hackathon showcase page at fundraiser.com/hackathon/showcase continuously from on or about January 30, 2025 through the date of filing of this Complaint — a period exceeding twelve months — using Plaintiff's submitted work product as the primary promotional marketing content for the hackathon platform without Plaintiff's consent and without compensation. The showcase page, populated with Plaintiff's project as its lead entry, serves as a demonstration of the purported quality and legitimacy of Defendants' contest and venture capital platform to prospective participants and investors, providing Defendants with ongoing marketing value derived from Plaintiff's uncompensated labor. Plaintiff's total damages, when combined with treble damages available under NRS 598.0963(2), substantially exceed $75,000.

## SECOND CAUSE OF ACTION

### Promissory Estoppel

### (Against All Defendants, in the Alternative)

54.    Plaintiff repeats and realleges Paragraphs 1 through 10b (Introduction and The Parties), 21 through 24 (Defendants' Promotion), 25 through 38a (Contest Terms and Plaintiff's Participation), 39 through 43 (Defendants' Complete Failure to Perform), and 45 through 46 (Defendant New Era's Operational Role) as if fully set forth herein.

55.    Defendants made clear and definite promises regarding the Hackathon, including specific prize amounts totaling over $1,000,000, defined judging criteria, a three-round judging process, a specific timeline for winner announcements, and that qualifying winners would receive the promised prizes. Defendant Tate personally reinforced these promises through public statements that constituted independent promises of performance: on January 13, 2025, Tate declared to his millions of followers, "I decided to put together this hackathon — unprecedented, never done before — over a million dollars in prizes" and "I'll be sponsoring everything myself via fundraiser.com" (*see* Exhibit V), thereby personally promising that the hackathon would be performed and that prizes totaling over $1,000,000 would be funded by Tate himself. On January 31, 2025, Tate publicly endorsed a hackathon participant's project on X/Twitter as "perfect for the average crypto trader" (*see* Exhibit W), a post viewed by 71,400 people, which constituted an ongoing representation that the hackathon was active and being performed — reinforcing participants' reliance on the promise that submissions would be evaluated and prizes awarded. Tate's January 13 statement was promissory in both form and substance: "I decided to put together this hackathon" communicated that Tate had made a personal decision that the hackathon would occur; "over a million dollars in prizes" identified the specific subject matter and magnitude of the promise; and "I'll be sponsoring everything myself" communicated a personal undertaking to fund that promise. Tate's January 13 statement was not mere puffery but a definite promise of performance for four independent reasons: first, Tate announced specific dollar amounts ("over a million dollars in prizes"), not vague or aspirational language susceptible to multiple interpretations; second, Tate stated "I'll be sponsoring everything myself," constituting a personal financial commitment by an identified individual — not a generalized corporate marketing claim; third, Tate specified the mechanism of performance ("via fundraiser.com"), directing the audience to a specific platform for specific performance of the promise; and fourth, the statement was made in a deliberate, produced promotional video distributed to millions of followers on a public platform, not in casual conversation or offhand remarks. These were not hedged aspirations or conditional expressions of intent — they were present commitments stated in the first person by an identified individual to a mass audience, creating an expectation that Tate was personally committing his resources to

ensure the hackathon's performance. Tate's January 31 endorsement — publicly praising a hackathon submission as "perfect for the average crypto trader" to 71,400 viewers eighteen days after the submission deadline — reinforced the January 13 promise by demonstrating that Tate continued to treat the hackathon as an active, ongoing contest being performed, thereby assuring participants who had relied on his January 13 pledge that their reliance remained justified and that Tate was engaged in the contest's execution. Tate's January 13 sponsorship pledge and January 31 endorsement, taken together, communicated a clear and definite promise: the hackathon would be performed, the prizes would be funded by Tate personally, and participants' submissions would be evaluated.

56. Defendants made these promises for the purpose of inducing participants to rely on them by investing substantial time and resources to develop and submit projects. The inducement was deliberate and targeted: the hackathon was structured as a participant-acquisition mechanism that required each participant to (a) invest weeks of development labor and (b) disclose intellectual property through the submission form. Defendants could not have obtained any of these benefits without making the prize and performance promises that induced participation. Plaintiff relied on these promises in developing and submitting Bangchain.

56a. Plaintiff did not see or become aware of the Solana Foundation's January 13, 2025 denial before completing his submission, and a reasonable participant in Plaintiff's position would not have encountered that denial through ordinary diligence. The critical distinction is between the two channels through which information about the hackathon was disseminated: (1) the hackathon website at fundraiser.com/hackathon, which was the authoritative, primary source of contest terms and the designated platform for submissions; and (2) the X/Twitter social media platform, where third-party replies to Tate's promotional posts appeared in a discussion thread. The Solana Foundation's denial appeared exclusively in the second channel — as a text reply by Akshay BD (the Foundation's CMO) posted beneath Tate's promotional post on X/Twitter. It was never posted on, linked from, or referenced on the hackathon website itself. At no time during the entire submission period (January 15 through February 15, 2025) did the hackathon website at fundraiser.com/hackathon display any correction, retraction, disclaimer, or notice that the Solana Foundation had denied involvement. The hackathon website — the channel that

Defendants themselves designated as the authoritative source for contest terms — continued to display the contest terms, the $1,000,000+ prize pool, the judging criteria, the submission mechanisms, and the sponsor designations without alteration. Plaintiff relied on the representations published on the hackathon website, which is the channel a reasonable participant would consult for authoritative contest information. To the extent Plaintiff also encountered Defendant Tate's promotional video through social media, Plaintiff viewed the video itself — not the reply thread beneath it. The Foundation's denial was a text reply posted by a third party in a discussion thread below the video post; it was not incorporated into, displayed alongside, or visually associated with the video content. A reasonable social media user encountering a promotional video through a feed, embed, or share would not necessarily view the text replies posted by third parties beneath the original post. Moreover, Tate's own reply acknowledging non-affiliation with the Solana Foundation ("Community note is correct, this hackathon is run from Fundraiser.com's treasury and is not affiliated with the Solana foundation") did not withdraw the contest or correct the prize representations — it confirmed the hackathon would proceed and identified Fundraiser.com's treasury as the funding source, thereby reassuring participants that the contest remained operative and funded, even if the Solana Foundation was not involved. A reasonable participant who did encounter Tate's reply would have understood it as a clarification of the funding source, not as a retraction of the prize promises or a warning against participation.

56a-1.   To the extent Defendants argue that the official hackathon pitch deck — hosted at deck.fundraiser.com/aideck — displayed "???" placeholders in its "TEAM" section in lieu of identified judges, that fact does not undermine the reasonableness of Plaintiff's reliance for four independent reasons. First, the pitch deck was hosted on a separate subdomain (deck.fundraiser.com) from the main hackathon page (fundraiser.com/hackathon) and was not a prerequisite to participation; the hackathon submission process routed participants to a Google Form accessible via the fundraiser.com/hackathon page, which did not require review of or reference to the pitch deck. (*See* Exhibit AC.) Second, the Google Form submission requirements did not reference the pitch deck, require acknowledgment of its contents, or condition submission on review of the "TEAM" section. Third, the pitch deck's "Coming Soon"

placeholders for judges were reasonably understood as indicating that judges had not yet been publicly announced — not that no judges would ever be selected. A hackathon that publishes detailed judging criteria ("product demo and pitch, business viability, AI models used, Solana integrations, potential impact, traction and marketing and innovation"), specifies a three-round evaluation process, and identifies a two-week winner announcement timeline communicates that judging will occur; the absence of named judges in a pre-launch document is consistent with judges being announced later, which is common practice in technology hackathons. Fourth, the representations on the hackathon website itself — the authoritative contest platform — were unambiguous: specific prize amounts, defined judging criteria, a structured three-round evaluation process, and a two-week winner announcement timeline. These website representations, not the pitch deck, were the primary basis for Plaintiff's reliance. (*See* Exhibits A, C, D.)

57.    As to Defendant New Era specifically, New Era made definite representations to its own subscribers by: (a) advertising a "THE REAL WORLD STUDENT EXCLUSIVE PERIOD" on the investment application page at fundraiser.com/apply (part of the hackathon ecosystem), thereby communicating to New Era's paying subscribers that the hackathon was a genuine, New Era–endorsed contest offering preferential access to Real World students (*see* Exhibit F; Wayback Machine capture, Sep. 27, 2024); (b) listing The Real World as a "Main Sponsor" with its logo hosted on the hackathon page, communicating New Era's endorsement and backing of the contest (*see* Exhibit L); and (c) structuring the hackathon's competition rounds around its own product hierarchy ("Hustlers Round," "Graduate," "PhD"), communicating that the contest was a genuine extension of New Era's commercial platform. These representations, taken together, constituted a promise by New Era that the hackathon would be performed in accordance with its stated terms — including that prizes would be awarded and judging would occur — and that New Era stood behind that performance. No reasonable commercial entity would designate itself as "Main Sponsor," direct its paying customers to participate, and structure a contest around its own product hierarchy for a contest it did not intend to perform. New Era's affirmative conduct went beyond passive endorsement to an assurance that New Era stood behind the contest's performance — creating a reasonable

expectation of reliance by participants who submitted projects in response. No reasonable participant — encountering a "Main Sponsor" designation from a known commercial platform and a "Student Exclusive Period" banner directed at that platform's own subscribers — would conclude that the sponsoring entity had not committed to the contest's performance. New Era's participation communicated an unambiguous promise: that the contest was genuine, that New Era stood behind it, and that participants could rely on its performance. Moreover, New Era communicated its endorsement directly to its subscriber base through subscriber-facing channels: the "Student Exclusive Period" designation was displayed on the fundraiser.com/apply page that New Era's own subscribers would encounter when following New Era's direction to participate; the live purchase notifications on the fundraiser.com/apply page (e.g., "[Name] from [Country] has purchased The Real World") demonstrated real-time commercial integration between the hackathon and New Era's subscription sales pipeline, further conveying to participants that New Era was operationally invested in the hackathon's performance.

58.    Plaintiff actually and reasonably relied on Defendants' promises — including Tate's personal sponsorship pledge and New Era's endorsement — by investing substantial time and resources in North Las Vegas, Nevada developing Bangchain and submitting it to the hackathon. Before committing to participate, Plaintiff investigated the contest's legitimacy and concluded it was genuine based on the following objective indicia: (i) the contest website at fundraiser.com/hackathon was professionally designed with detailed navigation, sponsor sections, FAQ pages, and a hackathon submission page routing to a Google Form — hallmarks of a legitimate commercial operation, not an amateur or fraudulent scheme; (ii) the prize amounts were specific and enumerated, with individual dollar values assigned to more than a dozen named categories, rather than vague or aspirational — the level of specificity conveyed that the prizes had been budgeted and allocated; (iii) the contest identified named sponsors, including The Real World (Defendant New Era's platform), a well-known commercial subscription platform with millions of subscribers and a public commercial presence, lending institutional credibility; (iv) the broader fundraiser.com ecosystem integrated Defendants' proprietary commercial platform throughout its infrastructure — the investment application page at fundraiser.com/apply required a "Real World Username" and directed users to "Log Into

The Real World To Verify Identity," and the hackathon designated The Real World as "Main Sponsor" with its logo hosted on the contest website — signaling that the operators had the commercial infrastructure, institutional reputation, and organizational commitment to perform a legitimate contest; (v) Defendant Tate, a public figure with millions of social media followers, personally declared on January 13, 2025 that he would be "sponsoring everything myself," providing a personal guarantee from a known, identifiable individual with substantial public wealth and commercial enterprises; (vi) a separate pitch deck was hosted on a dedicated subdomain (deck.fundraiser.com/aideck), reflecting professional organization; and (vii) Plaintiff had prior experience as a paying subscriber to Defendants' platform The Real World on two separate occasions (approximately November 2022 and March 2024) (*see* Exhibit Y), and based on that prior consumer relationship, Plaintiff had personal familiarity with Defendants' commercial platform and its operational legitimacy, which reinforced the reasonableness of Plaintiff's belief that a contest operated through and endorsed by that same platform would be performed. Plaintiff's prior subscriptions had each lapsed after approximately one month, and Plaintiff had maintained no active subscription for approximately ten months before the hackathon was announced — confirming that the January 2025 re-subscription was specifically induced by the hackathon, not by the platform's educational content standing alone. Plaintiff's familiarity with the platform as a prior subscriber made Plaintiff's reliance on the hackathon representations more reasonable, not less, because Plaintiff knew from personal experience that The Real World was a genuine commercial enterprise with real infrastructure, real subscribers, and a real public presence — characteristics that lent credibility to the hackathon's integration with the platform. Plaintiff's reliance was the product of reasonable investigation and informed judgment, not credulity. Every objective indicator available to Plaintiff — the professional website, the specific prize amounts, the named and identifiable sponsors, the formal verification process through an established commercial platform, the personal guarantee of a known public figure, and Plaintiff's own prior experience as a paying customer of Defendants' platform — pointed to the same conclusion: that the hackathon was a legitimate contest that would be performed in accordance with its terms. Plaintiff's reliance was not only subjectively genuine

but objectively reasonable under the totality of the circumstances. *See Vancheri v. GNLV Corp.*, 105 Nev. 417, 777 P.2d 366 (1989); Restatement (Second) of Contracts § 90.

59.     Plaintiff has suffered injury as a result of this reliance, including: (a) reliance damages — the reasonable value of approximately 200 hours of time, labor, and direct development costs invested in North Las Vegas, Nevada in creating and submitting Bangchain, at the prevailing market rate for freelance AI development services of approximately $150 per hour, totaling approximately $30,000, plus direct out-of-pocket costs including cloud computing, development tools, and the Real World subscription purchased in connection with the hackathon; (b) forgone freelance AI development opportunities during the contest period; and (c) in the alternative, the destruction of Plaintiff's substantial chance to compete for prizes valued at up to $500,000 in a contest with only two genuine submissions displayed on the showcase page.

60.     Injustice can be avoided only by enforcing Defendants' promises. Defendants have retained Plaintiff's work product — displaying Bangchain as the first-listed project on the hackathon showcase page — for more than twelve consecutive months while paying nothing, performing no judging, announcing no winners, and offering no explanation. Defendants simultaneously retained the ongoing promotional and marketing value of Plaintiff's project as the lead entry on a venture capital platform advertising a "$50M fund." No remedy other than enforcement of the promises can restore Plaintiff to the position he occupied before reliance: the development labor cannot be returned, the intellectual property disclosed through the submission form cannot be unread, and the twelve months of commercial exploitation cannot be undone. Defendants' reliance-inducing conduct was not merely foreseeable — it was specifically intended. The entire contest was structured to elicit developer participation: the prize representations, the three-round judging process, the formal submission portal, the "Student Exclusive Period" banner, the integration of Real World identity verification on the fundraiser.com/apply page, and Tate's personal sponsorship pledge were collectively designed to induce skilled developers to invest substantial time and resources creating projects for Defendants' benefit. Defendants did not passively receive reliance they had not anticipated; they architected a participant-acquisition mechanism whose sole commercial purpose was to induce

precisely the reliance Plaintiff provided. Plaintiff's reliance was therefore not merely foreseeable but specifically invited, and injustice can be avoided only by enforcement. *See Vancheri v. GNLV Corp.*, 105 Nev. 417, 777 P.2d 366 (1989); Restatement (Second) of Contracts § 90.

## THIRD CAUSE OF ACTION

### Unjust Enrichment

### (Against All Defendants, in the Alternative)

61.     Plaintiff repeats and realleges Paragraphs 1 through 10b (Introduction and The Parties), 25 through 38a (Contest Terms and Plaintiff's Participation), 39 through 43 (Defendants' Complete Failure to Perform), and 45 through 46 (Defendant New Era's Operational Role) as if fully set forth herein. This claim is pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2), which expressly permits a party to "state as many separate claims . . . as it has, regardless of consistency." Specifically, Plaintiff pleads unjust enrichment in the event that this Court determines no enforceable contract was formed between Plaintiff and Defendants — whether because the hackathon terms lacked mutual assent, because no contractual privity exists between Plaintiff and certain Defendants, or for any other reason. Under alternative pleading, the existence of a breach-of-contract claim does not bar a simultaneous unjust-enrichment claim; the two are not "mutually exclusive" at the pleading stage because the Court has not yet determined whether an enforceable contract exists. The adequate-remedy-at-law doctrine does not bar an unjust-enrichment claim at the pleading stage; a plaintiff may plead unjust enrichment in the alternative to a contract claim, and the Court need not resolve the availability of a legal remedy until after the factual record is developed. *See Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, 2015 WL 5022959, at *2 (D. Nev. Aug. 24, 2015) ("Parties are not precluded from pleading unjust enrichment in the alternative to breach of contract claims."); *see also Certified Fire Prot. Inc. v. Precision Constr.*, 128 Nev. 371, 283 P.3d 250 (2012).

62.     Plaintiff conferred benefits on Defendants by: (a) developing and submitting Bangchain — an AI project that Defendants received through the Google Form at

fundraiser.com/hackathon and displayed as the first-listed project on the hackathon showcase page for more than twelve months, providing content that populated Defendants' website and served as promotional marketing material demonstrating the quality of contest entries; (b) providing detailed disclosures of Plaintiff's intellectual property through the Google Form submission at fundraiser.com/hackathon — including a project description, the problem the project solves, Solana blockchain integration details, AI models and technologies used, and a link to the working prototype — while agreeing to an Intellectual Property Agreement that represented project ownership would remain with the submitter, thereby disclosing Plaintiff's technical architecture and functional prototype that Defendants collected and retained; (c) purchasing a Real World subscription in connection with the hackathon, generating subscription revenue and engagement for Defendants' commercial platform — Plaintiff, who was not an existing Real World subscriber at the time of the hackathon, purchased a new subscription to New Era's platform at approximately $49.99 per month, providing personal information and login credentials that generated a new user registration of measurable commercial value for New Era's subscription business; and (d) generating promotional value for Defendants' brands and platforms by participating in the hackathon.

62a.    Plaintiff did not confer these benefits gratuitously or as a volunteer. Plaintiff conferred benefits on Defendants in reasonable expectation of reciprocal performance — specifically, that Defendants would conduct the announced judging process and award prizes in accordance with the published contest terms. This expectation was induced by Defendants' own representations. The benefits were conditional: Plaintiff submitted his project, personal data, intellectual property, and subscription payment only because Defendants promised over $1,000,000 in prizes, a structured three-round judging process, and winner announcements within approximately two weeks. Had Defendants disclosed that they did not intend to judge submissions or award prizes — or that the G DAO Treasury Wallet contained less than two percent of the advertised prize pool — Plaintiff would not have conferred any benefit. The conditional nature of Plaintiff's conferral defeats any voluntariness defense. *See Topaz Mut. Co. v. Marsh*, 108 Nev. 845, 839 P.2d 606 (1992) (benefits conferred under mistake or fraud are not voluntary).

62b.    As to Defendants Thrifty and Legendary specifically, Thrifty and Legendary received direct, quantifiable benefits from Plaintiff's hackathon participation. As the entities that distribute The Real World to U.S. consumers, Thrifty and Legendary are the transactional intermediaries through which every U.S. subscription payment flows. The privacy policy on therealworldportal.com states that "The Real World is distributed on behalf of New Era Learning LLC by: Thrifty Consulting LLC," and every consumer-facing website identifies both Thrifty and Legendary as "distribution partners." When Plaintiff purchased a Real World subscription at approximately $49.99 per month in connection with the hackathon, that payment was processed through Defendants' distribution infrastructure in which Thrifty and Legendary are the identified U.S. distribution entities. The benefit to Thrifty and Legendary is not speculative: it is the subscription revenue — or the distribution fee, commission, or processing margin from that revenue — generated by Plaintiff's specific, identifiable purchase. Whether Thrifty and Legendary retained the full $49.99 or a percentage thereof is a matter within Defendants' exclusive knowledge, but that they received *some* direct financial benefit from Plaintiff's subscription payment is a necessary inference from their role as the only identified U.S. distribution entities for the platform. In addition, Thrifty and Legendary benefited from the brand-association value of the hackathon: as the entities publicly identified on every consumer-facing page as the distribution partners for the platform designated as "Main Sponsor" of a contest advertising $1,000,000+ in prizes, Thrifty and Legendary received the reputational and marketing benefit of association with a high-profile technology contest, which enhanced the perceived legitimacy and visibility of the platform they distribute. The BBB's identification of Thrifty and Legendary as *alternate business names* for New Era — not as independent distributors — further establishes that the benefits accruing to New Era from the hackathon accrued to the same enterprise of which Thrifty and Legendary are constituent parts. The precise allocation of subscription revenue among Defendants is a matter within Defendants' exclusive knowledge and will be established through discovery.

62c.    Defendant Tate personally received and retained a measurable, direct benefit from Plaintiff's participation in the hackathon. Tate's personal benefits include, but are not limited to: (i) *Social media engagement and audience growth* — Tate's January 13, 2025 promotional video

for the hackathon generated substantial engagement on the X platform, expanding Tate's personal reach and follower engagement metrics; Tate's January 31, 2025 post endorsing a hackathon submission as "perfect for the average crypto trader" received 71,400 views, 488 likes, and 84 retweets (*see* Exhibit W), all of which accrued to Tate's personal social media account and enhanced his personal brand visibility; (ii) *Personal brand promotion* — the hackathon was structured around Tate's personal brand trademarks ("Top G Grand Prize," "Most G," "certified by Top G himself"), and the display of legitimate AI projects like Plaintiff's Bangchain on the showcase page for over twelve months served as a continuous advertisement for Tate's personal brand, lending credibility to Tate's public persona as a technology entrepreneur and investor; (iii) *Subscriber growth for Tate's platform* — the deep integration between the hackathon and Defendants' Real World subscription ecosystem — including the "Main Sponsor" designation, the "Student Exclusive Period" promotion, the mirroring of Real World membership tiers in the competition structure, and the identity-verification requirements on the fundraiser.com/apply investment page — channeled hackathon participants toward paid subscriptions to The Real World, a platform that Tate controls as CEO of New Era, generating subscription revenue that directly benefits Tate as the controlling principal of the enterprise; (iv) *Venture capital platform credibility* — the fundraiser.com main page states "Apply For Investment From Andrew Tate & The War Room" and links to cobratate.com, Tate's personal brand website; the display of functional AI projects like Bangchain on the hackathon showcase enhanced the credibility and perceived legitimacy of Tate's personal venture capital brand, attracting prospective applicants to a platform that advertises "$20k - $1M investment allocation per project"; and (v) *Cryptocurrency token promotion* — Tate personally directed and participated in promotional activity around a cryptocurrency token that an unknown third party had minted bearing the name of a hackathon participant's showcased project (*see* Paragraph 44(m)–(n)) on January 30–31, 2025 (Paragraphs 44(h)–(k)), generating commercial attention for tokens associated with the hackathon ecosystem from which Tate, upon information and belief, derived personal financial benefit. These benefits were personal to Tate, not merely corporate benefits flowing to New Era, because Tate's personal brand, personal social media accounts,

personal promotional activity, and personal name were the instruments through which the benefits were generated and to which the benefits accrued.

63.     Defendants received and retained these benefits with full knowledge of Plaintiff's participation and the terms under which it was given — namely, the expectation that Defendants would conduct judging and award prizes. Defendants' receipt of Plaintiff's Bangchain project is confirmed by its continued display on their showcase page for more than twelve months. As to Defendant Tate specifically, Tate had direct personal knowledge of Plaintiff's participation and submission because Tate personally initiated a direct message to Bryan Mitchell (Plaintiff's brother) on January 30, 2025 regarding the hackathon (*see* Exhibit S), and Tate personally endorsed a hackathon submission on X/Twitter on January 31, 2025 (*see* Exhibit W). Tate personally received and retained the benefits alleged in Paragraph 62c — including social media engagement, personal brand promotion, subscriber growth for the platform he controls, venture capital platform credibility, and cryptocurrency promotion revenue — while performing none of the contest obligations he personally pledged to fund when he publicly declared "I'll be sponsoring everything myself." Tate's personal retention of these benefits is unjust because Tate personally induced Plaintiff's participation through his personal sponsorship pledge, personally profited from the content and engagement Plaintiff's participation generated, and has personally failed to perform any of the obligations he assumed. Furthermore, because Plaintiff's Bangchain project shares its name with the Bangchain cryptocurrency token described in Paragraph 44(m), Defendants' continued display of the project as the first-listed showcase entry for more than twelve months has provided ongoing promotional value by keeping public attention directed toward the associated cryptocurrency — a benefit that accrues to Defendants continuously while Plaintiff receives nothing.

64.     Defendants' retention of these benefits — while having performed none of their contest obligations for over twelve months — is unjust and inequitable. Defendants have commercially exploited Plaintiff's work product for over twelve consecutive months: Plaintiff's Bangchain has been displayed as the first-listed entry on the hackathon showcase page at fundraiser.com/hackathon/showcase continuously since on or about January 30, 2025, serving as the lead promotional content for a venture capital platform that advertises a "$50M fund" and

solicits investment applications from prospective entrepreneurs. The showcase page, populated with Plaintiff's project as its primary entry, functions as a live portfolio demonstrating the quality, sophistication, and legitimacy of submissions received through the fundraiser.com platform — providing ongoing commercial marketing value to Defendants by attracting prospective participants, investors, and subscribers. Defendants have derived this commercial value without Plaintiff's consent, without compensation, and without performing any of the contest obligations that induced Plaintiff to submit the project. Defendants have treated Plaintiff's project as their own promotional property — a free marketing asset extracted through false promises and displayed without compensation, consent, or any of the reciprocal performance that induced Plaintiff's submission. The commercial exploitation value of twelve consecutive months of first-position placement on a venture capital platform's live portfolio page is substantial and quantifiable: it is the functional equivalent of paid digital advertising, content licensing, and brand-association marketing that Defendants would otherwise have had to purchase on the open market. Plaintiff's detriment is the mirror of Defendants' enrichment: every hour of development labor Plaintiff invested (approximately 200 hours at prevailing market rates) produced free content that Defendants retained and commercially displayed; every dollar Plaintiff spent on the subscription purchased in connection with the hackathon (approximately $49.99 per month) flowed directly to Defendants' revenue; and every item of intellectual property Plaintiff disclosed through the submission form became an asset Defendants possessed without payment. The enrichment is quantifiable by reference to market rates for comparable services: the value of twelve consecutive months of first-position digital content placement on a commercial venture capital platform that advertises a "$50M fund" and solicits investment applications is ascertainable through prevailing rates for digital advertising, content licensing, and sponsored placement on comparable platforms — rates that are routinely established through expert testimony. This twelve-month period of unauthorized commercial exploitation constitutes the unjust retention of a benefit of substantial and quantifiable value. As to Defendant Tate specifically, the showcase page is hosted on fundraiser.com — a platform whose main page states "Apply For Investment From Andrew Tate & The War Room" — meaning Plaintiff's project has served for over twelve months as promotional content for Tate's

personal venture capital brand, enhancing the credibility and perceived deal flow of a platform that Tate personally operates and from which Tate personally derives economic benefit. *See Leasepartners Corp. v. Robert L. Brooks Trust*, 113 Nev. 747, 942 P.2d 182 (1997); *Certified Fire Prot. Inc. v. Precision Constr.*, 128 Nev. 371, 283 P.3d 250 (2012).

65.     Plaintiff is entitled to restitution in an amount to be proven at trial, representing the reasonable value of the benefits conferred on Defendants. The benefits Defendants received include, but are not limited to: (a) *Commercial exploitation of Plaintiff's project* — Defendants have displayed Plaintiff's Bangchain as the first-listed entry on the hackathon showcase page continuously for more than twelve months, using Plaintiff's work product as the lead promotional content for a venture capital platform that advertises a "$50M fund" and solicits investment applications. The commercial value of twelve months of first-position placement on a commercial platform's showcase page — providing ongoing credibility and marketing content to attract prospective participants and investors — is substantial and will be quantified at trial through expert testimony on the market value of comparable digital advertising and content licensing; (b) *Intellectual property* — Plaintiff's project description, technical architecture disclosures, AI implementation details, and link to a working prototype, which Defendants collected through the Google Form submission at fundraiser.com/hackathon and have retained; (c) *Subscription revenue and user data* — Plaintiff's new user registration, login credentials, and personal information provided to New Era's commercial platform, plus the approximately $49.99 monthly subscription payment purchased in connection with the hackathon; (d) *Promotional and brand-association value* — the value to New Era of being listed as "Main Sponsor" of a contest with a claimed $1M+ prize pool, which enhanced New Era's visibility and market presence; and (e) *Marketing funnel value* — the value of using a hackathon to channel participants into New Era's paid commercial ecosystem through the "Main Sponsor" designation, the "Student Exclusive Period" promotion, and the integration of Real World throughout the fundraiser.com ecosystem, generating new subscribers and engagement data of direct commercial value. As to Defendants Thrifty and Legendary, the benefit includes their traceable share of subscription revenue from hackathon-driven registrations as alleged in Paragraph 62b.

## FOURTH CAUSE OF ACTION

## Fraudulent Misrepresentation

## (Against Tate, New Era, Thrifty, Legendary, and Doe Defendant 1)

66.   Plaintiff repeats and realleges Paragraphs 1 through 3 (Introduction), 4 through 10b (The Parties), 21 through 24 (Defendants' Promotion and the Solana Foundation's Denial), 25 through 38a (Contest Terms, Plaintiff's Participation, and the Inducement Structure), 39 through 43 (Defendants' Complete Failure to Perform), 44(a) through 44(r) (Additional Circumstances Supporting Scienter), and 45 through 46 (Defendant New Era's Operational Role) as if fully set forth herein.

67.   Defendants Tate, New Era, and Doe Defendant 1 each made or authorized material representations of fact in connection with the Hackathon, and Defendants Thrifty and Legendary facilitated and profited from those representations as integral participants in the enterprise through which the representations were disseminated, as follows:

**Representations by Doe Defendant 1:** Doe Defendant 1, through the website fundraiser.com and the X/Twitter account @fundraiser_com, made the following representations:

a.   **Prize representations.** On or about January 16, 2025, via the @fundraiser_com X account, and on the fundraiser.com/hackathon website from on or about January 15, 2025 through the date of filing of this Complaint, Doe Defendant 1 represented that over $1,000,000 in prizes would be awarded to hackathon participants, specifying individual prizes including a $500,000 grand prize, a $200,000 runner-up prize, and a $100,000 award, among others. Plaintiff encountered and relied on these prize representations while located in North Las Vegas, Nevada on or about January 2025. (*See* Exhibits B, E.)

b.   **Judging representation.** Beginning on or about January 15, 2025 and continuing through the date of this Complaint, on the fundraiser.com/hackathon website, Doe Defendant 1 represented that submissions would be evaluated through a three-round judging process — "Round 1: Undergrad (Hustlers Round): Open submission. Round 2: Graduate: Vetted projects showcased. Round 3: PhD: Winners finalized and featured" —

based on "[a] variety of factors including product demo and pitch, business viability, AI models used, Solana integrations, potential impact, traction and marketing and innovation." (*See* Exhibit C.) Plaintiff encountered and relied on these representations while located in North Las Vegas, Nevada on or about January 2025.

c.    **Timeline representation.** Beginning on or about January 15, 2025 and continuing through the date of this Complaint, on the fundraiser.com/hackathon FAQ page, Doe Defendant 1 represented that winners would be announced "[a]pproximately two weeks after the hackathon ends." Plaintiff encountered and relied on this representation while located in North Las Vegas, Nevada on or about January 2025. (*See* Exhibit C.)

**Representations by Defendant Tate:**

d.    **Promotional video with false partnership claim.** On January 13, 2025, Tate personally posted a promotional video for the Hackathon on the X/Twitter platform, displaying the logo of the Solana Foundation and representing that the Foundation was an official partner of the hackathon. This representation was false — the Solana Foundation publicly denied any involvement the same day. Tate made this representation in his personal capacity and in his capacity as CEO of New Era, to his millions of social media followers, to promote a contest that listed Defendants' platform as "Main Sponsor." (*See* Exhibits H, J, V.)

e.    **Direct coordination of promotional activity.** On January 30, 2025, Tate personally sent a direct message on the X platform to Bryan Mitchell (Plaintiff's brother), stating: "Head of hackathon wants to reach out" and requesting Bryan Mitchell's Telegram contact. Within minutes, a Telegram user named "Issa" — with a documented history of coordinating pump-and-dump token schemes in association with Tate — contacted Bryan Mitchell and coordinated promotional activity around the Bangchain token. Tate's messages to Issa, captured in screenshots, included instructions to "join his space for 5 mins" and "tell him his product is HARAM," demonstrating Tate's real-time personal coordination. (*See* Exhibits S, T, X.) On the following day, January 31, 2025, Tate publicly replied on X/Twitter to a post by Bryan Mitchell (@prince_of_fakes) featuring a

screenshot of the hackathon showcase page, stating: "This product is perfect for the average crypto trader tbh." (*See* Exhibit W.) This public statement — made to an audience of 71,400 viewers — characterized a hackathon submission as a crypto trading product rather than as an AI project undergoing evaluation, constituting a further material representation regarding the nature and purpose of the hackathon.

**Representations by and attributable to Defendant New Era (and by extension to Thrifty and Legendary as the enterprise's distribution partners):** Tate's representations set forth in subparagraphs (d) and (e) above are attributable to New Era because Tate made them in his capacity as CEO of the entity whose brand was listed as "Main Sponsor," whose product hierarchy structured the contest, and whose subscriber base was affirmatively directed to participate. In addition, New Era made the following independent representations:

f.      **Representation to subscribers through "Student Exclusive Period."** Beginning on or about September 27, 2024 and continuing through at least the date of this Complaint, the investment application page at fundraiser.com/apply — which was part of the hackathon ecosystem — displayed a banner advertising "THE REAL WORLD STUDENT EXCLUSIVE PERIOD," representing that New Era had endorsed the hackathon and that at least one phase of the contest was reserved for New Era's paying subscribers. (*See* Exhibit F; Wayback Machine capture, Sep. 27, 2024.) This representation communicated to hackathon participants — including New Era's own subscribers — that the hackathon was a legitimate, New Era–endorsed contest offering preferential access to Real World students. The banner was published on a page within Defendants' integrated hackathon ecosystem — the same ecosystem through which Plaintiff submitted his project from North Las Vegas, Nevada on or about January 2025 — and demonstrates New Era's active endorsement of and integration into the hackathon infrastructure.

g.      **Express representations by New Era through its platform and subscriber-facing communications.** Beginning on or about January 15, 2025 and continuing through the

date of this Complaint, New Era made the following express, affirmative representations of fact to hackathon participants:

(1)    **"Main Sponsor" designation.** New Era expressly designated itself as a "Main Sponsor" of the hackathon, with its logo and brand name displayed on the fundraiser.com/hackathon page alongside the contest's $1,000,000+ prize representations. (*See* Exhibit L.) The term "Main Sponsor" is not a passive label — it is an express representation to the public that the designated entity has committed financial or institutional support to the sponsored event. In the context of a prize contest, the designation "Main Sponsor" appearing alongside specific prize amounts constitutes an express representation that the sponsor has committed to funding or backing those prizes. A reasonable participant encountering the "Main Sponsor" designation would understand that New Era had committed its institutional credibility and resources to ensure the contest would be performed and the prizes awarded. This representation was false: New Era provided no funding for the prize pool, which was funded at less than two percent of the advertised amount. The falsity of this representation does not depend on implication or inference. The word "sponsor" has a settled, universally understood commercial meaning: "one who assumes responsibility for some other person or thing" and "a person or an organization that pays for or plans and carries out a project or activity" (Merriam-Webster's Collegiate Dictionary). New Era published the literal, written words "Main Sponsor" on the fundraiser.com/hackathon webpage directly adjacent to the contest's enumerated prize pool totaling over $1,000,000, so that any participant viewing the page — including Plaintiff — would encounter New Era's sponsorship designation and the prize amounts on the same screen. A reasonable reader encountering the words "Main Sponsor" next to "$500,000 Grand Prize" and "Over $1,000,000 in prizes" would understand the designation to mean that New Era was the principal financial backer of the prizes being advertised. That is what the words "Main Sponsor" mean; it is what New Era intended them to mean; and it was false. Moreover, New Era's sponsorship was not passive — New Era provided its

proprietary authentication infrastructure (The Real World login system) as the identity-verification mechanism on the investment application page at fundraiser.com/apply, an act of active, affirmative participation that goes beyond mere labeling. By integrating its commercial platform throughout the fundraiser.com ecosystem — including through the identity-verification directive on the /apply page and the "Student Exclusive Period" promotion directed at its own subscribers — New Era did not merely allow its name to appear on a webpage; it committed its proprietary technology, its subscriber data infrastructure, and its commercial credibility to the operation of the contest. This active infrastructural participation confirms that the "Main Sponsor" designation reflected New Era's actual role in the hackathon — and no reasonable consumer viewing the "Main Sponsor" designation alongside specific prize representations totaling over $1,000,000 would interpret that designation as anything other than an endorsement of the contest's legitimacy and a commitment to its performance.

(2)    **"THE REAL WORLD STUDENT EXCLUSIVE PERIOD" banner.** Beginning on or about September 27, 2024, the investment application page at fundraiser.com/apply — a page within Defendants' hackathon ecosystem — displayed a banner stating: "THE REAL WORLD STUDENT EXCLUSIVE PERIOD." (*See* Exhibit F; Wayback Machine capture, Sep. 27, 2024.) This was an express, written representation by New Era to its subscriber base — published on the page that New Era's subscribers would encounter when following New Era's direction to participate — communicating three specific factual propositions: (a) that the hackathon was endorsed by New Era ("THE REAL WORLD" identifying the endorsing entity); (b) that New Era had designated a period of the contest as exclusive to its own paying subscribers ("STUDENT EXCLUSIVE PERIOD"), representing that New Era exercised sufficient control over the contest to reserve access for its customers; and (c) that the contest was genuine and would be performed, because no commercial platform would direct its paying subscribers to invest time and resources in a contest the platform knew would not be performed.

Each word in this banner is a literal, written assertion of fact — not an inference or implication drawn by Plaintiff. "THE REAL WORLD" is the registered trade name of New Era's platform, expressly identifying New Era as the entity behind the designation. "STUDENT" expressly characterizes contest participants as customers of New Era's educational platform — a characterization only New Era could authorize. "EXCLUSIVE PERIOD" expressly represents that a defined phase of the contest was reserved for New Era's paying subscribers, which could only be true if New Era possessed and exercised authority over the contest's timing and access — an authority consistent only with operational control, not passive sponsorship. The banner was displayed in capitalized, bold text at the top of the investment application page, ensuring it was the first representation encountered by every visitor who navigated to the page. Each of these was an express, written representation of fact published on a page under New Era's control and directed at New Era's own subscriber base. Each was false.

(3)     **Subscriber-directed marketing.** New Era expressly directed its paying subscribers to participate in the hackathon through at least three affirmative acts: (a) the "Student Exclusive Period" banner on the fundraiser.com/apply page, which expressly communicated to Real World subscribers that the hackathon offered them preferential access; and (b) the live purchase notifications on the fundraiser.com/apply page (e.g., "[Name] from [Country] has purchased The Real World"), which constituted express, real-time representations that the hackathon was actively generating paid subscriptions to New Era's platform, communicating that New Era was commercially invested in and profiting from the hackathon. These live purchase notifications were express, real-time representations of commercial integration between the hackathon and New Era's subscription business, displayed on the same fundraiser.com/apply page that also contained the identity-verification directive. Each notification displayed a specific, written factual assertion — that a named individual from a named country "has purchased The Real World" — constituting an express representation that the hackathon was

actively generating revenue for New Era's subscription platform at the moment of the participant's submission. The notifications expressly represented that New Era was not a passive bystander but was actively monetizing the hackathon in real time, deriving direct financial benefit from each submission. Taken together, these express representations communicated to participants that New Era was commercially invested in the hackathon, endorsed its legitimacy, and stood behind its performance. Each was false: the contest was not funded, was never performed, and New Era took no steps to verify the contest's legitimacy before directing its subscribers to participate and before accepting revenue generated by subscriptions purchased in connection with the contest.

(4)     **Absence of correction after Solana Foundation denial.** On January 13, 2025, the Solana Foundation publicly denied any involvement with the hackathon on the X/Twitter platform — two days before the hackathon's January 15 launch. Despite this denial, New Era proceeded to list itself as "Main Sponsor" and to maintain the "Student Exclusive Period" banner, all without publishing any correction, disclaimer, or notice on the hackathon website. By affirmatively continuing its sponsorship and subscriber-directed marketing after the Solana Foundation denial, New Era made an express representation by its post-denial conduct that the denial did not affect the hackathon's legitimacy — a representation that was false.

Each of these representations satisfies Rule 9(b) because each identifies: (i) *who* — New Era Learning LLC, through its trade name "The Real World" and through the express authorization of its CEO, Andrew Tate; (ii) *what* — the specific, verbatim written text of each representation ("Main Sponsor," "THE REAL WORLD STUDENT EXCLUSIVE PERIOD," "[Name] from [Country] has purchased The Real World"); (iii) *when* — on or about September 27, 2024 (Student Exclusive Period, as documented by a Wayback Machine capture) and from on or about January 15, 2025 through the date of filing (Main Sponsor designation and live purchase notifications); (iv) *where* — the hackathon pages at

fundraiser.com/hackathon (Main Sponsor designation) and fundraiser.com/apply (Student Exclusive Period banner and live purchase notifications); and (v) *why misleading* — because the contest was funded at less than two percent of the advertised prize pool, no judging infrastructure was established, no prizes were ever awarded, and a claimed partner (the Solana Foundation) had publicly denied involvement before the hackathon launched, all facts known to or recklessly disregarded by New Era through its CEO. These are not vague implications from which a court must infer falsity — they are specific, verbatim, written representations published on identified webpages on identified dates, each conveying a concrete factual proposition that was demonstrably false. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (Rule 9(b) satisfied where complaint identifies the "who, what, when, where, and how" of the misconduct); *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (particularity requirement is satisfied when the complaint "identif[ies] the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations").

68.    These representations were false when made:

a.    No funds sufficient to pay over $1,000,000 in prizes were set aside or made accessible. The G DAO Treasury Wallet — the only prize fund repository identified on the hackathon website — has never signed an outgoing transaction in its entire on-chain history, contains only approximately $16,513 in liquid assets (0.994 SOL and 16,383.46 USDC), and holds 27 pump.fun memecoins with no active trading pairs or market liquidity. The wallet was not created until February 4, 2025 — three weeks after Defendants began advertising the $1,000,000+ prize pool — demonstrating that Defendants began promoting the prizes before establishing even a nominal funding mechanism. (*See* Exhibits K, O.)

b.    The Solana Foundation had no involvement with the hackathon, and the Foundation publicly denied any association on January 13, 2025 — before the hackathon's January 15 launch — yet the hackathon launched and continued without correction. (*See* Exhibit H.)

c.   Defendants never conducted any judging process; and

d.   Defendants did not announce winners within two weeks, or at any time within the subsequent twelve months.

69.   Defendants made the foregoing representations with knowledge of their falsity, or with reckless disregard for their truth or falsity. The following circumstantial facts support a strong inference of scienter as to each Defendant:

**Scienter as to Defendant Tate:**

a.   On January 13, 2025, Tate declared to his millions of followers that he would be "sponsoring everything myself" for a hackathon advertising "over a million dollars in prizes." At the time Tate made this statement, the G DAO Treasury Wallet — the only prize fund repository identified on the hackathon website — did not yet exist; it was not created until February 4, 2025, three weeks later. Tate thus personally pledged to fund a $1,000,000+ prize pool at a time when no treasury, no escrow, no bank account, no smart contract, and no funding mechanism of any kind had been established to hold or disburse prize funds. The prize pool Tate pledged to "sponsor everything myself" for did not merely lack sufficient funding — it had zero funding and zero infrastructure. Tate either knew this (because he was the self-described organizer of the hackathon) or recklessly disregarded it (by pledging to personally fund a million-dollar prize pool without ascertaining whether any funding existed). On the same day, the Solana Foundation publicly denied any partnership with the hackathon on the X platform — the same platform where Tate had posted his promotional video displaying the Foundation's logo. The Foundation CMO's denial was posted as a direct public reply in the discussion surrounding Tate's promotional video. Tate, who was actively posting on X that day, was aware of or recklessly disregarded the Foundation's denial yet continued promoting the hackathon;

b.   On January 30, 2025, rather than facilitating judging or prize distribution, Tate personally initiated a chain of communication that led to coordinated promotional activity around a cryptocurrency token — minted that same day by an unknown third

party bearing the name of a hackathon participant's showcased project (*see* Paragraph 44(m)) — coordinated by a person (Issa) with a documented history of pump-and-dump token schemes in association with Tate. The following day, January 31, 2025, Tate publicly endorsed the same project on X/Twitter as "perfect for the average crypto trader" to an audience of 71,400 viewers — framing a purported hackathon submission as a cryptocurrency trading product while the associated token was experiencing a coordinated price spike. (*See* Exhibit W; Paragraph 44(k).) Tate's consecutive-day conduct — privately coordinating token promotion on January 30 and publicly endorsing the project as a crypto trading product on January 31 — demonstrates that Tate was aware the hackathon's purpose was promotional exploitation rather than legitimate contest performance;

c.    Tate has a documented pattern of association with token promotion schemes. Issa, the individual Tate directed to contact Bryan Mitchell, is the verified developer of the $DADDY token, which was "rugged" (liquidated in a coordinated sell-off) in January 2025 after Tate and Issa coordinated promotional activity. (*See* Paragraph 44(l).) This pattern supports the inference that Tate was aware the hackathon showcase was being used to generate attention for token trading activity;

**Scienter as to Doe Defendant 1:**

d.    Doe Defendant 1 published prize representations totaling over $1,000,000 on the fundraiser.com website beginning on or about January 15, 2025 — yet the G DAO Treasury Wallet, which Doe Defendant 1 itself displayed on the hackathon page as the designated prize fund repository, was not created until February 4, 2025. The wallet creation date is an immutable, publicly verifiable on-chain fact recorded on the Solana blockchain. Doe Defendant 1 thus published specific prize amounts totaling over $1,000,000 for twenty consecutive days (January 15 through February 3, 2025) while no treasury, no escrow, no funding mechanism, and no prize wallet of any kind existed. Doe Defendant 1 was not merely negligent about funding — it advertised a million-dollar prize pool during a period when zero dollars had been committed, zero infrastructure had

been created to hold prize funds, and the entity had taken no steps whatsoever toward funding the prizes it was actively advertising. This chronology demonstrates that Doe Defendant 1 knew the prizes were unfunded when the representations were made. After the wallet was finally created, it never contained more than approximately $16,513 in liquid value — less than two percent of the advertised prize pool — and has never signed a single outgoing transaction. The chronological sequence is devastating: (1) prize advertising began January 15, 2025; (2) the wallet was not created until February 4, 2025 — three weeks later; (3) the wallet was funded at less than two percent of the advertised amount; (4) the wallet has never signed a single outgoing transaction in its entire on-chain history; (5) no judging infrastructure was established; (6) no judges were identified; (7) no winners were announced; (8) no prizes were paid; and (9) all prize representations remained posted on the website for twelve months while the showcase page displayed Plaintiff's project as promotional content. This sequence — in which Doe Defendant 1 advertised prizes first, created a nominal wallet weeks later, funded it at a fraction of the advertised amount, and then abandoned the contest entirely while continuing to display participants' projects — establishes a strong inference that Doe Defendant 1 knew from the outset that the prizes would not be awarded. The inference of actual knowledge is further compelled by the fact that Doe Defendant 1 simultaneously controlled both sides of the representation: Doe Defendant 1 published the prize amounts totaling over $1,000,000 on the fundraiser.com website that Doe Defendant 1 itself operated, and Doe Defendant 1 published the G DAO Treasury Wallet address on the same website as the designated prize fund repository — a wallet that Doe Defendant 1, as the operator of the platform, identified, selected, and displayed. Because Doe Defendant 1 was the entity that chose to publish the wallet address as the prize fund, Doe Defendant 1 necessarily knew the wallet's contents — or recklessly failed to ascertain them — at the time it represented to participants that over $1,000,000 in prizes would be awarded from that fund. Doe Defendant 1 cannot have published a wallet containing less than two percent of the advertised prize pool as the "designated prize fund" without knowing that the wallet it was displaying was grossly insufficient to fund the prizes it

was simultaneously advertising. The wallet's contents were not hidden; they were publicly verifiable on the Solana blockchain through any block explorer. Doe Defendant 1 had actual knowledge that its prize representations were false because it controlled the only identified source of prize funds and knew — or deliberately avoided knowing — that the source contained a fraction of the amounts being advertised;

e.      Over twelve months of complete non-performance — no judging, no winners, no prizes, no public explanation — while maintaining the hackathon website with all prize representations intact and Plaintiff's project on continuous public display, is inconsistent with an honest inability to perform and consistent with an original intent not to perform;

f.      The showcase page displays only two genuine submissions alongside seven placeholder entries marked "Coming Soon," indicating no genuine evaluation process was ever established;

**Scienter as to Defendant New Era:**

g.      On January 13, 2025, the Solana Foundation publicly denied any partnership with the hackathon on the X platform. On that same day, Andrew Tate — New Era's CEO — posted a promotional video for the hackathon on X displaying the Solana Foundation logo and stating in his own words: "I decided to put together this hackathon — unprecedented, never done before — over a million dollars in prizes" and "I'll be sponsoring everything myself." (*See* Exhibit V.) The Solana Foundation CMO's denial was posted as a direct public reply on X in the discussion surrounding Tate's promotional video, on the same day. The denial generated significant public attention in the cryptocurrency community and was covered by CryptoTimes the same week. (*See* Exhibit H.) Tate, who was actively posting on X that same day promoting the hackathon and personally claiming to be its sole sponsor, was aware of or recklessly disregarded the Foundation's same-day, same-platform denial. This knowledge is imputable to New Era because Tate is New Era's CEO;

h.      New Era designated itself as "Main Sponsor" of the hackathon while the hackathon website displayed prize representations totaling over $1,000,000 without disclosing any

funding mechanism sufficient to pay those prizes. A basic inspection of the publicly accessible G DAO Treasury Wallet — displayed on the very hackathon page to which New Era directed its subscribers — using publicly available blockchain explorers such as Solscan, would have revealed that the wallet contained less than two percent of the advertised prize pool and had never signed an outgoing transaction. New Era's failure to conduct any due diligence before committing its brand and its subscribers to the hackathon demonstrates reckless disregard for the truth of the contest's prize representations. Moreover, New Era's CEO — the same individual who controlled New Era's decision to designate itself as "Main Sponsor" — personally pledged on January 13, 2025 to "sponsor everything myself" for a contest whose prize treasury did not yet exist. Tate's actual knowledge of the unfunded state of the prize pool is imputable to New Era as a matter of law, establishing that New Era authorized the "Main Sponsor" designation and the "Student Exclusive Period" banner with actual knowledge, through its CEO, that the $1,000,000+ prize pool those representations implicitly guaranteed was entirely unfunded; and

i.  On January 30, 2025, New Era's CEO personally sent a direct message to the brother of a hackathon participant, initiating a chain of communication that led to coordinated promotional activity by a person (Issa) with a documented history of pump-and-dump token schemes in association with Tate. (*See* Exhibits S, T, X.) This direct, personal involvement by New Era's CEO in coordinating promotional activity around a cryptocurrency token minted by an unknown third party bearing the name of a hackathon participant's showcased project (*see* Paragraph 44(m)) — rather than facilitating judging or prize distribution — supports the inference that New Era's leadership was aware that the hackathon's true purpose was promotional exploitation rather than legitimate contest performance. That inference is further strengthened by Tate's public endorsement of the same project the following day as "perfect for the average crypto trader" to an audience of 71,400 viewers (*see* Exhibit W; Paragraph 44(k)), demonstrating that New Era's CEO was actively characterizing hackathon submissions as cryptocurrency trading opportunities rather than AI projects warranting evaluation.

**Scienter as to Defendants Thrifty and Legendary:**

j.    Defendants Thrifty and Legendary are the entities through which New Era's platform "The Real World" is distributed to U.S. consumers. Every consumer-facing website associated with the platform identifies Thrifty and Legendary as distribution partners. The BBB profile for New Era Learning LLC lists Thrifty and Legendary as alternate business names — not merely as partners, but as names under which New Era itself operates. The BBB lists Thrifty's address (800 North State Street) and Legendary's address (221 North Broad Street) as the two locations of New Era Learning LLC. Upon information and belief, as the entities that process subscription payments and distribute The Real World to U.S. consumers, Thrifty and Legendary had access to subscriber registration data and engagement metrics showing hackathon-driven activity on The Real World platform. This data was available to Thrifty and Legendary through their ordinary course of business as payment processors and distributors. Upon information and belief, Thrifty and Legendary received a traceable share of the subscription revenue generated by hackathon-driven engagement. By facilitating the distribution of the platform that served as the hackathon's designated "Main Sponsor" — while the publicly accessible G DAO Treasury Wallet displayed on the hackathon page contained less than two percent of the advertised prize pool, a fact ascertainable through a basic blockchain inspection — Thrifty and Legendary provided substantial assistance to the fraudulent scheme with knowledge of or reckless disregard for the fraud. Their actual knowledge is further established by the integrated enterprise relationship alleged in Paragraph 10: because Thrifty and Legendary are identified by the BBB as alternate business names for New Era — the names under which New Era itself conducts U.S. operations — and because they share the same principal address and operational infrastructure, New Era's actual knowledge of the hackathon and its fraudulent character is directly attributable to Thrifty and Legendary as operating names of the same enterprise.

70.    Defendants made these representations with the intent to induce Plaintiff to develop and submit Bangchain and other participants to develop and submit their own projects, thereby generating content, data, and promotional value for Defendants' platforms. The economic

purpose of the scheme was as follows: by promising over $1,000,000 in prizes that were never funded, Defendants induced skilled developers to create functional AI projects and submit them for public display, generating a showcase of legitimate project content that served as an ongoing marketing asset for Defendants' venture capital platform (fundraiser.com) and educational platform (The Real World). The contest simultaneously generated social media engagement and promotional activity that expanded the reach of Defendants' brands. Defendants obtained all of these benefits — project content displayed for over twelve months, subscriber data, platform registrations, traffic, and brand promotion — in exchange for prize promises that were never funded at more than two percent of the advertised amount and were never intended to be honored, as demonstrated by the G DAO Treasury Wallet's creation three weeks after prize advertising began, its total absence of outgoing transactions, and Defendants' complete failure to establish any judging infrastructure.

71. Plaintiff actually and justifiably relied on Defendants' representations in deciding to participate in the hackathon and in investing approximately 200 hours and direct out-of-pocket costs over four weeks in North Las Vegas, Nevada developing and submitting Bangchain. Specifically, Plaintiff relied on: (a) the prize representations totaling over $1,000,000, which induced Plaintiff to devote weeks of skilled development labor to the project; (b) the three-round judging process and defined criteria, which Plaintiff used to design and calibrate Bangchain's technical features; (c) the winner announcement timeline of approximately two weeks, which set Plaintiff's expectation that the contest would conclude promptly; (d) New Era's designation as "Main Sponsor" of the hackathon, which signaled to Plaintiff that the contest had institutional backing from a known commercial entity and was therefore worth the investment of time and resources; and (e) Defendant Tate's personal pledge that "I'll be sponsoring everything myself," made in a promotional video posted to the X platform on January 13, 2025 (see Exhibit V), which constituted a personal financial commitment by an identified individual to fund the hackathon's $1,000,000+ prize pool and which, combined with the specificity of the prize amounts and the professional contest infrastructure, induced Plaintiff to conclude that the prizes were personally guaranteed by Tate and would be awarded. Plaintiff would not have invested the approximately 200 hours and direct costs required to develop and

submit Bangchain but for these representations. Plaintiff's reliance was justifiable given the specificity of the prize amounts, the professional quality of the contest website, the detailed judging criteria, the formal submission infrastructure, the named sponsors, and the identity verification requirement through an established platform. *See Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 956 P.2d 1382 (1998); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009).

72.     Defendant Tate is personally liable for fraudulent misrepresentation because Tate personally made false representations to the public with knowledge of their falsity. On January 13, 2025, Tate personally declared "I'll be sponsoring everything myself" for a hackathon advertising over $1,000,000 in prizes, while displaying the unauthorized Solana Foundation logo. At the time Tate made this statement, no prize funding mechanism of any kind existed — no treasury wallet, no escrow account, no bank account, and no smart contract had been created to hold or disburse the prizes Tate pledged to personally fund. The G DAO Treasury Wallet was not created until three weeks later, on February 4, 2025, and when it was finally created, it was funded at less than two percent of the advertised amount and never signed a single outgoing transaction. The Solana Foundation had publicly denied any partnership on the same platform, on the same day Tate made his promotional video. Tate thus personally represented that he would fund a $1,000,000+ prize pool while knowing or recklessly disregarding that no funds had been allocated, no funding mechanism existed, and a claimed partner had publicly disavowed the event. Tate further personally coordinated promotional activity around a cryptocurrency token — minted that same day by an unknown third party bearing the name of a hackathon participant's showcased project (*see* Paragraph 44(m)) — through Issa on January 30, 2025, and publicly endorsed the project on X/Twitter the following day as "perfect for the average crypto trader" in a post viewed 71,400 times (*see* Exhibit W), demonstrating that Tate was aware the hackathon's purpose was promotional exploitation rather than legitimate contest performance. If New Era was never formally organized as a limited liability company, Tate has no corporate shield and is personally liable for all obligations incurred under the New Era name. Even if New Era was validly formed, Tate is personally liable for his own tortious conduct regardless of his status as an officer or member of New Era.

72a.    Defendant New Era is independently liable for fraudulent misrepresentation because New Era itself made express, affirmative representations of fact to hackathon participants. As set forth in Paragraph 67(g), New Era made three categories of express representations: (1) the "Main Sponsor" designation, by which New Era expressly represented that it had committed institutional support and credibility to the hackathon and its $1,000,000+ prize pool; (2) the "THE REAL WORLD STUDENT EXCLUSIVE PERIOD" banner, by which New Era expressly represented to its own paying subscribers that the hackathon was a genuine, New Era–endorsed contest offering exclusive access to Real World students; and (3) subscriber-directed marketing through the "Student Exclusive Period" banner and live purchase notifications on the fundraiser.com/apply page, by which New Era expressly represented that it was commercially invested in and profiting from the hackathon. Each of these was an express, written or displayed representation of fact — not a vague implication — published on pages within or linked to New Era's commercial ecosystem and directed at New Era's subscriber base. To be clear: the words "Main Sponsor" are literal text published on the fundraiser.com/hackathon page; the words "THE REAL WORLD STUDENT EXCLUSIVE PERIOD" are literal text published on the fundraiser.com/apply page; the live purchase notifications (e.g., "[Name] from [Country] has purchased The Real World") are literal text dynamically displayed on the same fundraiser.com/apply page. These are not inferences drawn by Plaintiff from New Era's conduct — they are the actual, verbatim words that New Era caused to be published on identified webpages on identified dates. Each was false: the contest was funded at less than two percent of the advertised amount, was never performed, and New Era had conducted no due diligence to verify the contest's legitimacy before directing its subscribers to participate. New Era made these representations with knowledge or reckless disregard of their falsity: New Era's CEO was actively posting on X/Twitter on January 13, 2025 — the same day the Solana Foundation publicly denied involvement — and was aware of or recklessly disregarded the Foundation's same-day, same-platform denial (¶ 69(g)); a basic inspection of the publicly accessible G DAO Treasury Wallet displayed on the hackathon page would have revealed that the prize pool was funded at less than two percent of the advertised amount (¶ 69(h)); and New Era nonetheless continued its "Main Sponsor" designation, its subscriber-

directed marketing, and its identity-verification requirement on the fundraiser.com/apply page without any correction or disclaimer. In addition, New Era provided substantial assistance to Doe Defendant 1's fraudulent scheme by authorizing the integration of its proprietary platform throughout the fundraiser.com ecosystem — including as the identity-verification mechanism on the investment application page at fundraiser.com/apply — which lent institutional credibility to the contest and enabled the collection of participants' personal data. *See In re First Alliance Lending Corp.*, 471 F.3d 977, 993 (9th Cir. 2006); *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983).

72b.    Defendants Thrifty and Legendary are liable for fraudulent misrepresentation as participants in the integrated enterprise through which the fraudulent representations were made and disseminated. Thrifty and Legendary are identified on every consumer-facing website as the distribution partners for "The Real World," the platform designated as the hackathon's "Main Sponsor." The BBB lists "Thrifty Consulting LLC" and "Legendary Courses, Inc" as alternate business names for New Era Learning LLC — not as independent entities. Thrifty's address (800 North State Street) is listed as New Era's primary business address. Upon information and belief, Thrifty and Legendary are the entities through which New Era conducts its U.S. commercial operations, and they participated in and profited from the scheme by distributing the platform designated as the hackathon's "Main Sponsor." In the alternative, Thrifty and Legendary are liable for aiding and abetting Doe Defendant 1's and Tate's fraudulent scheme because they: (a) had actual knowledge of the fraud because, as the entities identified by the BBB as alternate business names for New Era — not independent partners, but names under which New Era itself operates — Thrifty and Legendary are the same enterprise as New Era and share the same operational knowledge. The BBB's designation is not an external classification; it reflects the manner in which New Era holds itself out to consumers — listing Thrifty's and Legendary's addresses as New Era's own business locations. Because Thrifty and Legendary are the names under which New Era conducts its U.S. commercial operations, New Era's actual knowledge of the hackathon — established through its CEO Tate's personal promotion, the same-day Solana Foundation denial, and the publicly verifiable wallet deficiency (see ¶¶ 69(g)–(i)) — is directly attributable to Thrifty and Legendary as the operating names of the same

enterprise. Their actual knowledge is further established by the following particularized facts: (i) the BBB identifies Thrifty and Legendary not as independent partners but as *alternate business names* for New Era Learning LLC — meaning, as the BBB reports it, they *are* New Era, and New Era's actual knowledge of the hackathon is imputed to its own alternate names; (ii) Thrifty and Legendary share a principal business address with New Era (800 North State Street, Dover, Delaware), from which the enterprise's U.S. operations are conducted; (iii) as the entities identified on every consumer-facing page as the distribution and payment-processing partners for The Real World, Thrifty and Legendary necessarily received, reviewed, or had access to the subscription-payment data showing new hackathon-driven registrations — a sudden influx of approximately $49.99/month payments from users who purchased subscriptions in connection with a publicly promoted contest; (iv) the hackathon was promoted through Tate's personal social media to millions of followers and through the fundraiser.com website, making it publicly known to anyone involved in the enterprise's operations; and (v) the publicly verifiable G DAO Treasury Wallet — which Thrifty and Legendary, as insiders of the enterprise, were positioned to inspect — contained less than two percent of the advertised prize pool, a fact that would have alerted any entity with knowledge of the contest to the fraudulent character of the prize representations; (b) provided substantial assistance by processing subscription payments from hackathon participants who purchased subscriptions in connection with the hackathon, thereby directly monetizing the fraudulent scheme and enabling the collection of subscription revenue that constituted a primary economic objective of the fraud. Without Thrifty's and Legendary's active participation in processing these payments and distributing the platform, the deep integration between the hackathon and Defendants' subscription ecosystem — and the associated subscription revenue extraction — could not have functioned; and (c) derived direct financial benefit from the hackathon-induced subscriptions. *See In re First Alliance Lending Corp.*, 471 F.3d 977, 993 (9th Cir. 2006); *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983).

72c.    In the alternative, and to the extent this Court concludes that the Complaint does not adequately allege that Defendants Thrifty or Legendary made direct fraudulent misrepresentations satisfying Rule 9(b), Defendants Thrifty and Legendary are independently

liable under a theory of aiding and abetting fraud. Under Nevada law, a defendant is liable for aiding and abetting a tort when the defendant (1) knows that the other party's conduct constitutes a breach of duty, and (2) gives substantial assistance or encouragement to the other party. *See Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983); *In re First Alliance Lending Corp.*, 471 F.3d 977, 993 (9th Cir. 2006). Thrifty and Legendary satisfy both elements: first, as the entities through which New Era distributes The Real World to U.S. consumers — identified as distribution partners on every consumer-facing website and listed by the BBB as alternate business names for New Era — Thrifty and Legendary had actual knowledge — directly attributable from New Era because the BBB identifies them as alternate business names for New Era, not as independent entities — that the hackathon was advertising over $1,000,000 in prizes funded at less than two percent of the advertised amount and that New Era's platform was designated as "Main Sponsor" of the contest. This knowledge is inferable from the particularized facts set forth in Paragraph 72b(a)(i)–(v), including the BBB's identification of Thrifty and Legendary as alternate business names for New Era, their shared principal address, their processing of hackathon-driven subscription payments, the public promotion of the hackathon, and the publicly verifiable G DAO Treasury Wallet balance; second, Thrifty and Legendary provided substantial assistance to Doe Defendant 1's and Tate's fraudulent scheme by continuing to distribute the platform designated as "Main Sponsor" of the hackathon, processing hackathon-driven subscription payments, and maintaining the commercial infrastructure that lent institutional credibility to the fraudulent contest.

73. As a direct and proximate result of Defendants' fraudulent misrepresentations, and Plaintiff's justifiable reliance thereon, Plaintiff has suffered damages in an amount to be proven at trial, including: (a) reliance damages — the reasonable value of approximately 200 hours of skilled development labor at the prevailing market rate for freelance AI development services of approximately $150 per hour (approximately $30,000), plus direct out-of-pocket costs including cloud computing resources, development tools, Solana blockchain integration resources, and the Real World subscription purchased in connection with the hackathon (approximately $49.99 per month), all of which Plaintiff invested in creating and submitting Bangchain in reliance on the false prize, judging, and sponsorship representations and would not have invested but for those

representations; (b) lost prize opportunity — in the alternative or in addition to reliance damages, the destruction of Plaintiff's substantial chance of receiving prizes as one of only two participants whose projects were publicly displayed in a contest advertising over $1,000,000 in prizes, recoverable under the lost-chance doctrine; (c) opportunity costs — the value of freelance AI development opportunities that Plaintiff declined in reliance on the false representations; and (d) unauthorized commercial exploitation — the value of Defendants' twelve-month use of Plaintiff's Bangchain as the lead entry on the showcase page as ongoing promotional marketing content for Defendants' venture capital and educational platforms, which exploitation was made possible by, and is a direct consequence of, the fraudulent inducement that caused Plaintiff to submit the project in the first instance.

**FIFTH CAUSE OF ACTION**

**Violation of Nevada Deceptive Trade Practices Act**

**(NRS 598.0903 *et seq.*)**

**(Against All Defendants)**

74.    Plaintiff repeats and realleges Paragraphs 1 through 3 (Introduction), 4 through 10b (The Parties), 21 through 24 (Defendants' Promotion and the Solana Foundation's Denial), 25 through 38a (Contest Terms, Plaintiff's Participation, and the Inducement Structure), 39 through 43 (Defendants' Complete Failure to Perform), 44(a) through 44(r) (Additional Circumstances Supporting Deceptive Intent), and 45 through 46 (Defendant New Era's Operational Role) as if fully set forth herein.

75.    At all relevant times, each Defendant qualified as a "person" engaged in "trade or commerce" within the meaning of NRS 598.0903. NRS 598.0903(1) defines "person" to include "a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity." Defendant Tate is a natural person who operates a commercial enterprise encompassing a paid subscription platform (The Real World), a venture capital platform (fundraiser.com), and personal brand licensing; Tate participated in trade or commerce by using the hackathon to advertise his branded platform and to generate commercial attention

for cryptocurrency tokens associated with hackathon participants — as confirmed by Tate's own public characterization of a hackathon project as "perfect for the average crypto trader" on January 31, 2025 (*see* Exhibit W). Defendant New Era is a legal entity that operates The Real World as a paid subscription platform selling subscriptions to consumers located in Nevada and nationwide; New Era used the hackathon to promote The Real World by designating it as "Main Sponsor," directing its subscribers to participate through the "Student Exclusive Period," and commercially benefiting from hackathon-driven subscriber engagement; the "Student Exclusive Period" further demonstrates that New Era used the hackathon as a marketing vehicle for its paid subscription service. Doe Defendant 1 is a legal entity that operated fundraiser.com as a commercial venture capital platform accessible to and used by consumers in Nevada, including Plaintiff, who accessed the platform and submitted his project while physically located in North Las Vegas, Nevada. Defendants Thrifty and Legendary are legal entities that participated in trade or commerce as the entities through which The Real World platform is distributed to U.S. consumers, including Nevada consumers; they are identified on every consumer-facing website as distribution partners, and the BBB lists them as alternate business names for New Era Learning LLC. Each Defendant's conduct constitutes "trade" or "commerce" as those terms are broadly construed under the NDTPA. Plaintiff's nexus to Nevada commerce is direct and specific: Plaintiff purchased a Real World subscription in connection with the hackathon while physically located in North Las Vegas, Nevada; Plaintiff accessed the fundraiser.com website and submitted his project from North Las Vegas, Nevada; Plaintiff received and relied upon all of Defendants' deceptive representations while located in North Las Vegas, Nevada; and Plaintiff performed all of his development labor in North Las Vegas, Nevada. The deceptive representations were transmitted into Nevada via the internet and received by a Nevada consumer, establishing the requisite nexus to Nevada commerce. Critically, the hackathon was not a standalone activity separate from Defendants' commercial enterprise — it was itself a deceptive *advertisement* for the subscription service. The sequence is dispositive: Defendants first published false prize representations to attract developer attention, then channeled those developers into the subscription ecosystem through the "Student Exclusive Period" promotion, the "Main Sponsor" designation, and the deep integration of Real World throughout the

fundraiser.com ecosystem, and then collected approximately $49.99 per month from each developer who subscribed. The hackathon functioned as a customer-acquisition campaign for the subscription service, no different in kind from a fraudulent advertisement that induces a consumer to enter a store and make a purchase. The hackathon's prize representations, judging criteria, and professional infrastructure functioned as marketing materials designed to induce consumers to purchase Real World subscriptions, which was the primary revenue-generating mechanism of the scheme. The subscription is the "good or service" within the meaning of the NDTPA; the hackathon was the deceptive advertisement for that good or service. The NDTPA prohibits deceptive practices "in connection with" the sale of goods or services (NRS 598.0915), and the hackathon was conducted entirely "in connection with" the sale of Real World subscriptions — the hackathon was structured as an extension of Defendants' Real World ecosystem — with The Real World designated as "Main Sponsor," competition tiers mirroring Real World membership tiers, and the "Student Exclusive Period" channeling subscribers into the contest — making the hackathon a promotional vehicle for subscription sales. Defendants used the Hackathon as an integral part of their commercial enterprise — including to attract attention to their brands, drive traffic to their platforms, and induce engagement with their paid ecosystem. Plaintiff's participation in the hackathon constituted a "consumer transaction" within the meaning of the NDTPA because: (i) Plaintiff purchased a paid subscription to The Real World at approximately $49.99 per month in connection with the hackathon — the hackathon was deeply integrated with Defendants' Real World ecosystem through the "Main Sponsor" designation, the "Student Exclusive Period," and the mirroring of Real World membership tiers, and this integration induced Plaintiff to purchase the subscription — and this $49.99/month subscription is, standing alone, an indisputable consumer transaction: it is the purchase of a commercial service (access to an online educational platform) by a consumer (Plaintiff) from a commercial vendor (Defendants); (ii) Plaintiff was not a first-time customer of Defendants' platform — Plaintiff had previously purchased Real World subscriptions on two separate prior occasions (approximately November 2022 and approximately March 2024), each time for approximately one month (*see* Exhibit Y), establishing an ongoing consumer relationship with Defendants' commercial subscription service that predated the hackathon by more than two

years; (iii) the hackathon was promoted and marketed as a commercial offering of Defendants' enterprise, integrated into the same website ecosystem as Defendants' venture capital platform and subscription business; and (iv) the hackathon served as a promotional vehicle for Defendants' paid subscription platform, inducing participants — including Plaintiff — to engage with Defendants' commercial ecosystem and purchase subscriptions. The NDTPA broadly protects consumers from deceptive trade practices in connection with the sale or advertisement of goods and services; the hackathon's prize representations constituted advertising of services in connection with Defendants' commercial enterprise. *See Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009) (deceptive advertising that induces a consumer purchase gives rise to NDTPA liability).

75a.    In the alternative, even if this Court were to conclude that Plaintiff's participation in the hackathon itself was not a consumer transaction, Plaintiff's purchase of a Real World subscription at approximately $49.99 per month was itself an indisputable consumer transaction within the meaning of the NDTPA. The subscription is a paid purchase of a commercial service (access to an online educational platform) from a commercial vendor (New Era, through its distribution partners Thrifty and Legendary) by a consumer (Plaintiff). There is no ambiguity: the purchase of a $49.99/month subscription to a commercial platform is the paradigmatic consumer transaction the NDTPA was enacted to protect. The NDTPA defines "consumer transaction" broadly and does not exclude purchases that are also prerequisites to other activities. A consumer who purchases a gym membership in reliance on a gym's false advertising has standing under a consumer-protection statute regardless of what the consumer does after purchasing the membership. Similarly, a consumer who purchases a subscription to an educational platform in reliance on false representations about a contest hosted through that platform has standing under the NDTPA because the subscription itself is the consumer transaction, and the false representations induced it. The NDTPA is to be liberally construed to effectuate its protective purposes. *See Poole v. Nev. Auto Dealership Invs., LLC*, 135 Nev. Adv. Op. 31 (Ct. App. 2019). Moreover, the subscription purchase is the "but for" consumer transaction: but for Defendants' deceptive hackathon representations — including the $1,000,000+ prize pool, the defined judging criteria, and the "Main Sponsor" endorsement —

Plaintiff would not have purchased the Real World subscription at all. The subscription was not purchased for its educational content but was induced by the hackathon's deep integration with Defendants' Real World ecosystem — including the "Main Sponsor" designation, the "Student Exclusive Period" promotion, and the mirroring of Real World membership tiers in the hackathon's competition structure — which led Plaintiff to believe that a Real World subscription was connected to meaningful hackathon participation. Plaintiff's development labor damages flow from the same deceptive course of conduct that induced the subscription purchase: the deceptive prize representations induced the subscription, and the subscription enabled the participation that consumed approximately 200 hours of Plaintiff's skilled development labor. The subscription and the development labor are not separate transactions but sequential steps in a single, integrated course of consumer conduct induced by a unified set of deceptive representations.

75a-1.　Plaintiff's prior subscription history defeats — rather than supports — any defense argument that the January 2025 subscription was unrelated to the hackathon. Plaintiff had previously subscribed to The Real World on two separate occasions: approximately November 2022 and approximately March 2024, each time for approximately one month. (*See* Exhibit Y.) Critically, both prior subscriptions lapsed after approximately one month and were not renewed. At the time the hackathon was announced in January 2025, Plaintiff had no active Real World subscription and had not maintained one for approximately ten months. This pattern — two brief subscriptions, each voluntarily discontinued after approximately one month, followed by a ten-month gap with no subscription — establishes a clear baseline: absent the hackathon, Plaintiff would not have purchased a new subscription. Plaintiff had twice independently determined that the educational content alone was not worth maintaining, and each time allowed the subscription to lapse. The January 2025 subscription broke this pattern only because a new intervening cause — Defendants' deceptive hackathon representations — induced Plaintiff to re-subscribe. The prior subscriptions thus function as a natural experiment in but-for causation: they demonstrate what Plaintiff does when there is no hackathon (subscribes briefly, then cancels) and what Plaintiff does when Defendants announce a $1,000,000+ prize contest integrated with the subscription platform (re-subscribes after a ten-month hiatus). The

only variable that changed between Plaintiff's pattern of non-subscription and the January 2025 purchase was the hackathon. Moreover, Plaintiff's familiarity with the platform as a prior subscriber reinforces the reasonableness of Plaintiff's reliance: Plaintiff knew Defendants' platform was a genuine commercial enterprise with real infrastructure and a real subscriber base, which made the hackathon's integration with that platform appear credible and legitimate. A consumer who has previously transacted with a vendor is more — not less — reasonable in relying on that vendor's subsequent representations, because the consumer has personal experience with the vendor's commercial operations. Plaintiff's status as a repeat consumer of Defendants' platform confirms both that the January 2025 subscription was a consumer transaction and that Plaintiff's reliance on the hackathon representations was reasonable.

75a-2.    Defendants' deceptive representations about the hackathon — including the false prize representations in violation of NRS 598.0915(1), the false Solana Foundation partnership in violation of NRS 598.0915(2), the advertising with intent not to provide prizes as advertised in violation of NRS 598.0915(9), and the knowing false representations in a transaction in violation of NRS 598.0915(15) — directly induced Plaintiff to enter into that consumer transaction. Plaintiff would not have purchased a Real World subscription but for the fraudulent hackathon representations that induced him to engage with Defendants' ecosystem. Plaintiff's subscription purchase was therefore a direct and proximate result of the deceptive trade practices. To state the causal chain with specificity: (1) Defendants made false prize representations totaling over $1,000,000 in violation of NRS 598.0915(1); (2) Defendants represented that the hackathon had the sponsorship of the Solana Foundation and New Era in violation of NRS 598.0915(2); (3) Defendants advertised prizes with the intent not to provide them in violation of NRS 598.0915(9); (4) Defendants knowingly made false representations in a transaction in violation of NRS 598.0915(15); (5) these deceptive representations induced Plaintiff to participate in the hackathon; (6) in connection with that participation, Plaintiff purchased a Real World subscription at $49.99/month (the consumer transaction); and (7) Plaintiff would not have purchased the subscription but for the deceptive representations. The subscription purchase was not collateral to the deception — it was part of how Defendants

monetized the deception, as the hackathon served as a deceptive advertisement for New Era's subscription service.

75a-3.   Plaintiff's development labor — approximately 200 hours of skilled AI development work at a prevailing market rate of approximately $150 per hour — was likewise a direct and proximate result of the deceptive trade practices that induced the consumer transaction. The subscription purchase and the development labor were not independent acts; they were sequential steps in a single integrated course of conduct induced by the same deceptive representations. Defendants designed the hackathon as an integrated acquisition funnel in which the deceptive prize representations induced participation, participation was intertwined with Defendants' subscription ecosystem, inducing Plaintiff to purchase the subscription (the consumer transaction). The development labor was the foreseeable and intended consequence of the same deceptive representations that induced the subscription purchase. Under NRS 598.0963(1), a victim of consumer fraud may recover "the amount of any actual damages sustained" as a "direct and proximate result" of the deceptive practice. Because Defendants designed the deceptive scheme to extract both the subscription fee and substantial development labor from participants, and because Plaintiff's labor was the intended and foreseeable consequence of the deceptive representations that induced the consumer transaction, Plaintiff's full reliance damages — including the value of his development labor — constitute ascertainable loss proximately caused by Defendants' deceptive trade practices. The NDTPA's private right of action therefore extends to Plaintiff regardless of whether the hackathon participation itself constitutes a consumer transaction, because the deceptive trade practices directly caused Plaintiff to enter into a separate, indisputable consumer transaction (the subscription purchase) and to suffer ascertainable loss as a direct and proximate result. NRS 598.0963(1) authorizes recovery of "the amount of any actual damages sustained by the person as a result of the consumer fraud" (emphasis added). The statute says "any actual damages" — not "damages limited to the price of the consumer transaction." Because Plaintiff's development labor was induced by the same deceptive representations that induced the consumer transaction, and because those representations were designed to extract both the subscription fee and the development labor as part of a single integrated scheme, Plaintiff's full reliance damages —

including the approximately $30,000 value of his development labor — constitute "actual damages sustained . . . as a result of" the deceptive practices within the meaning of NRS 598.0963(1). The NDTPA's damages provision contains no cap tied to the price of the consumer transaction, and Nevada courts have not imposed one. The statute authorizes recovery of "the amount of any actual damages sustained" — language that is deliberately expansive and that encompasses all foreseeable economic harm flowing from the deceptive practices, not merely the price paid in the initial consumer transaction. *See Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009) (NDTPA damages encompass losses sustained as a result of the deceptive practice, not merely the purchase price). The causal chain from the $49.99 subscription to the $30,000 in development labor is neither attenuated nor unprecedented — it is the precise, foreseeable, and intended consequence of Defendants' integrated scheme. Defendants designed the hackathon as a single acquisition funnel in which the deceptive prize representations induced participation, participation was intertwined with Defendants' subscription ecosystem, inducing Plaintiff to purchase the subscription (the consumer transaction), and the subscription purchase accompanied and facilitated the development labor that the scheme was designed to extract. Each step in this chain was planned, structured, and executed by Defendants: Defendants set the prize amounts to induce participation, Defendants integrated the subscription requirement into the contest ecosystem, and Defendants published the judging criteria and timeline that shaped the scope and duration of Plaintiff's labor. The development labor was not a collateral consequence of an unrelated consumer purchase — it was the primary economic value Defendants sought to extract through the deceptive scheme, with the subscription serving as the commercial gateway through which Defendants monetized participants' engagement with the hackathon ecosystem. The relationship between the subscription and the development labor is analogous to established NDTPA precedent: a consumer who purchases a vehicle in reliance on a dealer's false odometer representation may recover not only the purchase price but also the cost of repairs necessitated by the vehicle's true condition — consequential damages that exceed the consumer transaction price but flow directly and foreseeably from the deception. *See Poole v. Nev. Auto Dealership Invs., LLC*, 135 Nev. Adv. Op. 31, at *11–12 (Ct. App. 2019) (affirming NDTPA liability for deceptive practices

inducing consumer transactions and recognizing broad remedial scope). Here, the development labor is the functional equivalent of consequential damages: it was the foreseeable, intended, and designed consequence of the deceptive representations that induced the consumer transaction. To impose a transaction-price cap would render the NDTPA impotent against sophisticated fraud schemes that use low-cost consumer transactions as gateways to extract far greater economic value — precisely the type of scheme at issue here, where a $49.99 subscription was induced by a contest designed to extract hundreds of hours of skilled development labor from each participant. The Nevada Legislature's intent to reach beyond the gateway transaction price is further confirmed by NRS 598.0963(2), which authorizes *treble* damages for willful violations — a multiplier that, by definition, extends recovery beyond the consumer's out-of-pocket expenditure and that presupposes the availability of a meaningful base damages figure. At the pleading stage, this Court need not resolve the ultimate scope of recoverable damages; it need only conclude that Plaintiff has plausibly alleged that his development labor was an "actual damage[] sustained . . . as a result of" the deceptive practices — a question for summary judgment or trial, not for Rule 12(b)(6) dismissal. *See Poole*, 135 Nev. Adv. Op. 31 (remedial statutes receive liberal construction).

75b.    The NDTPA is remedial consumer-protection legislation entitled to liberal construction. *See Poole v. Nev. Auto Dealership Invs., LLC*, 135 Nev. Adv. Op. 31, at *11 (Ct. App. 2019) (holding that "[b]ecause the NDTPA is a remedial statutory scheme," courts must "afford[] [it] liberal construction to accomplish its beneficial intent") (quoting *Welfare Div. of State Dep't of Health, Welfare & Rehab. v. Washoe Cty. Welfare Dep't*, 88 Nev. 635, 637, 503 P.2d 457, 458 (1972)); *see also Betsinger v. D.R. Horton, Inc.*, 126 Nev. 162, 166, 232 P.3d 433, 436 (2010) ("Statutory offenses that sound in fraud are separate and distinct from common law fraud."). Under NRS 598.0963(1), a victim of consumer fraud may recover "the amount of any actual damages sustained" as a "direct and proximate result" of the deceptive practice. Ascertainable loss under the NDTPA is not limited to the price of the consumer transaction itself; it encompasses all economic harm that flows directly and proximately from the deception that induced the transaction. Plaintiff's deceptive-practice-induced subscription purchase was the consumer transaction through which Defendants monetized Plaintiff's hackathon

participation, and Plaintiff's subsequent investment of approximately 200 hours of development labor and associated costs was the direct and foreseeable consequence of the same deceptive representations that induced the subscription purchase. Because the subscription was a prerequisite imposed by Defendants as part of their integrated commercial acquisition funnel — and because Defendants designed that funnel specifically to convert hackathon participants into paying subscribers — Plaintiff's full reliance damages constitute ascertainable loss proximately caused by the deceptive trade practices that induced the consumer transaction.

76. Defendants engaged in deceptive trade practices in violation of NRS 598.0915 by, among other things:

a. **NRS 598.0915(1) — Knowingly making false representations as to the characteristics, uses, benefits, or quantities of goods or services.** Defendants knowingly made false representations of fact concerning the Hackathon by representing that over $1,000,000 in prizes would be awarded to participants when Defendants had no intent or ability to pay such prizes. The falsity of these representations is established by: the G DAO Treasury Wallet containing less than two percent of the advertised prize pool; the wallet having never signed an outgoing transaction; the wallet not being created until three weeks after prize advertising began; twelve months of complete non-performance; and the total absence of any judging process. (*See* Exhibits B, K, O.) Each Defendant participated in these false representations: Doe Defendant 1 published the specific prize amounts on the fundraiser.com website and the @fundraiser_com X/Twitter account, specifying a $500,000 grand prize, a $200,000 runner-up prize, a $100,000 award, and additional category prizes totaling over $1,000,000; Defendant Tate personally declared to his millions of followers on January 13, 2025 that he would be "sponsoring everything myself" for a contest advertising "over a million dollars in prizes," personally representing that over $1,000,000 in prizes would be awarded when he knew or recklessly disregarded that no funding mechanism existed; and Defendant New Era expressly designated itself as "Main Sponsor" of a contest advertising over $1,000,000 in prizes, directed its paying subscribers to participate through the "Student Exclusive Period" banner, and deeply integrated its commercial platform into the

hackathon ecosystem through the Main Sponsor designation and Student Exclusive Period promotion — thereby inducing participants to purchase subscriptions and collecting subscription revenue from participants drawn in by the false prize representations. Each Defendant's participation in the false prize representations violated NRS 598.0915(1) independently.

b.   **NRS 598.0915(2) — Representing that goods or services have the sponsorship, approval, characteristics, accessories, uses, or benefits that they do not have.** Defendants represented, directly and expressly, that the hackathon had the sponsorship, approval, and affiliation of the Solana Foundation when it did not. Tate personally displayed the Solana Foundation's logo in his January 13, 2025 promotional video; the hackathon website displayed the logo beginning January 12, 2025. The Solana Foundation publicly denied any involvement on January 13, 2025, before the hackathon launched. (*See* Exhibit H.) Defendants further represented that the hackathon had the sponsorship of New Era ("Main Sponsor" designation) and that such sponsorship was backed by institutional commitment, when in fact New Era provided no funding and conducted no due diligence.

c.   **NRS 598.0915(9) — Advertising goods or services with the intent not to sell or provide them as advertised.** Defendants advertised the hackathon and its prizes with the intent not to provide the prizes as advertised. The intent not to perform is established by the totality of the following circumstantial evidence: Defendants began advertising prizes totaling over $1,000,000 three weeks before creating the G DAO Treasury Wallet; the wallet has never contained more than approximately $16,513 in liquid value (less than two percent of the advertised amount); the wallet has never signed a single outgoing transaction; Defendants established no judging infrastructure; no judges or evaluators were ever identified; Defendants maintained all prize representations on the website for twelve months without announcing winners or awarding any prizes; New Era's CEO coordinated promotional activity around a cryptocurrency token minted by an unknown third party bearing the name of a participant's showcased project (*see* Paragraph 44(m)) on the day that project appeared on the showcase, rather than facilitating judging or prize

distribution; and the following day, Tate publicly endorsed the project as "perfect for the average crypto trader" rather than as an AI innovation warranting evaluation (*see* Exhibit W), demonstrating that Tate viewed the hackathon as a vehicle for cryptocurrency promotion, not legitimate contest performance.

d.     **NRS 598.0915(15) — Knowingly making any other false representation in a transaction.** Defendants knowingly made false representations in a transaction by: (i) representing through the hackathon website and social media that the Solana Foundation was an official partner when it was not and the Foundation had publicly denied involvement before the hackathon launched; (ii) representing that winners would be announced approximately two weeks after the submission deadline when no judging process was established and no winners have been announced in over twelve months; (iii) representing through the "TEAM" section of the official pitch deck that judges or organizers would be identified ("Coming Soon") when no judge, organizer, or evaluator was ever named; (iv) New Era representing through the "Main Sponsor" designation that it had committed institutional backing to the contest when it had provided no funding and conducted no due diligence; (v) New Era representing through the "Student Exclusive Period" banner that the hackathon was a genuine, New Era–endorsed contest offering exclusive access to Real World subscribers, when the contest was unfunded and was never performed; and (vi) displaying Plaintiff's Bangchain as the first-listed project on the showcase page for over twelve months while simultaneously disclaiming endorsement of the projects, thereby using Plaintiff's work as promotional content while disavowing responsibility.

As to Defendants Thrifty and Legendary specifically, Thrifty and Legendary engaged in deceptive trade practices in connection with their distribution of The Real World platform by: (i) distributing the platform designated as "Main Sponsor" of the hackathon, while the contest was not funded and was never performed; (ii) upon information and belief, processing and receiving subscription payments from hackathon-driven engagement, knowing or having reason to know that the hackathon inducing that engagement was not a legitimate contest; and (iii) maintaining their designation as "distribution partners" on the consumer-facing websites that promoted the

hackathon ecosystem, thereby lending their commercial identity to the enterprise's promotional activities. The BBB profile for New Era Learning LLC lists "Thrifty Consulting LLC" and "Legendary Courses, Inc" as alternate business names, and the addresses of Thrifty (800 North State Street) and Legendary (221 North Broad Street) as the only U.S. locations of New Era — demonstrating that Thrifty and Legendary are not arms-length distributors but integral components of the enterprise whose deceptive practices are alleged herein.

As to Defendant New Era specifically, New Era engaged in deceptive trade practices in connection with its own trade or commerce by: (i) beginning on or about September 27, 2024 and continuing through at least the date of this Complaint, advertising a "THE REAL WORLD STUDENT EXCLUSIVE PERIOD" on the investment application page at fundraiser.com/apply (which was part of the hackathon ecosystem), representing to its paying subscribers and hackathon participants that the hackathon was a New Era–endorsed contest worthy of their participation (*see* Exhibit F; Wayback Machine capture, Sep. 27, 2024); (ii) from on or about January 15, 2025 through the date of this Complaint, listing The Real World as a "Main Sponsor" of a contest advertising over $1,000,000 in prizes on the fundraiser.com/hackathon page (*see* Exhibit L); and (iii) from on or about January 15, 2025 through the date of this Complaint, deeply integrating The Real World into the hackathon ecosystem — including through the "Main Sponsor" designation, competition tiers mirroring Real World membership tiers, and the investment application page at fundraiser.com/apply requiring Real World identity verification (*see* Exhibit F) — thereby using the hackathon to drive subscriber engagement with New Era's paid commercial platform. These representations were made in connection with New Era's subscription business and were false because the contest was not funded at more than two percent of the advertised prize pool, had been publicly disavowed by a claimed partner (the Solana Foundation) before it launched, and was never performed. New Era's CEO was actively posting on the same social media platform (X/Twitter) on the same day the Solana Foundation's denial was published, and a basic inspection of the publicly accessible treasury wallet would have revealed the absence of prize funding. New Era's representations therefore constituted knowing or reckless false representations in connection with its trade or commerce in violation of NRS 598.0915(1) (knowingly making false representations as to the characteristics, uses,

benefits, or quantities of goods or services — i.e., representing through "Main Sponsor" that the contest had institutional financial backing when it did not); NRS 598.0915(2) (representing that the hackathon had the sponsorship and approval of New Era when New Era provided no funding and conducted no due diligence); NRS 598.0915(9) (advertising the hackathon and its prizes with intent not to provide them as advertised, as demonstrated by the absence of any prize funding, judging infrastructure, or performance over twelve months); and NRS 598.0915(15) (knowingly making false representations in a transaction — specifically, the "Main Sponsor" designation and "Student Exclusive Period" banner, each of which was a knowing false representation of fact in connection with the subscription transactions induced by the hackathon).

As to Defendant Tate specifically, Tate engaged in deceptive trade practices in connection with his own trade or commerce by: (i) on January 13, 2025, personally declaring to his millions of social media followers that he would be "sponsoring everything myself" for a hackathon advertising "over a million dollars in prizes," when no funding mechanism for those prizes existed, in violation of NRS 598.0915(1) (knowingly making false representations as to the benefits of services) and NRS 598.0915(15) (knowingly making a false representation in a transaction); (ii) displaying the Solana Foundation's logo in his promotional video and representing that the Foundation was an official partner when the Foundation had publicly denied involvement on the same day and on the same platform, in violation of NRS 598.0915(2) (representing that services have sponsorship or approval they do not have); (iii) on January 31, 2025, publicly endorsing a hackathon submission as "perfect for the average crypto trader" to an audience of 71,400 viewers — characterizing the hackathon as a vehicle for cryptocurrency trading rather than a legitimate contest — while the contest remained entirely unperformed, in violation of NRS 598.0915(9) (advertising services with intent not to provide them as advertised); and (iv) personally coordinating promotional activity around a cryptocurrency token — minted that same day by an unknown third party bearing the name of a hackathon participant's showcased project (*see* Paragraph 44(m)) — through Issa on January 30, 2025, demonstrating that Tate's purpose was promotional exploitation rather than legitimate contest performance. Tate's deceptive representations were made in connection with his trade or

commerce because Tate used the hackathon to promote his personal brand, his venture capital platform (fundraiser.com, which advertises "Apply For Investment From Andrew Tate & The War Room"), and his paid subscription platform (The Real World), and because the hackathon's deep integration with The Real World ecosystem induced participants — including Plaintiff — to purchase subscriptions to Defendants' commercial platform.

77.    Plaintiff suffered ascertainable loss as a direct and proximate result of Defendants' deceptive trade practices. Plaintiff's ascertainable loss includes: (a) reliance damages — the fair market value of approximately 200 hours of development time and resources invested in creating Bangchain, at the prevailing market rate for freelance AI development services of approximately $150 per hour (approximately $30,000), plus direct out-of-pocket costs including a Real World subscription purchased in connection with the hackathon (approximately $49.99 per month); (b) the destruction of Plaintiff's substantial chance to compete for prizes valued at up to $500,000 in a contest with only two genuine submissions; (c) opportunity costs of forgone freelance AI development opportunities during the contest period; (d) the value of personal data provided to Defendants' commercial ecosystem under false pretenses; and (e) the commercial exploitation value of Defendants' unauthorized twelve-month display of Plaintiff's Bangchain project as the first-listed entry on the hackathon showcase page, using Plaintiff's work product as promotional marketing content for Defendants' venture capital and educational platforms without compensation.

78.    Pursuant to NRS 598.0963, Plaintiff is entitled to actual damages, and because Defendants' violations were willful, the Court may increase the award up to three times the amount otherwise awardable. Plaintiff is also entitled to costs of suit as provided by NRS 598.0963(3).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Anthony Mitchell respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, jointly and severally, and award the following relief:

A.    Compensatory damages in an amount to be proven at trial, including but not limited to: reliance damages representing the value of approximately 200 hours of skilled

development labor and direct out-of-pocket costs; lost-chance damages for the destruction of Plaintiff's substantial probability of receiving prizes in a contest with only two genuine submissions; opportunity costs for forgone freelance AI development work; and the commercial exploitation value of Defendants' unauthorized twelve-month display of Plaintiff's project as the lead entry on the hackathon showcase page;

B.      Restitution and disgorgement of benefits Defendants obtained through the Hackathon, including the value of Plaintiff's project Bangchain displayed on their showcase page for more than twelve months as promotional content, the ongoing promotional value of directing public attention toward the Bangchain cryptocurrency token through the continued display of the identically named project on Defendants' live website, the engagement data and login activity generated through Defendants' platform, and the promotional value of Plaintiff's participation;

C.      Treble damages pursuant to NRS 598.0963(2) based on Defendants' willful deceptive trade practices;

D.    Costs of suit pursuant to NRS 598.0963(3) and as otherwise provided by law;

E.    Pre-judgment and post-judgment interest at the maximum rate permitted by law;

F.    A declaration that Defendants' operation of the Hackathon constituted deceptive trade practices in violation of NRS 598.0903 *et seq.*;

G.      Leave to amend to substitute the true names and identities of Doe Defendants 1 through 10 when ascertained through discovery; and

H.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: March 4, 2026

Respectfully submitted,

*/s/ Anthony Mitchell*


ANTHONY MITCHELL

618 Painted Opus Place

North Las Vegas, Nevada 89084

Telephone: (702) 884-0472

Email: realanthonymitchell@gmail.com

*Pro Se* Plaintiff

**LIST OF EXHIBITS**

*(Exhibits to be attached upon filing)*

**Exhibit A**   AI Hackathon Main Webpage (fundraiser.com/hackathon) — full page capture including header, prize banner, and footer

**Exhibit B**   Prize Pool Sections from fundraiser.com/hackathon — Main Prize Pool ($800,000), Tracks Prize Pool ($150,000), Special Awards ($100,000), Additional Incentives ($50,000)

**Exhibit C**   FAQ Section from fundraiser.com/hackathon — judging criteria, three-round process ("Hustlers Round" / "Graduate" / "PhD"), winner announcement timeline, IP ownership

**Exhibit D**   Official Hackathon Pitch Deck from deck.fundraiser.com/aideck — including Timeline slide (Launch, Deadline, Winner Announcement dates), Team section (three "???" / "Coming Soon" placeholder entries with no identified judges or organizers), Treasury Wallet section ("Developers can send tokens to our treasury wallet to grab attention" with address listed as "Coming Soon"), and Vision section ("Beyond a Hackathon: Launchpad for real AI startups" / "Funding Opportunities: Private seed and beyond")

**Exhibit E**   X/Twitter Post by @fundraiser_com (January 16, 2025) announcing "$1,000,000 prize pool" hackathon

**Exhibit F**   Investment Application Page at fundraiser.com/apply — showing pitch deck upload form, "Log Into The Real World To Verify Identity" directive, "THE REAL WORLD STUDENT EXCLUSIVE PERIOD" banner, and live Real World purchase notifications

**Exhibit G**   Project Showcase Page at fundraiser.com/hackathon/showcase showing Plaintiff's Bangchain as first-listed project with seven "Coming Soon" placeholders

**Exhibit H**   CryptoTimes Article (Jan. 16, 2025): "Solana Foundation distances itself from Andrew Tate Hackathon" — documenting unauthorized Solana Foundation

branding and CMO Akshay BD's public denial

**Exhibit I**      Fundraiser.com Main Page showing "$50M fund," "Apply For Investment From Andrew Tate & The War Room," and "Cobratate" navigation link

**Exhibit J**      Cobratate.com Contact Page showing Andrew Tate's photograph and links to The Real World

**Exhibit K**     G DAO Treasury Wallet Section from fundraiser.com/hackathon showing Solana wallet address

**Exhibit L**      Sponsors Section from fundraiser.com/hackathon showing "The Real World," "Top G," and "Fundraiser Dot Com" as Main Sponsors

**Exhibit M**     Declaration of Anthony Mitchell in Support of Complaint

**Exhibit N**     Fundraiser.com Navigation Menu showing "Cobratate" link to cobratate.com

**Exhibit O**     Solscan Blockchain Explorer Analysis of G DAO Treasury Wallet showing ~$16,513 in liquid assets (0.994 SOL + 16,383.46 USDC), zero outgoing transactions, and 27 pump.fun memecoins with no market liquidity vs. $1M+ advertised prize pool

**Exhibit P**      Archive.org Wayback Machine Captures of fundraiser.com/hackathon (Jan. 12, Mar. 5, Jun. 22, 2025) confirming persistent prize representations and unauthorized Solana Foundation logo

**Exhibit Q**     New Era Learning LLC — Terms of Service, Privacy Policy, and footer disclosures from university.com and jointherealworld.com identifying New Era as "Owner and Manager" of The Real World

**Exhibit R**     DNS/WHOIS Technical Analysis showing shared Cloudflare nameservers, Zoho mail servers, SPF mail delegation, and Vercel hosting across fundraiser.com, university.com, cobratate.com, and jointherealworld.com

**Exhibit S**      X/Twitter Direct Message from Andrew Tate (@Cobratate) to Bryan Mitchell (@prince_of_fakes) — January 30, 2025 — "Head of hackathon wants to reach out" and request for Telegram contact

**Exhibit T**      Telegram Messages between Bryan Mitchell and "Issa" (@issathecooker) — January 30–31, 2025 — documenting Tate-directed contact, hackathon

showcase listing, token locking instructions, coordinated Twitter Space promotion, and Tate's real-time coordination messages

**Exhibit U**    Bangchain AI Token Blockchain Analysis — Solana mint address 8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump — showing token minted by unknown individual on January 30, 2025; total supply of 1,000,000,000 tokens; all-time high of $0.0153 (peak market cap ~$15,300,000) on first trading day; 99.6% price decline to ~$0.0000645 (current market cap ~$64,500); and 15.33% bundled buys

**Exhibit V**    Transcription of Promotional Video Posted by Emory Andrew Tate III (@Cobratate) on X/Twitter — January 13, 2025 (x.com/Cobratate/status/1878595249825828998) — in which Tate states: "I decided to put together this hackathon — unprecedented, never done before — over a million dollars in prizes"; "I'll be sponsoring everything myself via fundraiser.com"; "I have access to the top venture capital firms"; "the Real World token is launching once we have SEC approval"; and directs viewers to fundraiser.com/hackathon

**Exhibit W**    X/Twitter Post and Reply — January 31, 2025 — Bryan Mitchell (@prince_of_fakes) posts screenshot of the PROJECT SHOWCASE page at fundraiser.com/hackathon/showcase featuring Bangchain as the first-listed project, and Emory Andrew Tate III (@Cobratate) replies: "This product is perfect for the average crypto trader tbh." (x.com/Cobratate/status/1885431561857741088; 71,400 views, 488 likes, 84 retweets)

**Exhibit X**    Declaration of Bryan Mitchell in Support of Complaint

**Exhibit Y**    The Real World Subscription Receipts — (1) Welcome email from New Era Learning (support@neweralearning.net) — November 25, 2022 — confirming Plaintiff's access to The Real World; (2) Subscription receipt from New Era Learning — April 28, 2024 — confirming payment of $49.99 for "The Real World Monthly," billing descriptor "UNIVERSITY.COM TRW"

**Exhibit Z**    Hackathon Submission Google Form — "Fundraiser.com Hackathon Submission Form" — the Official Project Submission form for the

fundraiser.com/hackathon Solana AI Hackathon, hosted on Google Forms (docs.google.com), requiring: Project Name, Team Name, Primary Contact (Telegram, Twitter, Email), Project Description, Problem Solved, Solana Blockchain Integration, AI Models/Technologies Used, Link to Demo/Prototype, Award Category (Optional), Fun Pitch Line, Intellectual Property Agreement ("Do you agree that the project submission remains 100% owned by you or your team?"), and Eligibility Confirmation — confirming that the hackathon submission process was conducted through a Google Form and did not require a Real World username or identity verification

**Exhibit AA**   X/Twitter Post by Emory Andrew Tate III (@Cobratate) — January 12, 2025 — "ALL YOU NEED TO GET STARTED: fundraiser.com/hackathon deck.fundraiser.com discord.gg/fundraiser" (399K views, 63 retweets, 759 likes) — with Tate's own reply on January 13, 2025: "Community note is correct, this hackathon is run from Fundraiser.com's treasury and is not affiliated with the Solana foundation." (132K views) — demonstrating Tate's personal acknowledgment of the Solana Foundation non-affiliation while continuing to promote the hackathon

**Exhibit AB**   Telegram Channel — "AI-G Hackathon" (128 subscribers) — Channel created January 12, 2025 — first message links to Tate's X post and references "the Cobratate team" — demonstrating the "AI-G Hackathon" naming variant and the cross-platform promotional infrastructure

**Exhibit AC**   Google Form Header — "Fundraiser.com Hackathon Submission Form" — describing the contest as "the fundraiser.com/hackathon Solana AI Hackathon" and directing participants to Telegram channel t.me/ai_g_hackathon — demonstrating the "Solana AI Hackathon" naming variant and the link between the Google Form submission and the AI-G Hackathon Telegram channel

# EXHIBIT A

AI Hackathon Main Webpage
(fundraiser.com/hackathon)
Full page capture including header, prize banner
("Extended to Feb 15th. Online hackathon. $1M+ in prizes."),
and submission call-to-action

*Source: Plaintiff's screen capture, March 10, 2026*
*Page remains live as of the date of filing*



**EXHIBIT A**

# EXHIBIT B

Prize Pool Sections from fundraiser.com/hackathon
Main Prize Pool ($800,000)
Tracks Prize Pool ($150,000)
Special Awards ($100,000)
Additional Incentives ($50,000)

*Source: Plaintiff's screen captures, March 10, 2026*
*Page remains live as of the date of filing*









# EXHIBIT C

FAQ Section from fundraiser.com/hackathon
All Q&A entries including winner announcement timeline,
judging criteria, rounds, IP ownership, eligibility,
and submission rules

*Source: Plaintiff's screen captures, March 10, 2026*
*Page remains live as of the date of filing*



EXHIBIT C — Page 1 of 8



EXHIBIT C — Page 2 of 8



EXHIBIT C — Page 3 of 8



EXHIBIT C — Page 4 of 8



EXHIBIT C — Page 5 of 8



EXHIBIT C — Page 6 of 8



EXHIBIT C — Page 7 of 8



EXHIBIT C — Page 8 of 8

# EXHIBIT D

Pitch Deck Timeline Slide
(deck.fundraiser.com/aideck — Slide 11/12)
Showing Launch Date, Deadline, and Winner
Announcement dates with G DAO branding

*Source: Plaintiff's screen capture, March 10, 2026*



EXHIBIT D

# EXHIBIT E

X/Twitter Post and Profile for @fundraiser_com
Verified account announcing "$1,000,000 prize pool"
hackathon, showing "Followed by ... Andrew Tate"
and January 16, 2025 announcement post

*Source: Plaintiff's screen capture, March 16, 2026*



# EXHIBIT F

Investment Application Page at fundraiser.com/apply
Showing pitch deck upload form and warning:
"After Submitting You Will Be Required To Log Into
The Real World To Verify Identity"

*Source: Plaintiff's screen capture, March 10, 2026*
*Page remains live as of the date of filing*



# EXHIBIT G

Project Showcase Page
(fundraiser.com/hackathon/showcase)
Showing Plaintiff's "Bangchain" as first-listed project,
"BrokieAI" as second, and seven "Coming Soon"
placeholder entries with no winners designated

*Source: Plaintiff's screen capture, March 10, 2026*
*Page remains live as of the date of filing*



# EXHIBIT H

CryptoTimes Article (January 16, 2025):
"Solana Foundation distances itself from
Andrew Tate Hackathon"
Documenting Tate's January 13, 2025 announcement
of the Hackathon on X/Twitter with unauthorized
Solana Foundation branding, and Solana CMO
Akshay BD's public denial:
"FYI: The Solana Foundation has nothing to do
with this. Be careful, DYOR etc."

*Source: cryptotimes.io — Published January 16, 2025*
*URL: https://cryptotimes.io/2025/01/16/solana-foundation-distances-itself-from-andrew-tate-hackathon*

News ⌄    Exclusive    Opinion    Learn ⌄    Podcasts    More ⌄

**MARKET NEWS**

# Solana Foundation distances itself from Andrew Tate Hackathon

Written By:
**Sourabh Parihar**

Reviewed By:
**Vaibhav Jha**

Last updated: January 16, 2025 6:23 PM
🕐 Published January 16, 2025 6:22 PM

⤴ Share  𝕏  ⓦ  in  ✈  •••

The Solana Foundation has distanced itself from Andrew Tate



### Join Our Newsletter

**Subscribe to get latest crypto news!**

Enter Your Email Address

**Subscribe**

Built with **Kit**

After controversial social media influencer Andrew Tate announced a hackathon on 'X' for Web3 developers bearing the logo of Solana Foundation, the organization has distanced itself from him.

The Solana Foundation had to issue a statement after Tate uploaded a video promoting his hackathon on X platform, using the brand logo of Solana Foundation.

> " **FYI: The Solana Foundation has nothing to do with this. Be careful, DYOR etc.**
> https://t.co/zRAyUDaXXu
>
> — Akshay BD (@akshaybd) January 13, 2025

Tate has recently been in the news for all the wrong reasons including making racist, sexist and derogatory comments on a wide range of topics. He also announced forming a political front- BRUV party– and to contest for Prime Minister of the United Kingdom in 2025. Tate is facing multiple criminal investigations on charges of rape, human trafficking, assault and running a

### Latest News

Eric Trump Said Bitcoin Would Hit $120,000 to $150,000 Next Month: Fact Check

Binance Adds AVAX, LINK, LTC, PAXG, ZEC Trading Pairs With Zero Maker Fees

Doppler Finance and Hex Trust Expand Wrapped XRP for Institutions

White House Sends Kevin Warsh Fed Chair Nomination to Senate

EXHIBIT H

# EXHIBIT I

Fundraiser.com Main Page
Showing "$50M fund," venture capital claims,
"Apply For Investment From Andrew Tate & The War Room,"
and "Cobratate" navigation link

*Source: Plaintiff's screen captures, March 10, 2026*



EXHIBIT I — Page 1 of 3



# Companies That Started With Venture Capital

    



**EXCLUSIVE FUNDING & KNOWLEDGE**

# Apply For Investment From Andrew Tate & The War Room



EXHIBIT I — Page 2 of 3



EXHIBIT I — Page 3 of 3

# EXHIBIT J

Cobratate.com Contact Page
Fundraiser.com's "Contact" link directs users
to cobratate.com/contact, featuring
Andrew Tate's photograph and footer links
to "War Room" and "The Real World"
The form is an email signup for automated mailers
with no message field for actual contact

*Source: Plaintiff's screen captures, March 10, 2026*



cobratate.com/contact

*Tate*

THE REAL WORLD      CHAMPIONS      THE WAR ROOM      WISDOM      RESOURCES      MY ACCOUNT

TOP G      SHOP



# YOUR CHANCE

Once you tell men they need to put in some effort, most of them don't even try. If you're serious about becoming great, you can **contact me below**.

Name

Email

**SEND MESSAGE**

**TOP PROGRAMS**

War Room

The Real World

**MEDIA**

Tate Confidential

**SITEMAP**

Home

41 Tenets

Tales Of Wudan

Programs

Contact Me

**LEGAL**

Refund Policy

Privacy Policy

Terms & Conditions



**EXHIBIT J**

# EXHIBIT K

G DAO Treasury Wallet Section
from fundraiser.com/hackathon
Showing Solana wallet address
55ZBpYaDnpd9QyENdyVrkYWkm76ee15WRnLaKEDwS7Xq
presented as apparent repository of prize funds

*Source: Plaintiff's screen capture, March 10, 2026*
*Page remains live as of the date of filing*



# EXHIBIT L

Sponsors Section from fundraiser.com/hackathon
Showing Main Sponsors:
"The Real World," "Top G," and "Fundraiser Dot Com"
with all Tracks Sponsors listed as "Coming Soon"

*Source: Plaintiff's screen capture, March 10, 2026*
*Page remains live as of the date of filing*



EXHIBIT L

# EXHIBIT M

Declaration of Anthony Mitchell
In Support of Complaint

*Executed under 28 U.S.C. § 1746*

**DECLARATION OF ANTHONY MITCHELL**
**IN SUPPORT OF COMPLAINT**

I, Anthony Mitchell, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

*Identity and Residence*

1. I am the Plaintiff in the above-captioned action. I am over the age of eighteen and competent to testify to the matters set forth herein. I make this Declaration based on my personal knowledge.

2. I am a natural person and a citizen of the State of Nevada. I reside at 618 Painted Opus Place, North Las Vegas, Nevada 89084. I have been domiciled in Nevada at all times relevant to this action.

3. My telephone number is (702) 884-0472. My email address is realanthonymitchell@gmail.com.

*Prior Engagement with Defendants' Ecosystem*

4. On or about November 25, 2022, I subscribed to The Real World, a paid online platform operated by Defendant New Era Learning LLC. I received a welcome email from support@neweralearning.net confirming my access. I subscribed for approximately one month to review the information and content offered on the platform, then canceled my subscription. (See Exhibit Y.)

5. On September 8, 2023, my son was born. I named him Tristan, after Tristan Tate — the brother of Emory Andrew Tate III. This naming reflects the genuine regard in which I held the Tate brand at the time, well before the events giving rise to this action.

6. On or about March 28, 2024, I purchased a second subscription to The Real World at a cost of $49.99 per month. The attached receipt, dated April 28, 2024, reflects the recurring monthly charge one month after my initial subscription date. The receipt was issued by New Era Learning (support@neweralearning.net) and stated that the charge would appear on my receipt as "UNIVERSITY.COM TRW." I held this subscription for approximately one month

to review updated content, then canceled. (See Exhibit Y.)

7. At the time I encountered the HACKATHON G-AI in January 2025, my Real World subscription had lapsed. I was not an active subscriber.

*Discovery of the Hackathon*

8. In or about January 2025, while located in North Las Vegas, Nevada, I became aware of the "HACKATHON G-AI" through online promotional materials, including the website fundraiser.com/hackathon and social media posts by the verified X/Twitter account @fundraiser_com.

9. I reviewed the hackathon website at fundraiser.com/hackathon, which described itself as a "$1M+ in prizes" artificial intelligence hackathon. The website displayed detailed prize categories, judging criteria, submission requirements, and a timeline for winner announcements.

10. I reviewed the prize pool, which specified over $1,000,000 in prizes, including: a $500,000 "Top G Grand Prize"; a $200,000 "Hustler's Runner Up Prize"; a $100,000 "Matrix Breaker Award"; a $150,000 "Tracks Prize Pool" across four categories; a $100,000 "Special Awards" pool across four categories; and $50,000 in "Additional Incentives." I also reviewed the FAQ section, which stated that winners would be announced "[a]pproximately two weeks after the hackathon ends."

11. Based on the specificity of the prize amounts, the professional appearance of the website, the detailed judging criteria, the formal submission infrastructure, the multiple named sponsors, and the promotion through a verified social media account followed by Andrew Tate, I believed the hackathon was a legitimate contest that would award the promised prizes.

*Reliance and Participation*

12. In reliance on the representations described above, I decided to participate in the HACKATHON G-AI. I invested substantial time over the course of several weeks, while located in North Las Vegas, Nevada, developing an artificial intelligence project titled "Bangchain."

13. In developing Bangchain, I incurred costs including cloud computing resources, development tools, and related expenses. I also devoted significant personal time to the project that I would otherwise have spent on other productive endeavors, including other hackathons, freelance development work, and independent project development.

14. But for Defendants' representations regarding the prize pool and contest terms, I would not have invested the time and resources required to develop and submit Bangchain.

*Submission*

15. Prior to the extended deadline of February 15, 2025, while located in North Las Vegas, Nevada, I submitted Bangchain through Defendants' designated submission portal at fundraiser.com/apply. I uploaded a pitch deck PDF as required by the submission form. I completed the required identity verification by logging into The Real World as directed by the warning beneath the submission button.

16. My submission was timely, made before the extended deadline of February 15, 2025.

*Post-Submission Observations*

17. On March 10, 2026, I visited the hackathon website from North Las Vegas, Nevada to check on the status of the contest. As of March 10, 2026, no winners had been announced.

18. I reviewed the project showcase page at fundraiser.com/hackathon/showcase. My submission "Bangchain" appeared as the first-listed project on the page, alongside only one other submission ("BrokieAI") and seven placeholder entries marked "Coming Soon." No winners had been designated.

19. On March 10, 2026, I systematically captured screenshots of the entire hackathon website, including: the main hackathon page with the "$1M+ in prizes" banner; the complete prize pool; the FAQ section; the project showcase page showing Bangchain as the first-listed project; the sponsors section; the G DAO Treasury Wallet section; the submission page at fundraiser.com/apply; and the pitch deck timeline from deck.fundraiser.com/aideck. I also captured screenshots of fundraiser.com's main venture capital page and cobratate.com's contact page.

20. On March 16, 2026, I captured a screenshot of the @fundraiser_com X/Twitter profile page, which showed the account as verified with a bio describing a "$1,000,000 prize pool," 1,367 followers, and the notation "Followed by ... Andrew Tate."

*Continued Publication of Hackathon Website*

21. As of the date of this Declaration, the hackathon website at fundraiser.com/hackathon remains live and publicly accessible. The pages at fundraiser.com/hackathon, fundraiser.com/hackathon/showcase, and fundraiser.com/apply continue to display all prize representations, contest terms, judging criteria, and the project showcase page — including my displayed submission Bangchain as the first-listed project. Defendants have maintained this website with all prize representations intact for more than twelve months after the submission deadline, without announcing winners, conducting judging, or paying prizes.

22. I have received no communication from any Defendant regarding the HACKATHON G-AI at any time — before, during, or after the contest period — regarding the status of the hackathon, the judging process, or the contest results. To my knowledge, no other participant has received any such communication.

23. The screenshots I captured on March 10 and March 16, 2026, document the hackathon website content. The website remains accessible and substantially unchanged as of the date of this Declaration.

*Communications Involving My Brother Bryan Mitchell*

24. My brother, Bryan Mitchell, is the individual known on the X/Twitter platform as @prince_of_fakes. On January 30, 2025, Bryan Mitchell received a direct message on X from Andrew Tate (@Cobratate) stating "Hey bro," "Head of hackathon wants to reach out," and "whats your telegram." Bryan Mitchell provided his Telegram contact information. Within minutes, a person identified as "Issa" (associated with the X account @issathecooker) contacted Bryan Mitchell on Telegram, stating "andrew told me to text you." Bryan Mitchell preserved screenshots of both the X direct messages and the Telegram conversation. Bryan Mitchell attests to these facts in his own Declaration. (See Exhibit X.)

25. I am informed and believe, based on Bryan Mitchell's account and Declaration (see Exhibit X), that on January 30, 2025, an unknown individual minted a cryptocurrency token associated with the Bangchain project name on the Solana blockchain and sent a percentage of the token supply to Bryan Mitchell. Issa then instructed Bryan Mitchell to lock up his token holdings, announce a Twitter Space, and promote the Bangchain project publicly. Issa stated that Andrew Tate would join the Twitter Space. A Twitter Space was held but experienced technical difficulties. The token hit its all-time high price on its first day of trading and subsequently declined approximately 99.6% in value, consistent with a pump-and-dump pattern. These communications occurred on the same day that my submission Bangchain appeared on the hackathon showcase page. On January 31, 2025, the following day, Bryan Mitchell posted a screenshot of the hackathon showcase page featuring Bangchain on X/Twitter, and Andrew Tate publicly replied: "This product is perfect for the average crypto trader tbh." The post received 71,400 views. (See Exhibit W.) I did not create, mint, or authorize the creation of the Bangchain token. I did not participate in or authorize any bundled token purchases, coordinated trading activity, or pump-and-dump scheme involving the Bangchain token.

*Current Status*

26. As of the date of this Declaration — more than twelve months after the submission deadline — Defendants have still not announced any winners, conducted any judging process, or paid any portion of the advertised prize pool to me or, to my knowledge, to any other participant.

*Damages*

27. As a direct result of Defendants' conduct, I have suffered damages including: (a) lost prize opportunity — I was deprived of the opportunity to compete for prizes valued at up to $500,000, and my submission Bangchain was the first-listed project on the showcase page, one of only two real submissions; (b) reliance damages — the value of time, labor, and development costs invested in creating Bangchain; (c) opportunity costs — hackathons, freelance work, and employment opportunities forgone; and (d) personal data provided under

false pretenses.

28. The total value of my damages, including lost prize opportunity, reliance damages, and opportunity costs, exceeds $75,000.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 4, 2026, in North Las Vegas, Nevada.


*/s/ Anthony Mitchell*

ANTHONY MITCHELL
618 Painted Opus Place
North Las Vegas, Nevada 89084
(702) 884-0472
realanthonymitchell@gmail.com

# EXHIBIT N

Fundraiser.com Navigation Menu
Showing "Cobratate" link connecting
fundraiser.com to cobratate.com

*Source: Plaintiff's screen capture, March 10, 2026*



EXHIBIT N

# EXHIBIT O

Solscan Blockchain Explorer Analysis
of G DAO Treasury Wallet
Address: 55ZBpYaDnpd9QyENdyVrkYWkm76ee15WRnLaKEDwS7Xq
Showing approximately $16,513 in liquid assets
(less than 2% of advertised $1,000,000+ prize pool)

*Source: Solana Mainnet-Beta RPC & solscan.io*
*Publicly verifiable Solana blockchain record*

# EXHIBIT O — SOLSCAN BLOCKCHAIN EXPLORER ANALYSIS
# G DAO TREASURY WALLET

```
Case:           Mitchell v. Tate et al.
Court:          U.S. District Court, District of Nevada
Prepared by:    Solana Blockchain RPC Query & Solscan.io Cross-Reference
Date:           March 10, 2025
```

## I. WALLET IDENTIFICATION

```
Wallet Address:    55ZBpYaDnpd9QyENdyVrkYWkm76ee15WRnLaKEDwS7Xq
Blockchain:        Solana (Mainnet-Beta)
Label:             G DAO Treasury Wallet
Purpose:           Purported prize pool wallet for the Hackathon
    as displayed on fundraiser.com/hackathon
```

This wallet address was publicly displayed on the fundraiser.com/hackathon
webpage as the designated prize pool treasury for the Hackathon, which
advertised over $1,000,000 in total prizes.

## II. NATIVE SOL BALANCE

```
Balance (lamports):    994,432,593
Balance (SOL):         0.9944 SOL
```
*Approximate USD: $85.12 (at $85.60/SOL, March 10, 2025)*

**FINDING: The wallet holds less than 1 SOL in native balance — insufficient**

even to cover transaction fees for a prize distribution of the advertised
magnitude.

## III. SPL TOKEN HOLDINGS

The wallet contains 35 SPL token accounts. The sole liquid, dollar-pegged
asset is USDC (USD Coin):

### A. USDC (Primary Liquid Asset)

```
Mint:       EPjFWdd5AufqSSqeM2qN1xzybapC8G4wEGGkZwyTDt1v
Balance:    16,383.456857 USDC
USD Value:  $16,383.46
```

### B. Other Token Holdings (Non-Liquid / Negligible Value)

The remaining 34 token accounts consist of meme tokens, pump.fun tokens,
and other speculative tokens with minimal or no meaningful market liquidity.
Representative holdings include:

| Token (Mint Suffix) | Balance | Estimated Value |
|---|---|---|
| ...5JEdw...Wpump | 888 | Negligible |
| ...HsZft...pump | 72,000 | Negligible |
| ...98rRy... | 500,000 | Negligible |
| ...H9Kcf...pump | 50,000,000 | Negligible |
| ...LX2mJ...pump | 1,369 | Negligible |
| ...5UHdu...pump | 11,000 | Negligible |
| ...Dv9dN...pump | 169,420 | Negligible |
| ...CsBtz...pump | 10,000,000 | Negligible |
| ...45CSt...pump | 1,055,000 | Negligible |
| ...YLoto...pump | 153,489 | Negligible |
| ...9g4Cx... | 10,000,000 | Negligible |
| ...NuSvb...pump | 1,111 | Negligible |
| ...4Cnk9...pump | 25.46 | Negligible |
| ...3Lc1C...pump | 12,369 | Negligible |
| ...2LTw2... | 1,000,000 | Negligible |
| ...HfMbP... | 15 | Negligible |

■ ...3LbZx...pump ■ 10,000 ■ Negligible ■
■ ...AbktL... ■ 25,000 ■ Negligible ■
■ ...AYzTE...pump ■ 126,840 ■ Negligible ■
■ ...2MBMBu...pump ■ 2,000,000 ■ Negligible ■
■ ...3KjX1...pump ■ 701,677,559 ■ Negligible ■
■ ...9jKcD... ■ 500,000,000 ■ Negligible ■
■ ...AHFia...pump ■ 25,000,000 ■ Negligible ■
■ ...R1PH1...pump ■ 10,000 ■ Negligible ■
■ ...AWNQt...pump ■ 144,000 ■ Negligible ■
■ ...uEC7E...pump ■ 26,638 ■ Negligible ■
■ ...AH5vL...pump ■ 100,000 ■ Negligible ■
■ ...3vsts...pump ■ 500,000,000 ■ Negligible ■
■ ...2tZRi...pump ■ 11,000,000 ■ Negligible ■
■ ...7219U...pump ■ 11,000,000 ■ Negligible ■
■ ...fnDj6...pump ■ 1,420 ■ Negligible ■
■ ...CMDKx... ■ 69,000 ■ Negligible ■
■ ...9eHUc...pump ■ 100 ■ Negligible ■
■ ...AXNgt...pump ■ 1,000 ■ Negligible ■
■ ...CiEBD... ■ 5,080,742 ■ Negligible ■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

*Note: The majority of these tokens were minted via pump.fun, a Solana meme* token launchpad, and carry minimal or zero market value. Their presence in the purported prize pool wallet raises questions about wallet management practices.

## IV. TOTAL LIQUID ASSETS SUMMARY

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■ Asset ■ USD Value ■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■ SOL (native) ■ $85.12 ■
■ USDC (stablecoin) ■ $16,383.46 ■
■ Other SPL tokens (est.) ■ ~$50 - $100 ■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■ TOTAL LIQUID ASSETS ■ ~$16,513 ■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

## V. COMPARISON TO ADVERTISED PRIZE POOL

```
Advertised Prize Pool:      $1,000,000+
Actual Liquid Assets:       ~$16,513
Shortfall:                  ~$983,487
Percentage Funded:          ~1.65%
```

**FINDING: The G DAO Treasury Wallet — the wallet publicly displayed on** fundraiser.com/hackathon as the designated prize pool — contained approximately $16,513 in liquid assets at the time of analysis. This represents less than 2% of the advertised $1,000,000+ prize pool.

The wallet's holdings are overwhelmingly composed of illiquid meme tokens minted through pump.fun, with only USDC representing a meaningful, dollar-denominated reserve.

## VI. METHODOLOGY

```
Data Source:        Solana Mainnet-Beta RPC endpoint (api.mainnet-beta.solana.com)
Methods Used:       getBalance (SOL), getTokenAccountsByOwner (SPL tokens)
Cross-Reference:    Solscan.io blockchain explorer (solscan.io/account/55ZBp...)
SOL Price Source:   CoinGecko API (api.coingecko.com)
Query Slot:         405,617,176
```

All data is derived from publicly verifiable, immutable Solana blockchain records. Any party may independently verify these findings by querying the Solana blockchain using the wallet address above.

# EXHIBIT P

Archive.org Wayback Machine Captures
of fundraiser.com/hackathon and
fundraiser.com/hackathon/showcase
Confirming: (1) unauthorized Solana Foundation logo
on original page; (2) full prize pool detail;
(3) Plaintiff's Bangchain on showcase;
(4) page still live months after deadline

*Source: web.archive.org — Internet Archive Wayback Machine*
*7 captures between January 12, 2025 and June 22, 2025*





INTERNET ARCHIVE
WayBackMachine

https://www.fundraiser.com/hackathon/showcase          Go

5 captures

DEC | JAN | FEB
30
2025

About this capture

+ PROJECT SHOWCASE +

NONE OF THE FEATURED PROJECTS ON THIS PAGE ARE ENDORSED BY THE
HACKATHON G-AI. THEY JUST PARTICIPATED IN THE HACKATHON, THEY CAN TURN
OUT TO BE A SCAM OR SPAM PROJECT. DYOR.

SUBMIT YOUR PROJECT



Providing unique realistic adult experiences, personalized intimacy and a level of affection that no modern
woman is capable of.

COMING SOON

This is a placeholder description for a project. As new projects are featured in the AI hackathon, they'll
appear here alongside the others.

INTERNET ARCHIVE
WayBackMachine
https://www.fundraiser.com/hackathon/showcase    Go
5 captures
FEB MAR APR
19
About this capture

## + PROJECT SHOWCASE +

NONE OF THE FEATURED PROJECTS ON THIS PAGE ARE ENDORSED BY THE HACKATHON G-AI. THEY JUST PARTICIPATED IN THE HACKATHON, THEY CAN TURN OUT TO BE A SCAM OR SPAM PROJECT. DYOR.

SUBMIT YOUR PROJECT



### BANGCHAIN

Providing unique realistic adult experiences, personalized intimacy and a level of affection that no modern woman is capable of.



### BROKIEAI

Voice enabled, no code AI agent builder made to ease the deployment of custom AI Agents as an 1 click deployment SaaS platform within the Solana ecosystem.

### COMING SOON

This is a placeholder description for a project. As new projects are featured in the AI hackathon, they'll appear here alongside the others.

### COMING SOON

This is a placeholder description for a project. As new projects are featured in the AI hackathon, they'll appear here alongside the others.

### COMING SOON

This is a placeholder description for a project. As new projects are featured in the AI hackathon, they'll appear here alongside the others.

### COMING SOON

This is a placeholder description for a project. As new projects are featured in the AI hackathon, they'll appear here alongside the others.

### COMING SOON

This is a placeholder description for a project. As new projects are featured in the AI hackathon, they'll appear here alongside the others.

### COMING SOON

This is a placeholder description for a project. As new projects are featured in the AI hackathon, they'll appear here alongside the others.

### COMING SOON

This is a placeholder description for a project. As new projects are featured in the AI hackathon, they'll appear here alongside the others.



FUNDRAISER
DOT COM

SHOWCASE    PRIZES    SPONSORS    FAQ    REGISTER    PITCH DECK    PARTNERSHIPS    TWITTER/X

2024 FUNDRAISER.COM AI HACKATHON © ALL RIGHTS RESERVED

# EXHIBIT Q

New Era Learning LLC
Terms of Service, Privacy Policy, and Footer Disclosures
From university.com and jointherealworld.com
identifying New Era Learning LLC as
"Owner and Manager" of The Real World
Each page states: "Owned and Managed by New Era Learning LLC"
and identifies Thrifty Consulting LLC and Legendary Courses, Inc.
as distribution partners with addresses

*Source: university.com/privacy, jointherealworld.com/terms,*
*jointherealworld.com/privacy, university.com — captured March 8, 2026*

Privacy Policy

**Introduction**

This Privacy Policy ("Policy") applies to University.com and New Era Learning LLC ("Company") and governs data collection and usage in compliance with applicable laws and regulations, including the General Data Protection Regulation (GDPR) where applicable. For the purposes of this Privacy Policy, unless otherwise noted, all references to the Company include University.com. By using the Company's application, you consent to the data practices described in this statement.

**Collection of Your Personal Information**

We do not collect personal information beyond the username and email address you provide. This information is collected based on your consent and/or for fulfilling our contract with you. We do not share this information with any third parties. We implement all reasonable measures to ensure the confidential storage and handling of personal information. You understand that your content (excluding credit card information) may be transferred unencrypted and involve:

○ Transmissions over various networks
○ Changes to conform and adapt to technical requirements of connecting networks or devices

We do not have access to your credit card information; this is managed by our payment gateway providers. All credit/debit card details and personally identifiable information will NOT be stored, sold, shared, rented, or leased to any third parties.

**Use of Your Personal Information**

The Company collects and uses your personal information based on your consent and/or for the purpose of fulfilling our contract with you to:

○ Operate and deliver the services you have requested;
○ Provide you with information, products, or services that you request from us;
○ Provide you with notices about your account;
○ Carry out the Company's obligations and enforce our rights arising from any contracts entered between you and us, including for billing and collection;
○ Notify you about changes to our services or any products we offer;
○ For any other purpose with your consent.

**Sharing Information with Third Parties**

The Company does not sell, rent, or lease its customer lists to third parties. The Company may share data with trusted partners to help perform statistical analysis, send you email, or provide customer support. All such third parties are prohibited from using your personal information except to provide these services to the Company, and they are required to maintain the confidentiality and security of your information. We ensure that any data transfers to third parties, including those outside of your country, are safeguarded in accordance with applicable data protection laws, such as the GDPR.
The Company may disclose your personal information without notice if required to do so by law or in the good faith belief that such action is necessary to:

○ Conform to the edicts of the law or comply with legal process served on the Company or the site;
○ Protect and defend the rights or property of the Company;
○ Act under exigent circumstances to protect the personal safety of users of the Company, or the public.

**Your Data Protection Rights Under The General Data Protection Regulation**

If you are a resident of the EEA or the UK, you have the following data protection rights:

○ Access: You have the right to request access to your personal data.
○ Correction: You have the right to request that we correct any information you believe is inaccurate or complete information you believe is incomplete.
○ Deletion: You have the right to request the deletion of your personal data.
○ Objection: You have the right to object to the processing of your personal data.
○ Restriction: You have the right to request that we restrict the processing of your personal data.
○ Portability: You have the right to request the transfer of your personal data to another organization or directly to you.

You can exercise these rights by emailing us at support@University.com. If you have opted-in to receive marketing communications, you can opt out at any time by clicking on the "unsubscribe" link in the emails. To opt out of other forms of marketing, please contact us by email.
If we have collected and processed your personal information with your consent, you can withdraw your consent at any time. Withdrawing your consent will not affect the lawfulness of processing based on consent before its withdrawal.
You also have the right to complain to a data protection authority about our collection and use of your personal information. For more information, please contact your local data protection authority.
We respond to all requests we receive from individuals wishing to exercise their data protection rights in accordance with applicable data protection laws.

**Right to Deletion**

Subject to certain exceptions set out below, upon receipt of a verifiable request from you, we will delete your personal information from our records and direct any service providers to delete your personal information from their records. To make a verifiable request, please contact us at support@University.com.
Please note that we may not be able to comply with requests to delete your personal information if it is necessary to:

○ Complete the transaction for which the personal information was collected, fulfill the terms of a written warranty or product recall conducted in accordance with federal law, and provide a good or service requested by you, or reasonably anticipated within the context of our ongoing business relationship with you, or otherwise perform a contract between you and us;
○ Detect security incidents, protect against malicious, deceptive, fraudulent, or illegal activity; or prosecute those responsible for that activity;
○ Debug to identify and repair errors that impair existing intended functionality;
○ Exercise free speech, ensure the right of another consumer to exercise his or her right of free speech, or exercise another right provided for by law;
○ Comply with the California Electronic Communications Privacy Act;
○ Engage in public or peer-reviewed scientific, historical, or statistical research in the public interest that adheres to all other applicable ethics and privacy laws, when our deletion of the information is likely to render impossible or seriously impair the achievement of such research, provided we have obtained your informed consent;
○ Enable solely internal uses that are reasonably aligned with your expectations based on your relationship with us;
○ Comply with an existing legal obligation; or
○ Otherwise use your personal information, internally, in a lawful manner that is compatible with the context in which you provided the information.

**Children Under Thirteen**

The Company does not knowingly collect personally identifiable information from children under the age of 13. If you are under the age of 13, you must ask your parent or guardian for permission to use this application. If we have collected personal information from a child under age 13 without verification of parental consent, we will delete that information as soon as possible. If you believe this may be the case, please contact us immediately at support@University.com.

**Email Communications**

From time to time, the Company may contact you via email to provide announcements, promotional offers, alerts, confirmations, surveys, and other general communication. To improve our services, we may use cookies or other tracking technologies to receive a notification when you open an email from the Company or click on a link therein. If you would like to stop receiving marketing or promotional communications via email from the Company, you may opt out of such communications by clicking on the unsubscribe button in the email or by contacting us at support@University.com.

**Changes to This Statement**

The Company reserves the right to change this Policy from time to time to meet legal requirements and standards. We will notify you about significant changes by sending a notice to the primary email address specified in your account, placing a prominent notice on our site, and/or updating any privacy information. You will have a reasonable period to review the changes before they take effect. Modifications will be effective on the day they are posted. Your continued use of the application and/or services available after such modifications will constitute your acknowledgment of the modified Policy and agreement to abide by and be bound by that Policy.

**Contact Information**

Enroll Now

The Company welcomes your questions or comments regarding this Policy. If you believe that the Company has not adhered to this Policy,

## Agreement Between User and The Real World

Welcome to The Real World. The Real World website (the "Site") is comprised of various web pages operated by New Era Learning LLC ("NEL"). The Real World is offered to you conditioned on your acceptance without modification of the terms, conditions, and notices contained herein (the "Terms"). Your use of The Real World constitutes your agreement to all such Terms. Please read these terms carefully and keep a copy of them for your reference.

### Service Overview

At The Real World, we take great pride in offering top-quality educational content, personalized support, and a nurturing community, all designed to help our students flourish. We warmly encourage prospective students to thoughtfully consider their commitment to their educational journey before applying. The Real World is specifically crafted for individuals who are dedicated to investing time and effort to achieve tangible results, rather than for those who merely wish to "try out" our offerings. Access to our services is exclusive to members who adhere to these commitments.

### Privacy

Your use of The Real World is subject to NEL's Privacy Policy. Please review our Privacy Policy, which also governs the Site and informs users of our data collection practices.

### Electronic Communications

Visiting The Real World or sending emails to NEL constitutes electronic communications. You consent to receive electronic communications and you agree that all agreements, notices, disclosures, notifications, and other communications that we provide to you electronically, via email and on the Site, satisfy any legal requirement that such communications be in writing.

### Your Account

If you use this site, you are responsible for maintaining the confidentiality of your account and password and for restricting access to your computer. You agree to accept responsibility for all activities that occur under your account or password. You acknowledge that NEL is not responsible for third-party access to your account that results from theft or misappropriation of your account. NEL and its associates reserve the right to refuse or cancel service, terminate accounts, or remove or edit content in our sole discretion. You are responsible for providing accurate and complete information during registration and account management.

### Membership and Payment

Your membership includes access to an exclusive server for education, mentorship, and a positive community to network within. By placing your monthly recurring order of The Real World, you will be charged $99.99 now and every 30 days thereafter until you cancel your subscription. You will receive an electronic receipt after each successful transaction. We accept payments online using Visa, Mastercard, American Express and Discover credit/debit cards in USD (or any other agreed currency). Cancellations must be made before the next billing cycle to avoid being charged for the subsequent month.

### Prohibited Transactions

NEL will NOT conduct business with or provide services or products to any countries sanctioned by the Office of Foreign Assets Control (OFAC) in accordance with the laws of Delaware and the United States.

### Children Under Thirteen

NEL does not knowingly collect, either online or offline, personal information from persons under the age of thirteen. If you are under 13, you may use The Real World only with permission of a parent or guardian.

### Cancellation/Refund Policy

You can cancel your membership at any time by logging into your membership portal and changing your preference. Please note that cancellations must be made before the next billing cycle to avoid being charged for the subsequent month. As a general principle, we do not offer refunds on any of our products or services due to their digital nature. This policy is in place due to the significant investment we make in creating, maintaining, and delivering top-notch content. We understand that life can be unpredictable, and exceptional circumstances may arise that warrant consideration on a case-by-case basis. If you believe your situation calls for an exception to our refund policy, please contact our support team at support@jointherealworld.com.

### Links to Third Party Sites/Third Party Services

The Real World may contain links to other websites ("Linked Sites"). The Linked Sites are not under the control of NEL and NEL is not responsible for the contents of any Linked Site, including without limitation any link contained in a Linked Site, or any changes or updates to a Linked Site. NEL is providing these links to you only as a convenience, and the inclusion of any link does not imply endorsement by NEL of the site or any association with its operators. Certain services made available via The Real World are delivered by third-party sites and organizations. By using any product, service, or functionality originating from The Real World domain, you hereby acknowledge and consent that NEL may share such information and data with any third party with whom NEL has a contractual relationship to provide the requested product, service, or functionality on behalf of The Real World users and customers. You are responsible for complying with the terms of service of any Linked Sites you visit.

### No Unlawful or Prohibited Use/Intellectual Property

You are granted a non-exclusive, non-transferable, revocable license to access and use The Real World strictly in accordance with these terms of use. As a condition of your use of the Site, you warrant to NEL that you will not use the Site for any purpose that is unlawful or prohibited by these Terms. You may not use the Site in any manner which could damage, disable, overburden, or impair the Site or interfere with any other party's use and enjoyment of the Site. You may not obtain or attempt to obtain any materials or information through any means not intentionally made available or provided for through the Site. All content included as part of the Service, such as text, graphics, logos, images, as well as the compilation thereof, and any software used on the Site, is the property of NEL or its suppliers and protected by copyright and other laws that protect intellectual property and proprietary rights. You agree to observe and abide by all copyright and other proprietary notices, legends or other restrictions contained in any such content and will not make any changes thereto. You will not modify, publish, transmit, reverse engineer, participate in the transfer or sale, create derivative works, or in any way exploit any of the content, in whole or in part, found on the Site. NEL content is not for resale. Your use of the Site does not entitle you to make any unauthorized use of any protected content, and in particular, you will not delete or alter any proprietary rights or attribution notices in any content. You will use protected content solely for your personal use and will make no other use of the content without the express written permission of NEL and the copyright owner. You agree that you do not acquire any ownership rights in any protected content. We do not grant you any licenses, express or implied, to the intellectual property of NEL, or our licensors except as expressly authorized by these Terms.

### Use of Communication Services

The Site may contain bulletin board services, chat areas, news groups, forums, communities, personal web pages, calendars, and/or other message or communication facilities designed to enable you to communicate with the public at large or with a group (collectively, "Communication Services"). You agree to use the Communication Services only to post, send and receive messages and material that are proper and related to the particular Communication Service. By way of example, and not as a limitation, you agree that when using a Communication Service, you will not:

- Defame, abuse, harass, stalk, threaten or otherwise violate the legal rights (such as rights of privacy and publicity) of others;
- Publish, post, upload, distribute or disseminate any inappropriate, profane, defamatory, infringing, obscene, indecent or unlawful topic, name, material or information;
- Upload files that contain software or other material protected by intellectual property laws (or by rights of privacy of publicity) unless you own or control the rights thereto or have received all necessary consents;
- Upload files that contain viruses, corrupted files, or any other similar software or programs that may damage the operation of another's computer;
- Advertise or offer to sell or buy any goods or services for any business purpose, unless such Communication Service specifically allows such messages;
- Conduct or forward surveys, contests, pyramid schemes or chain letters;
- Download any file posted by another user of a Communication Service that you know, or reasonably should know, cannot be legally distributed in such manner;
- Falsify or delete any author attributions, legal or other proper notices or proprietary designations or labels of the origin or source of software or other material contained in a file that is uploaded;
- Restrict or inhibit any other user from using and enjoying the Communication Services;
- Violate any code of conduct or other guidelines which may be applicable for any particular Communication Service;
- Harvest or otherwise collect information about others, including e-mail addresses, without their consent;
- Violate any applicable laws or regulations.

NEL has no obligation to monitor the Communication Services. However, NEL reserves the right to review materials posted to a Communication Service and to remove any materials in its sole discretion. NEL reserves the right to terminate your access to any or all of the Communication Services at any time without notice for any reason whatsoever. NEL reserves the right at all times to disclose any information as necessary to satisfy any applicable law, regulation, legal process or governmental request, or to edit, refuse to post or to remove any information or materials, in whole or in part, in NEL's sole discretion.

### Materials Provided to The Real World or Posted on Any NEL Web Page

NEL does not claim ownership of the materials you provide to The Real World (including feedback and suggestions) or post, upload, input, or submit to any NEL Site or our associated services (collectively "Submissions"). However, by posting, uploading, inputting, providing or submitting your Submission you are granting NEL, our affiliated companies and necessary sublicensees permission to use your Submission in connection with the operation of their Internet businesses including, without limitation, the rights to: copy, distribute, transmit, publicly display, publicly perform, reproduce, edit, translate and reformat your Submission; and to publish your name in connection with your Submission. No compensation will be paid with respect to the use of your Submission, as provided herein. NEL is under no obligation to post or use any Submission you may provide and may remove any Submission at any time in NEL's sole discretion.

### International Users

The Service is controlled, operated and administered by NEL from our offices within the USA. If you access the Service from a location outside the USA, you are responsible for compliance with all local laws. You agree that you will not use the NEL Content accessed through The Real World in any country or in any manner prohibited by any applicable laws, restrictions or regulations.

### Indemnification

You agree to indemnify, defend and hold harmless NEL, its officers, directors, employees, agents and third parties, for any losses, costs, liabilities and expenses (including reasonable attorney's fees) relating to or arising out of your use of or inability to use the Site or services, any user postings made by you, your violation of any terms of this Agreement or your violation of any rights of a third party, or your violation of any applicable laws, rules or regulations.

### Class Action Waiver

Any arbitration under these Terms and Conditions will take place on an individual basis; class arbitrations and class/representative/collective actions are not permitted. THE PARTIES AGREE THAT A PARTY MAY BRING CLAIMS AGAINST THE OTHER ONLY IN EACH'S INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PUTATIVE CLASS, COLLECTIVE AND/OR REPRESENTATIVE PROCEEDING, SUCH AS IN THE FORM OF A PRIVATE ATTORNEY GENERAL ACTION AGAINST THE OTHER.

### Liability Disclaimer

THE INFORMATION, SOFTWARE, PRODUCTS, AND SERVICES INCLUDED IN OR AVAILABLE THROUGH THE SITE MAY INCLUDE INACCURACIES OR TYPOGRAPHICAL ERRORS. CHANGES ARE PERIODICALLY ADDED TO THE INFORMATION HEREIN. NEW ERA LEARNING LLC AND/OR ITS SUPPLIERS MAY MAKE IMPROVEMENTS AND/OR CHANGES IN THE SITE AT ANY TIME.

### Termination/Access Restriction

NEL reserves the right, in its sole discretion, to terminate your access to the Site and the related services or any portion thereof at any time, without notice. To the maximum extent permitted by law, this agreement is governed by the laws of the State of Delaware and you hereby consent to the exclusive jurisdiction and venue of courts in Delaware in all disputes arising out of or relating to the use of the Site.

### Changes to Terms

NEL reserves the right, in its sole discretion, to change the Terms under which The Real World is offered. The most current version of the Terms will supersede all previous versions. NEL encourages you to periodically review the Terms to stay informed of our updates.

### Contact Us

NEL welcomes your questions or comments regarding the Terms at support@jointherealworld.com.
Owned and Managed by New Era Learning LLC
Distributed by our partners:

- Thrifty Consulting LLC
  800 North State St Ste 403, Dover, DE 10901
- Legendary Courses, Inc
  221 N. Broad St, Middletown, DE 19709

Effective as of Jan 01, 2025

Privacy Policy

**Introduction**

This Privacy Policy ("Policy") applies to The Real World and New Era Learning LLC ("Company") and governs data collection and usage in compliance with applicable laws and regulations, including the General Data Protection Regulation (GDPR) where applicable. For the purposes of this Privacy Policy, unless otherwise noted, all references to the Company include The Real World. By using the Company's application, you consent to the data practices described in this statement.

**Collection of Your Personal Information**

We do not collect personal information beyond the username and email address you provide. This information is collected based on your consent and/or for fulfilling our contract with you. We do not share this information with any third parties. We implement all reasonable measures to ensure the confidential storage and handling of personal information. You understand that your content (excluding credit card information) may be transferred unencrypted and involve:

○ Transmissions over various networks
○ Changes to conform and adapt to technical requirements of connecting networks or devices

We do not have access to your credit card information; this is managed by our payment gateway providers. All credit/debit card details and personally identifiable information will NOT be stored, sold, shared, rented, or leased to any third parties.

**Use of Your Personal Information**

The Company collects and uses your personal information based on your consent and/or for the purpose of fulfilling our contract with you to:

○ Operate and deliver the services you have requested;
○ Provide you with information, products, or services that you request from us;
○ Provide you with notices about your account;
○ Carry out the Company's obligations and enforce our rights arising from any contracts entered between you and us, including for billing and collection;
○ Notify you about changes to our services or any products we offer;
○ For any other purpose with your consent.

**Sharing Information with Third Parties**

The Company does not sell, rent, or lease its customer lists to third parties. The Company may share data with trusted partners to help perform statistical analysis, send you email, or provide customer support. All such third parties are prohibited from using your personal information except to provide these services to the Company, and they are required to maintain the confidentiality and security of your information. We ensure that any data transfers to third parties, including those outside of your country, are safeguarded in accordance with applicable data protection laws, such as the GDPR.
The Company may disclose your personal information without notice if required to do so by law or in the good faith belief that such action is necessary to:

○ Conform to the edicts of the law or comply with legal process served on the Company or the site;
○ Protect and defend the rights or property of the Company;
○ Act under exigent circumstances to protect the personal safety of users of the Company, or the public.

**Your Data Protection Rights Under The General Data Protection Regulation**

If you are a resident of the EEA or the UK, you have the following data protection rights:

○ Access: You have the right to request access to your personal data.
○ Correction: You have the right to request that we correct any information you believe is inaccurate or complete information you believe is incomplete.
○ Deletion: You have the right to request the deletion of your personal data.
○ Objection: You have the right to object to the processing of your personal data.
○ Restriction: You have the right to request that we restrict the processing of your personal data.
○ Portability: You have the right to request the transfer of your personal data to another organization or directly to you.

You can exercise these rights by emailing us at support@jointherealworld.com. If you have opted-in to receive marketing communications, you can opt out at any time by clicking on the "unsubscribe" link in the emails. To opt out of other forms of marketing, please contact us by email.
If we have collected and processed your personal information with your consent, you can withdraw your consent at any time. Withdrawing your consent will not affect the lawfulness of processing based on consent before its withdrawal.
You also have the right to complain to a data protection authority about our collection and use of your personal information. For more information, please contact your local data protection authority.
We respond to all requests we receive from individuals wishing to exercise their data protection rights in accordance with applicable data protection laws.

**Right to Deletion**

Subject to certain exceptions set out below, upon receipt of a verifiable request from you, we will delete your personal information from our records and direct any service providers to delete your personal information from their records. To make a verifiable request, please contact us at support@jointherealworld.com.
Please note that we may not be able to comply with requests to delete your personal information if it is necessary to:

○ Complete the transaction for which the personal information was collected, fulfill the terms of a written warranty or product recall conducted in accordance with federal law, and provide a good or service requested by you, or reasonably anticipated within the context of our ongoing business relationship with you, or otherwise perform a contract between you and us;
○ Detect security incidents, protect against malicious, deceptive, fraudulent, or illegal activity; or prosecute those responsible for that activity;
○ Debug to identify and repair errors that impair existing intended functionality;
○ Exercise free speech, ensure the right of another consumer to exercise his or her right of free speech, or exercise another right provided for by law;
○ Comply with the California Electronic Communications Privacy Act;
○ Engage in public or peer-reviewed scientific, historical, or statistical research in the public interest that adheres to all other applicable ethics and privacy laws, when our deletion of the information is likely to render impossible or seriously impair the achievement of such research, provided we have obtained your informed consent;
○ Enable solely internal uses that are reasonably aligned with your expectations based on your relationship with us;
○ Comply with an existing legal obligation; or
○ Otherwise use your personal information, internally, in a lawful manner that is compatible with the context in which you provided the information.

**Children Under Thirteen**

The Company does not knowingly collect personally identifiable information from children under the age of 13. If you are under the age of 13, you must ask your parent or guardian for permission to use this application. If we have collected personal information from a child under age 13 without verification of parental consent, we will delete that information as soon as possible. If you believe this may be the case, please contact us immediately at support@jointherealworld.com.

**Email Communications**

From time to time, the Company may contact you via email to provide announcements, promotional offers, alerts, confirmations, surveys, and other general communication. To improve our services, we may use cookies or other tracking technologies to receive a notification when you open an email from the Company or click on a link therein. If you would like to stop receiving marketing or promotional communications via email from the Company, you may opt out of such communications by clicking on the unsubscribe button in the email or by contacting us at support@jointherealworld.com.

**Changes to This Statement**

The Company reserves the right to change this Policy from time to time to meet legal requirements and standards. We will notify you about significant changes by sending a notice to the primary email address specified in your account, placing a prominent notice on our site, and/or updating any privacy information. You will have a reasonable period to review the changes before they take effect. Modifications will be effective on the day they are posted. Your continued use of the application and/or services available after such modifications will constitute your acknowledgment of the modified Policy and agreement to abide by and be bound by that Policy.

**Contact Information**

The Company welcomes your questions or comments regarding this Policy. If you believe that the Company has not adhered to this Policy, please contact us at support@jointherealworld.com.
Owned and Managed by New Era Learning LLC
Distributed by our partners:

○ Thrifty Consulting LLC
   800 North State St Ste 403, Dover, DE 19901
○ Legendary Courses, Inc
   221 N. Broad St, Middletown, DE 19709

Effective as of Jan 01, 2025



# EXHIBIT R

DNS / WHOIS Technical Infrastructure Analysis
Showing shared Cloudflare nameservers
(bob.ns.cloudflare.com / heidi.ns.cloudflare.com),
Zoho mail servers, SPF mail delegation from
therealworld.ag, and Vercel hosting across
fundraiser.com, university.com, cobratate.com,
and jointherealworld.com

*Source: Live DNS lookup records (dig NS, dig MX, dig TXT, dig A)
and WHOIS registration queries — performed March 9, 2026*

## EXHIBIT R — DNS / WHOIS TECHNICAL INFRASTRUCTURE ANALYSIS

```
Case:        Mitchell v. Tate et al.
Prepared by: DNS Forensic Analyst (Technical Exhibit)
Date:        March 9, 2026
Type:        Technical Infrastructure Analysis — Domain Name System (DNS)
```
and WHOIS Registration Records

## I. METHODOLOGY

This analysis was conducted on March 9, 2026, using standard DNS interrogation
tools (dig) and WHOIS registration lookups (whois) from a macOS workstation.
The following record types were queried for each target domain:

```
- NS  (Nameserver)   : Identifies the authoritative DNS servers for the domain
- MX  (Mail Exchange) : Identifies servers authorized to receive email
- TXT (Text)          : Contains SPF mail-authorization policies, domain
```
verification tokens, and other metadata
```
- A   (Address)       : Identifies the IPv4 hosting address(es)
```

Additionally, a WHOIS lookup was performed on fundraiser.com to determine
`registrant identity, and a TXT record lookup was performed on therealworld.ag`
to identify SPF mail-sending delegation.

All results reflect live DNS responses at the time of query. Records are
reproduced verbatim.

## II. TARGET DOMAINS

1. fundraiser.com
2. university.com
3. cobratate.com
4. jointherealworld.com
5. therealworld.ag (supplemental — SPF delegation analysis only)

## III. RESULTS BY DOMAIN

### DOMAIN 1: fundraiser.com

#### A. Nameservers (NS)

```
bob.ns.cloudflare.com.
heidi.ns.cloudflare.com.
```

#### B. Mail Exchange (MX)

```
10 mx.zoho.com.
20 mx2.zoho.com.
50 mx3.zoho.com.
```

#### C. TXT Records

```
"zoho-verification=zb52932876.zmverify.zoho.com"
"google-site-verification=y62Gq-e1_VztjDyZzmW7UogWRrk6MfiaHji0sJAQU0I"
"v=spf1 include:zohomail.com ~all"
```

#### D. A Records (Hosting IP)

```
76.76.21.21

WHOIS on 76.76.21.21:
NetName: VERCEL-01
Organization: Vercel, Inc (ZEITI)
NetRange: 76.76.21.0 - 76.76.21.255
```

HOSTING PROVIDER: Vercel, Inc.

#### E. WHOIS Registration Data

```
Domain Name: fundraiser.com
```

```
Registry Domain ID: 2288051_DOMAIN_COM-VRSN
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Creation Date: 1995-04-23
Registry Expiry Date: 2031-04-24
Updated Date: 2025-06-09

Registrant Name: Registration Private
Registrant Organization: Domains By Proxy, LLC
Registrant Street: DomainsByProxy.com
```
100 S. Mill Ave, Suite 1600
```
Registrant City: Tempe
Registrant State: Arizona
Registrant Country: US
Registrant Phone: +1.4806242599

Domain Status:
clientDeleteProhibited
clientRenewProhibited
clientTransferProhibited
clientUpdateProhibited
```

*NOTE: Registrant identity is concealed behind GoDaddy's*
"Domains By Proxy, LLC" privacy proxy service. **

## DOMAIN 2:  university.com

### A.  Nameservers (NS)

```
bob.ns.cloudflare.com.
heidi.ns.cloudflare.com.
```

### B.  Mail Exchange (MX)

```
10 mx.zoho.com.
20 mx2.zoho.com.
50 mx3.zoho.com.
```

### C.  TXT Records

```
"google-site-verification=ccMjqyQhlzQd-_7ArKW1EHAHXH87zaR007K2BT1AHTk"
"zoho-verification=zb96213756.zmverify.zoho.com"
"v=spf1 include:zoho.com ~all"
"ms=ms41663240"
"v=spf1 include:_spf.google.com include:_mxs.therealworld.ag ~all"
```

*NOTE: Two SPF records are present. This is technically non-compliant*
with RFC 7208 §3.2, which mandates at most one SPF record per domain.
```
The second SPF record explicitly authorizes therealworld.ag's mail
infrastructure (_mxs.therealworld.ag) to send email as university.com.
```
The "ms=" record indicates Microsoft 365/Azure AD domain verification. **

### D.  A Records (Hosting IP)

```
104.18.39.56
172.64.148.200
```

Both IPs fall within Cloudflare's published address ranges
```
(104.16.0.0/12 and 172.64.0.0/13).
```

HOSTING PROVIDER: Cloudflare (proxied / CDN)

## DOMAIN 3:  cobratate.com

### A.  Nameservers (NS)

```
bob.ns.cloudflare.com.
heidi.ns.cloudflare.com.
```

### B.  Mail Exchange (MX)

(No MX records returned)

*NOTE: Although no MX records exist, the SPF TXT record below*
```
references Zoho (zoho.com, spf.zoho.com) and therealworld.ag,
```
indicating this domain has been configured to authorize outbound
email sending through those services. **

### C. TXT Records

```
"google-site-verification=oW1jSf_Ncyvs6w4IWTXvYk1MnL_JNZTFveTO6I5mSZc"
"loaderio=9848ffd81487810abba811b9eda74763"
"v=spf1 include:zcsend.net include:zoho.com include:spf.sendinblue.com include:spf.zoho.com
include:_mxs.therealworld.ag ~all"
"sendinblue-code:944cd697969b2ec3e1db3034c001b0c4"
"google-site-verification=GsM1sAh5g327Mo9Xlcab742SHgSuZFIkd83RGZWewkI"
```

*NOTE: SPF record authorizes FIVE sending sources:*
```
1. zcsend.net (Zoho Campaigns / ZeptoMail)
2. zoho.com (Zoho Mail)
3. spf.sendinblue.com (Brevo / Sendinblue)
4. spf.zoho.com (Zoho Mail — redundant)
5. _mxs.therealworld.ag (The Real World mail infrastructure)
```
The Sendinblue/Brevo verification token and Loader.io token
indicate active marketing automation and load-testing. **

### D. A Records (Hosting IP)

```
172.64.144.76
104.18.43.180
```

Both IPs fall within Cloudflare's published address ranges.

HOSTING PROVIDER: Cloudflare (proxied / CDN)

## DOMAIN 4:  jointherealworld.com

### A. Nameservers (NS)

```
kenia.ns.cloudflare.com.
owen.ns.cloudflare.com.
```

*NOTE: These are DIFFERENT Cloudflare nameservers from those used by*
fundraiser.com, university.com, and cobratate.com (bob / heidi).
Cloudflare assigns nameserver pairs per account, indicating that
jointherealworld.com is managed under a separate Cloudflare account. **

### B. Mail Exchange (MX)

```
10 mx.zoho.com.
20 mx2.zoho.com.
50 mx3.zoho.com.
```

### C. TXT Records

```
"v=spf1 include:zoho.com include:_mxs.therealworld.ag ~all"
"zoho-verification=zb20321642.zmverify.zoho.com"
"brevo-code:3f2d0cf68bc3b4292dd23594030bb2b9"
"google-site-verification=IDn6mXbTvApgIy8VIWlFV0PI7ncnSGL83ox99XTz9YM"
```

### D. A Records (Hosting IP)

```
216.150.1.1
```

```
WHOIS on 216.150.1.1:
NetName: VERCEL-09
Organization: Vercel, Inc (ZEITI)
NetRange: 216.150.1.0 - 216.150.1.255
```

HOSTING PROVIDER: Vercel, Inc.

## SUPPLEMENTAL:  therealworld.ag (TXT Records Only)

### TXT Records

```
"v=spf1 include:_spf.google.com include:_mxs.therealworld.ag -all"
"google-site-verification=1eJn-mGD49hZlS0eaP3fJ9FJMAdiGSF8WYpjGIrj1Ec"
"google-site-verification=0Z7AqkjNiVZc2QcX6IetOQVu12iwO5RRlWGcons_LGk"
"v=spf1 include:_spf.google.com include:_mxs.therealworld.ag ~all"
"google-site-verification=GaXFJIAJF6gwP7WFTsJujyNdYfE4Z-sfhDjEnHj-6D8"
```

*NOTE: therealworld.ag itself also has dual SPF records (one with -all*
hard-fail, one with ~all soft-fail). Both authorize Google Workspace
(_spf.google.com) and _mxs.therealworld.ag for sending. This is the
same _mxs.therealworld.ag include referenced by university.com,
cobratate.com, and jointherealworld.com — establishing a shared mail

delegation chain. **

## IV. CROSS-DOMAIN INFRASTRUCTURE COMPARISON

| ATTRIBUTE | fundraiser.com | university.com | cobratate.com | jointherealworld.com |
|---|---|---|---|---|
| NS Server 1 | bob.ns.cloudflare.com | bob.ns.cloudflare.com | bob.ns.cloudflare.com | kenia.ns.cloudflare.com |
| NS Server 2 | heidi.ns.cloudflare.com | heidi.ns.cloudflare.com | heidi.ns.cloudflare.com | owen.ns.cloudflare.com |
| SAME CF NS PAIR | YES (bob/heidi) | YES (bob/heidi) | YES (bob/heidi) | NO (kenia/owen) |
| MX (Zoho) | YES | YES | NO (no MX) | YES |
| Zoho in SPF | YES (zohomail.com) | YES (zoho.com) | YES (zoho.com + spf.zoho.com) | YES (zoho.com) |
| _mxs.therealworld.ag in SPF | NO | YES | YES | YES |
| Zoho Verification | YES | YES | NO | YES |
| Google Site Verif. | YES | YES | YES (x2) | YES |
| Hosting Provider | Vercel (76.76.21.21) | Cloudflare (104.18.39.56, 172.64.148.200) | Cloudflare (172.64.144.76, 104.18.43.180) | Vercel (216.150.1.1) |
| Sendinblue / Brevo | NO | NO | YES | YES (brevo-code) |
| WHOIS Privacy Proxy | YES (Domains By Proxy, LLC) | (not queried) | (not queried) | (not queried) |
| Registrar | GoDaddy.com, LLC | (not queried) | (not queried) | (not queried) |

## V. KEY FINDINGS

### FINDING 1 — SHARED CLOUDFLARE NAMESERVER PAIR (bob / heidi)

Three of the four domains — fundraiser.com, university.com, and cobratate.com — resolve to the IDENTICAL Cloudflare nameserver pair:

```
bob.ns.cloudflare.com
heidi.ns.cloudflare.com
```

Cloudflare assigns a unique nameserver pair to each customer account. The fact that three ostensibly separate domains share the same pair is strong technical evidence that all three are managed under the SAME Cloudflare account, and therefore by the same administrator or organization.

jointherealworld.com uses a different pair (kenia / owen), indicating it is managed under a separate Cloudflare account.

### FINDING 2 — SHARED ZOHO MAIL INFRASTRUCTURE

Three of the four domains — fundraiser.com, university.com, and jointherealworld.com — have IDENTICAL Zoho MX records:

```
10 mx.zoho.com
20 mx2.zoho.com
50 mx3.zoho.com
```

cobratate.com does not have MX records, but its SPF record includes both zoho.com and spf.zoho.com, authorizing Zoho to send email on its behalf.

All four domains reference Zoho in either their MX or SPF records,

demonstrating that all four domains are part of the same Zoho Mail organizational ecosystem.

**FINDING 3 — SPF MAIL DELEGATION VIA therealworld.ag**

Three of the four domains include "_mxs.therealworld.ag" in their SPF records:

```
university.com: include:_mxs.therealworld.ag
cobratate.com: include:_mxs.therealworld.ag
jointherealworld.com: include:_mxs.therealworld.ag
```

This SPF include directive means that The Real World's mail infrastructure (therealworld.ag) is explicitly authorized to send email on behalf of all three domains. This is a direct technical linkage: the operators of therealworld.ag have been granted the ability to send email that will pass SPF authentication as if it originated from university.com, cobratate.com, or jointherealworld.com.

therealworld.ag's own SPF records confirm it uses Google Workspace (_spf.google.com) and its own _mxs.therealworld.ag infrastructure.

fundraiser.com does NOT include _mxs.therealworld.ag in its SPF, but its shared Cloudflare account (same nameservers) and Zoho Mail infrastructure with university.com and cobratate.com still establish a clear infrastructure connection.

**FINDING 4 — SHARED VERCEL HOSTING (fundraiser.com & jointherealworld.com)**

Two domains resolve to Vercel, Inc. hosting infrastructure:

```
fundraiser.com → 76.76.21.21 (VERCEL-01, NET-76-76-21-0-1)
jointherealworld.com → 216.150.1.1 (VERCEL-09, NET-216-150-1-0-1)
```

Both IP addresses are confirmed as belonging to Vercel, Inc. through ARIN WHOIS records. This indicates both websites are deployed on the same hosting platform.

university.com and cobratate.com resolve to Cloudflare-proxied IPs (104.18.x.x, 172.64.x.x), meaning their origin hosting servers are masked behind Cloudflare's CDN/proxy layer.

**FINDING 5 — WHOIS PRIVACY PROXY ON fundraiser.com**

The WHOIS registration for fundraiser.com shows:

```
Registrant Name: Registration Private
Registrant Organization: Domains By Proxy, LLC
Registrant Address: DomainsByProxy.com
100 S. Mill Ave, Suite 1600
Tempe, Arizona 85281
```

"Domains By Proxy, LLC" is GoDaddy's WHOIS privacy proxy service. The true registrant's identity is concealed. The domain was originally created on April 23, 1995, and was last updated on June 9, 2025, with an expiration date of April 24, 2031.

All four domain status flags (clientDeleteProhibited, clientRenewProhibited, clientTransferProhibited, clientUpdateProhibited) are set, indicating the registrant has locked the domain against unauthorized changes — a measure consistent with high-value domain management.

**FINDING 6 — SHARED MARKETING / TRANSACTIONAL EMAIL PLATFORMS**

cobratate.com and jointherealworld.com both reference Brevo (formerly Sendinblue), a transactional email and marketing automation platform:

```
cobratate.com: sendinblue-code:944cd697...
include:spf.sendinblue.com (in SPF)
include:zcsend.net (in SPF — Zoho Campaigns)
jointherealworld.com: brevo-code:3f2d0cf6...
```

This indicates both domains are integrated with the same email marketing platform (Brevo/Sendinblue), further linking their

operations.

**FINDING 7 — MICROSOFT 365 VERIFICATION ON university.com**

university.com contains the TXT record:

```
"ms=ms41663240"
```

This is a Microsoft 365 / Azure Active Directory domain verification token, indicating university.com has been verified within a Microsoft 365 tenant — typically used for enterprise email, identity management, or Office 365 services.

## VI.  INFRASTRUCTURE RELATIONSHIP DIAGRAM (TEXT)

CLOUDFLARE ACCOUNT "A" (bob / heidi nameservers)

■ fundraiser.com ■
■ university.com ■
■ cobratate.com ■

■ ■ ■
■ ■ ■
▼ ▼ ▼

■ Vercel ■ ■ Cloudflare ■ ■ Cloudflare ■
■ Hosting ■ ■ Proxied ■ ■ Proxied ■

CLOUDFLARE ACCOUNT "B" (kenia / owen nameservers)

■ jointherealworld.com ■

■
▼

■ Vercel ■
■ Hosting ■

SHARED ZOHO MAIL ECOSYSTEM

■ fundraiser.com (MX + SPF) ■
■ university.com (MX + SPF) ■
■ cobratate.com (SPF only, no MX) ■
■ jointherealworld.com (MX + SPF) ■

```
SPF DELEGATION CHAIN — therealworld.ag
```

■ ▲ ■ ■
■ ■ authorized to send as: ■
■ ■ ■ ■

■ ■ ▼ ▼ ▼ ■
■ ■ university.com cobratate jointhereal ■
■ ■ .com world.com ■

## VII.  CONCLUSION

The DNS and WHOIS analysis demonstrates the following infrastructure relationships among the four target domains:

1. UNIFIED CLOUDFLARE ADMINISTRATION: fundraiser.com, university.com, and cobratate.com are managed under a single Cloudflare account, as evidenced by their shared nameserver pair (bob.ns.cloudflare.com / heidi.ns.cloudflare.com). jointherealworld.com is managed under a separate Cloudflare account.

2. COMMON MAIL PROVIDER: All four domains use Zoho for email services, either through MX records (fundraiser.com, university.com, jointherealworld.com) or SPF authorization (cobratate.com).

3. CENTRALIZED MAIL DELEGATION: university.com, cobratate.com, and jointherealworld.com all delegate mail-sending authority to therealworld.ag via the SPF include:_mxs.therealworld.ag directive.

This means The Real World's mail servers can send authenticated email on behalf of all three domains — a configuration that requires administrative access to each domain's DNS and demonstrates coordinated control.

4. SHARED HOSTING: fundraiser.com and jointherealworld.com are both hosted on Vercel, Inc. infrastructure. university.com and cobratate.com are proxied through Cloudflare, obscuring their origin servers.

5. CONCEALED OWNERSHIP: The registrant of fundraiser.com is hidden behind GoDaddy's Domains By Proxy privacy service. Despite this concealment, the shared Cloudflare account, Zoho mail infrastructure, and hosting patterns technically link fundraiser.com to the other domains in this analysis.

6. OPERATIONAL LINKAGE: The shared use of Brevo/Sendinblue marketing tools by cobratate.com and jointherealworld.com, combined with all other infrastructure overlaps, indicates these domains are operated as part of a coordinated digital ecosystem rather than independent entities.

These technical findings are consistent with centralized administrative control over the domains fundraiser.com, university.com, cobratate.com, and `jointherealworld.com, with therealworld.ag serving as a hub for` shared email infrastructure.

---

END OF EXHIBIT R

---

**CERTIFICATION:**

This analysis reflects actual DNS query results obtained on March 9, 2026. All records were queried in real time and are reproduced verbatim. No records have been fabricated or altered. The analytical conclusions are based solely on the technical evidence presented herein.

# EXHIBIT S

X/Twitter Direct Message
from Andrew Tate (@Cobratate) to Bryan Mitchell
January 30, 2025
"Hey bro" — "Head of hackathon wants to reach out"
— "whats your telegram" — "sent you a msg ;)"

*Source: Screenshot preserved by Bryan Mitchell*
*January 30, 2025*



# Andrew Tate ✔ ♟



## Andrew Tate ✔ ♟
@Cobratate
Joined July 2011

**View Profile**

Jan 30, 2025

Hey bro  1:59 AM

Hey  1:59 AM ⊘

Head of hackathon wants to reach out

whats your telegram  3:07 AM

7028440978 or princeoffakes

3:17 AM ⊘

t.me

sent you a msg ;)  3:32 AM



Mar 5, 2025

Saw Full Send.  Coming here to Vegas for Power Slap in 2 days? Meet then?

2:08 PM ⊘

# EXHIBIT T

Telegram Messages
Between Bryan Mitchell and "Issa" (@issathecooker)
January 30–31, 2025
Documenting: (1) Tate-directed initial contact;
(2) hackathon showcase listing of Bangchain;
(3) token locking and promotional instructions;
(4) coordinated Twitter Space with planned Tate appearance;
(5) Tate's real-time coordination messages to Issa;
(6) Issa's self-identification as $DADDY token developer

*Source: Screenshots preserved by Bryan Mitchell*
*January 30–31, 2025*









◀ Search

◀ **462** **Issa** 🧑‍🎤 30
online

minutes
3:45 AM

Then do the space talk about the future of orifice AI, what you guys are doing, what you have done
3:46 AM

Etc 3:46 AM

Would be good mindshare 3:46 AM

Trust me 3:58 AM

Tweet out 3:58 AM

Twitter space in 30 mins 3:59 AM

I'll have Andrew join 3:59 AM

Don't say andrew's gonna join 3:59 AM

Or anything 3:59 AM

Just let that come naturally
👍 BA
3:59 AM

Great work
❤️ BA
4:04 AM

Should I do the record option on the spaces
❤️ 🧑‍🎤
4:14 AM ✓✓

Yes 4:14 AM

📎   Message          🕐   🎤

No keep record spaces



◀ Search

◀ **462**   **Issa** 🧕
online

Should I do the record option on the
spaces
❤️ 🐼
4:14 AM ✓✓

Yes 4:14 AM

Or give people FOmo 4:15 AM ✓✓

No keep record spaces 4:15 AM

Cuz people will clip this andrew
interaction
4:15 AM

Don't do the spaces? 4:15 AM ✓✓

Do the space
Keep recording on
Start space talking about who you are,
what this project is
What the future is for your project
Andrew will join mid way through, invite
him on, you guys will talk
Then end the space on a high note, make
people bullish

🔥 **BA**
4:16 AM

Ok 4:32 AM

Keep this tab open 4:32 AM

I'll keep texting you and helping you with

ff  Message

I'll tell you if you're saying something
wrong





# EXHIBIT U

Bangchain AI Token — Blockchain Forensic Analysis
Solana Mint: 8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump
Showing: Token minted by unknown individual
on January 30, 2025 (same day as Tate DM and
Issa communications); all-time high on first
trading day ($0.0153); subsequent 99.6% price
decline; 15.33% bundled buys (insider indicator)

*Source: DexScreener API, GeckoTerminal, Solscan —*
*publicly verifiable Solana blockchain records*

# EXHIBIT U — BLOCKCHAIN FORENSIC ANALYSIS

BANGCHAIN AI TOKEN ($BANGCHAIN) — SOLANA BLOCKCHAIN
FORENSIC EXAMINATION REPORT

```
REPORT PREPARED BY:    CipherTrace Blockchain Forensic Analysis Unit
REPORT DATE:           March 9, 2026
CASE REFERENCE:        Mitchell v. Tate et al.
SUBJECT TOKEN:         Bangchain AI ($BANGCHAIN)
BLOCKCHAIN:            Solana
MINT ADDRESS:          8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump
```

## TABLE OF CONTENTS

**1. Executive Summary**

**2. Token Identity**

**3. Supply and Distribution**

**4. Price History**

**5. Trading Activity**

**6. Pump-and-Dump Indicators**

**7. Associated Social Media / Listing Metadata**

**8. Press Release Analysis**

**9. Methodology**

**10. Appendix: Data Source URLs**

## 1. EXECUTIVE SUMMARY

This report presents a forensic blockchain analysis of the Solana-based token
"Bangchain AI" (ticker: $BANGCHAIN), mint address
8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump. The token was created via the
pump.fun meme token launchpad on the Solana blockchain and commenced trading
on January 30, 2025.

The analysis draws upon publicly available on-chain data obtained from
blockchain explorers, decentralized exchange aggregators, and market data
platforms. All findings reported herein are based on independently verifiable
on-chain records or, where specified, upon information and belief derived from
complaint allegations.

Key findings:

- The token reached an all-time high price of $0.0153 on January 30, 2025
— the same day it began trading — corresponding to a peak market
capitalization of approximately $15,300,000.

- As of March 9, 2026, the token trades at approximately $0.0000639,
representing a decline of approximately 99.6% from its all-time high.

- The current market capitalization is approximately $63,900.

- On-chain security analysis confirms that 15.33% of tokens were acquired
through "bundled buys" — coordinated multi-wallet purchases executed
in a single transaction bundle — a pattern frequently associated with
artificial demand generation and insider accumulation.

- The token creator wallet (partial address: 7fYbe...dSZK) has deployed
19 total token launches and has 1 documented prior rug pull, per

RugCheck on-chain analysis data.

- Daily trading volume has declined to approximately $1.00, with only 2 transactions recorded in the most recent 24-hour period as of the date of this report.

## 2. TOKEN IDENTITY

Full Mint Address: 8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump
Token Name: Bangchain AI
Ticker Symbol: BANGCHAIN
Blockchain: Solana
Token Standard: SPL (Solana Program Library)
Minting Platform: pump.fun (confirmed by DexScreener and GeckoTerminal)

Date of First Trade: January 30, 2025
     Source: Messari ("First Trade: Jan 30, 2025 on
     Meteora (dlmm)")

Raydium Pair Creation: January 30, 2025 at approximately 08:31:35 UTC
     Source: DexScreener API (pairCreatedAt:
     1738225895000 Unix milliseconds)

Raydium Pair Address: 4Ry6WroZKCq4mA8cT1Ly613Ag7bvkpU92X2zQk6urg6B

Creator Wallet Address: 7fYbe...dSZK (partial; as reported by GeckoTerminal)
     NOTE: The full creator wallet address requires
     direct Solscan or Solana RPC lookup for complete
     resolution. The partial address is as displayed
     on GeckoTerminal's pool detail page.

Mint Authority: DISABLED (revoked; no additional tokens can be minted)
     Source: GeckoTerminal / RugCheck on-chain data

Freeze Authority: DISABLED (revoked; token accounts cannot be frozen)
     Source: GeckoTerminal / RugCheck on-chain data

Token Description "COIN related to ORiFICE Ai: Our mission is to
(On-Chain Metadata): holistically address the fundamental aspects of
     men's well-being by providing innovative solutions
     that cater to their primal energies, deep-seated
     desires for unconditional acceptance, and sexual
     fulfillment."
     Source: GeckoTerminal token metadata

### OBSERVATIONS:

(a) The "pump" suffix in the mint address (8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump) is characteristic of tokens created through the pump.fun platform, which uses a vanity address derivation ending in "pump."

(b) Pump.fun is a Solana-based meme token launchpad that allows any user to create a new SPL token with minimal technical knowledge or cost. Tokens created on pump.fun follow a bonding curve model and, upon reaching a capitalization threshold, automatically migrate liquidity to the Raydium decentralized exchange.

(c) The token first traded on Meteora (a dynamic liquidity market maker on Solana) before migrating to Raydium, consistent with the standard pump.fun token lifecycle.

## 3. SUPPLY AND DISTRIBUTION

Maximum Supply: 1,000,000,000 BANGCHAIN
Source: Bybit, Messari

Circulating Supply: 999,775,778 BANGCHAIN
Source: CoinStats, Bybit, Messari

Difference (Burned/ 224,222 BANGCHAIN (~0.02% of max supply)
Otherwise Removed): NOTE: This minor discrepancy between supply
and circulating supply is typical of pump.fun
tokens, where small amounts may be consumed during
the bonding curve graduation process.

**HOLDER DISTRIBUTION:**

Total Holders: 4,299 (as of March 9, 2026)
Source: GeckoTerminal

Largest Holder: Raydium Liquidity Pool
Address: 5Q544fKrFoe6tsEbD7S8EmxGTJYAKtTVhAW5Q5pge4j1
Holdings: 284,960,057 BANGCHAIN (~28.50% of supply)
Value: ~$18,204 (at current price)
Source: GeckoTerminal

Creator Holdings: 0% (as of March 9, 2026)
Source: GeckoTerminal / RugCheck data

**BUNDLED BUY ANALYSIS:**

Bundled Buy 15.33% of tokens were purchased via bundled buys
Percentage: Source: GeckoTerminal / RugCheck on-chain data

Total Bundled: 37.78%
Source: GeckoTerminal security panel (RugCheck)

Unsold Bundles: 0%
Source: GeckoTerminal security panel (RugCheck)

Airdrop Percentage: 0%
Source: GeckoTerminal security panel (RugCheck)

**OBSERVATIONS:**

(a) "Bundled buys" refer to multiple token purchase transactions that are
atomically bundled into a single Solana transaction. This technique
is commonly used to acquire tokens across multiple wallets
simultaneously — often within the same block as the token's
creation — creating the appearance of broad market demand from
multiple independent buyers when in fact the purchases originate
from a single operator.

(b) The 15.33% bundled buy figure is independently verifiable via
RugCheck's on-chain analysis and is displayed on GeckoTerminal's
security panel for this token.

(c) The "Total Bundled" figure of 37.78% indicates that, when accounting
for all coordinated activity, over one-third of the total token
supply was subject to bundled transaction activity.

(d) The complaint alleges a bundled buy percentage of 15.33%. This figure
is CONFIRMED by independent on-chain analysis.

(e) The creator currently holds 0% of the supply, and unsold bundles are
at 0%, indicating that all bundled tokens have been sold or
distributed.

**LIQUIDITY:**

Liquidity Pool: $36,325 - $36,480 (varies with SOL price)
Source: DexScreener API, GeckoTerminal

Pooled BANGCHAIN: 284,960,057.96 tokens (~$18,114)
Pooled SOL: 221.01 SOL (~$18,159)

Source: GeckoTerminal

Liquidity Lock: 99.99% locked
Source: GeckoTerminal

Liquidity Providers: 3
Source: DexScreener

---

## 4. PRICE HISTORY

---

**ALL-TIME HIGH:**

Price: $0.0153
Date: January 30, 2025
Source: Messari (confirmed)
NOTE: Bybit reports a different ATH of $0.00453387
on February 13, 2025. This discrepancy is
attributable to the fact that Messari tracks the
initial Meteora (dlmm) trading venue where the
token first listed, while Bybit may track only
Raydium data. The $0.0153 figure from Messari
represents the earliest and highest recorded
price across all trading venues.

ATH Market Cap: ~$15,300,000
Calculation: $0.0153 x 1,000,000,000 = $15,300,000
NOTE: This is consistent with complaint allegations.

**CURRENT PRICE (as of March 9, 2026):**

Price: $0.0000639 - $0.0000645 (varies by source)
Sources: DexScreener ($0.00006381),
GeckoTerminal ($0.00006388),
CoinStats ($0.00006452),
Bybit ($0.00006408)

Current Market Cap: $63,800 - $64,500
Sources: DexScreener ($63,812),
GeckoTerminal ($63,869),
CoinStats ($64,500)

**PRICE DECLINE FROM ATH:**

Decline Amount: $0.0153 - $0.0000639 = $0.0152361
Decline Percentage: 99.58%
Source: Calculated from Messari ATH and current
DexScreener price
Messari independently reports: -99.35%
NOTE: The complaint alleges ~99.6% decline.
This is CONFIRMED to within a fraction of a
percent by on-chain data.

**ALL-TIME LOW:**

Price: $0.00006213
Date: March 4, 2026
Source: Bybit

Cycle Low: $0.0000994
Date: March 2, 2026
Source: Messari

**RECENT PRICE PERFORMANCE:**

7-Day Change: -34.95% to -35.90% (Sources: CoinStats, Bybit)
14-Day Change: -45.84% (Source: Bybit)
30-Day Change: -44.87% (Source: Bybit)

1-Year Change: -75.06% (Source: Messari)

**OBSERVATIONS:**

(a) The token achieved its all-time high price of $0.0153 on the same day it began trading (January 30, 2025), then experienced a catastrophic and sustained decline exceeding 99%.

(b) The pattern of reaching maximum value on the first day of trading, followed by a near-total loss of value, is a hallmark characteristic of pump-and-dump schemes in the cryptocurrency markets.

(c) The complaint's alleged price figures — ATH of ~$0.0153, ATH date of January 30, 2025, current price of ~$0.0000645, and decline of ~99.6% — are each independently confirmed by publicly available market data.

## 5. TRADING ACTIVITY

**24-HOUR METRICS (as of March 9, 2026):**

24h Volume: $1.00 - $1.90 (varies by source)
Sources: DexScreener ($1.00),
GeckoTerminal ($1.0046),
CoinStats ($1.90)

24h Transactions: 2 (1 buy, 1 sell)
Source: DexScreener, GeckoTerminal

24h Makers: 2
24h Buyers: 1
24h Sellers: 1
Source: DexScreener

24h High: $0.0000647 (at 01:55 AM UTC)
24h Low: $0.00006388 (at 01:14 AM UTC)
Source: GeckoTerminal

**HOLDER COUNT:        4,299**
Source: GeckoTerminal, DexScreener

**LIQUIDITY POOL DETAILS:**

DEX: Raydium (Solana)
Pool Address: 4Ry6WroZKCq4mA8cT1Ly613Ag7bvkpU92X2zQk6urg6B
Total Liquidity: ~$36,325 - $36,480
Pooled BANGCHAIN: 284,960,057.96 (~$18,114)
Pooled SOL: 221.01 (~$18,159)
Liquidity Providers: 3
Liquidity Lock Status: 99.99% locked
Sources: DexScreener API, GeckoTerminal

**EXCHANGE RATE:**

1 BANGCHAIN = 0.0000007775 SOL (~$0.0000639)
1 USD = 15,653.52 BANGCHAIN
Source: GeckoTerminal

**AVAILABLE TRADING VENUES:**

Raydium, Phantom, Jupiter, Maestro Bot, MEXC DEX+, Bybit
Sources: GeckoTerminal, Bybit

**OBSERVATIONS:**

(a) The 24-hour trading volume of approximately $1.00 indicates that the token is effectively illiquid. A $1.00 daily volume on a token with 4,299 holders suggests near-complete abandonment of active

trading.

(b) With only 2 transactions in 24 hours and only 2 unique traders, there is no meaningful price discovery occurring in the market.

(c) Despite having 4,299 recorded holders, the overwhelming majority appear to be inactive — holding residual token balances with no discernible intent to trade.

---

## 6. PUMP-AND-DUMP INDICATORS

---

The following factors, individually and collectively, are consistent with patterns observed in cryptocurrency pump-and-dump schemes. These observations are presented as factual data points drawn from on-chain records and do not constitute a legal conclusion.

### 6.1  FIRST-DAY PRICE SPIKE

The token reached its all-time high of $0.0153 on January 30, 2025 — the same day it commenced trading. This first-day-only peak is a characteristic pattern in pump-and-dump operations, where artificial demand drives the price to an initial high before insiders liquidate holdings.

Source: Messari (ATH $0.0153, Jan 30, 2025; First Trade: Jan 30, 2025 on Meteora (dlmm))

### 6.2  BUNDLED BUY ANALYSIS

15.33% of the token supply was acquired through bundled buys — coordinated multi-wallet purchases executed within the same transaction bundle. The total bundled activity encompasses 37.78% of the supply.

Bundled buying is a well-documented technique used to:
- Simulate organic demand from multiple independent buyers
- Accumulate large positions across multiple wallets to avoid detection as a single large holder
- Manipulate holder count metrics to create the appearance of widespread adoption

Source: GeckoTerminal / RugCheck on-chain data

### 6.3  RAPID PRICE DECLINE AFTER ATH

Following the January 30, 2025 all-time high, the token declined 99.58% to its current price of ~$0.0000639. This decline was sustained and irreversible, with the token never recovering to any significant fraction of its peak value.

Source: Messari, DexScreener, GeckoTerminal, CoinStats, Bybit

### 6.4  CREATOR WALLET HISTORY

The creator wallet (7fYbe...dSZK) has the following on-chain history as reported by RugCheck:

- Total Token Launches: 19
- Best Token: BANGCHAIN (this token)
- Creator Past Rugs: 1
- Current Creator Holdings: 0%
- Unsold Bundles: 0%

The creator's history of 19 token launches and 1 documented rug pull suggests a pattern of serial token creation. The fact that the creator currently holds 0% of the supply and has 0% unsold bundles indicates complete liquidation of initial positions.

Source: GeckoTerminal security panel (powered by RugCheck)

## 6.5  NEAR-ZERO TRADING VOLUME

As of March 9, 2026, the 24-hour trading volume is approximately $1.00 with only 2 transactions. This level of activity is consistent with an abandoned project where no meaningful economic activity persists.

Source: DexScreener, GeckoTerminal

## 6.6  MISMATCH BETWEEN MARKETING AND OUTCOME

The token was promoted via a press release on PRLog dated January 31, 2025, as "The Next Moonshot Token" with claims of "cutting-edge AI technology," "smart contract integrations," and utility across "AI automation, adaptive learning, and interactive digital experiences." None of these claimed functionalities are observable on-chain; the token operates as a simple SPL transfer token with no smart contract logic, no AI integration, and no utility beyond speculative trading.

Source: PRLog press release (ID: 13059738); on-chain token data

## 6.7  GT SCORE

GeckoTerminal assigns this token a GT Score of 51/100, where scores are calculated based on trading volume, liquidity, holder distribution, audits, and token age. A score of 51 indicates below-average reliability and trust metrics.

Component scores (from GeckoTerminal):
- Pool Score: 53
- Transactions Score: 0
- Creation Score: 100
- Info Score: 100
- Holders Score: 60
- Soul Scanner Score: 1
- TrenchRadar Score: 1

The Transactions Score of 0, Soul Scanner Score of 1, and TrenchRadar Score of 1 are particularly notable, indicating minimal legitimate trading activity and elevated risk signals.

Source: GeckoTerminal security panel

## 6.8  COMMUNITY REPORTS

As of the date of this report, 1 community member has flagged this pool as "suspicious" on GeckoTerminal.

Source: GeckoTerminal

# 7. ASSOCIATED SOCIAL MEDIA / LISTING METADATA

**DEXSCREENER LISTING:**

Profile Type: Community Takeover
Takeover Date: January 30, 2025
Community Claim Text: "Hi, the token was created and DEX was not updated properly. Only a poor quality banner was..."
[text truncated on DexScreener]

NOTE: DexScreener's "Community Takeover" feature allows any user to claim a token profile and add custom branding, social links, and descriptions. This does not require verification of identity or

authorization from the token creator.

**LINKED WEBSITE:**        **https://www.orifice.store/**
Source: DexScreener, GeckoTerminal, CoinStats, Bybit

**LINKED TWITTER ACCOUNT:  https://x.com/prince_of_fakes**
Handle: @prince_of_fakes
Source: DexScreener, GeckoTerminal, CoinStats

NOTE: The complaint alleges that the Twitter handle @prince_of_fakes
was associated with the Bangchain AI token listing WITHOUT Bryan
Mitchell's knowledge or authorization. The handle itself — literally
"prince of fakes" — is noted here for the record.

**LINKED TELEGRAM GROUP:   https://t.me/BangChainSOL**
Source: DexScreener, GeckoTerminal

**ADDITIONAL LINKED RESOURCES (from GeckoTerminal):**

- https://cfd51a6b-d3f1-4108-9fd1-45a211fb6379.usrfiles.com/ugd/
cfd51a_fab22bfc774f4fd889308b557625c019.pdf
(Wix-hosted PDF document)

- https://eomail6.com/web-version
(Email marketing link)

**TOKEN DESCRIPTION (DexScreener):**

Original Profile: "THE BOLD BLOCKCHAIN BASED BACKBONE FUELING
FRICTIONLESS UNSTOPPABLE REMOTE BANGING"

Community Takeover: "Introducing Thrust and Bangchain. Our entry
into the @Cobratate hackathon."

NOTE: The community takeover description explicitly references the
@Cobratate hackathon, directly linking this token to the hackathon
organized by Emory Andrew Tate III. The reference to "our entry into
the @Cobratate hackathon" indicates the token was created and submitted
as a participant project in that hackathon.

**CONTACT EMAIL:**        **\*\*\*@orifice.store**
Source: PRLog press release contact information
(email partially redacted by PRLog)

**TOKEN CATEGORIES/TAGS:    "pump fun," "ai"**
Source: GeckoTerminal

---

# 8. PRESS RELEASE ANALYSIS

---

A press release was published via PRLog on January 31, 2025 (the day after
the token's creation), with the following relevant details:

Title: "BangChain: The Next Moonshot Token Launching
with Cutting-Edge AI Technology"

Published By: BangChain AI

Date Published: January 31, 2025

Location: Las Vegas, Nevada, United States

PRLog ID: 13059738

Contact Organization: Orifice AI
Contact Email: \*\*\*@orifice.store

Key Claims Made:

(a) "BangChain (BANG), a newly launched cryptocurrency, is rapidly
gaining attention as the next moonshot token in the blockchain

and AI space."

(b) "[I]t's a utility-driven digital asset designed to enhance AI-powered platforms, enabling seamless transactions, smart contract integrations, and decentralized security."

(c) "BangChain is also compatible with augmented reality (AR) and virtual reality (VR) platforms."

(d) "BangChain and its connected AI technology are being developed in the United States."

(e) "Stay updated on BangChain's developments by visiting the developer's X page (@prince_of_fakes) or DexScreener."

The press release links directly to:
- DexScreener: https://dexscreener.com/solana/4ry6wrozkcq4ma8ct1ly613ag7 bvkpu92x2zqk6urg6b
- Twitter: @prince_of_fakes

### OBSERVATIONS:

(a) The press release was published one day after the token launched and one day after the token reached its all-time high, consistent with an effort to attract additional buyers during or shortly after the initial price spike.

(b) The press release identifies @prince_of_fakes as "the developer's X page," establishing a direct association between that account and the token's development.

(c) The claims of "smart contract integrations," "AI-powered platforms," and "AR/VR compatibility" are not supported by any observable on-chain functionality. The token is a standard SPL token with transfer-only capability.

(d) The contact organization is listed as "Orifice AI" with an email domain of orifice.store, matching the website linked in all exchange listings.

## 9. METHODOLOGY

### SOURCES CONSULTED:

1. DexScreener (https://dexscreener.com)
- Web interface and public REST API
- Data retrieved: Token pair details, price, volume, liquidity, pair creation timestamp, social links, community takeover data

2. GeckoTerminal (https://www.geckoterminal.com)
- Pool detail page and security panel (powered by RugCheck)
- Data retrieved: Price, volume, holder count, liquidity, bundled buy percentage, creator wallet info, creator launch history, mint/freeze authority status, liquidity lock status, GT Score breakdown, token metadata, social links

3. Messari (https://messari.io)
- Project page for BangChain AI
- Data retrieved: All-time high price and date, first trade date and venue, circulating supply, max supply, total supply, 1-year performance, cycle low

4. Bybit (https://www.bybit.com)
- Token price page
- Data retrieved: Current price, ATH (alternative data source), ATL, circulating supply, max supply, price change percentages

5. CoinStats (https://coinstats.app)
- Token detail page
- Data retrieved: Market cap, total supply, circulating supply, 24h volume, price change percentages, explorer links

6. PRLog (https://www.prlog.org)
- Press release ID 13059738
- Data retrieved: Full press release text, publisher information, contact details, publication date, location

7. RugCheck (https://rugcheck.xyz) — via GeckoTerminal integration
- Data retrieved: Creator wallet analysis, past rug count, total launches, bundled buy data, authority status

8. DexScreener Public API
- Endpoint: /latest/dex/tokens/8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump
- Data retrieved: JSON response with pair details, price, volume, liquidity, FDV, market cap, pair creation timestamp, social links

**DATE OF ANALYSIS:**        **March 9, 2026**

**VERIFICATION METHODS:**

- Cross-referencing price data across multiple independent platforms (DexScreener, GeckoTerminal, Messari, Bybit, CoinStats)
- Confirming pair creation date via Unix timestamp conversion from DexScreener API (1738225895000 ms = Jan 30, 2025 08:31:35 UTC)
- Verifying complaint allegations against independently obtained on-chain data
- Reviewing on-chain security analysis from RugCheck (accessed via GeckoTerminal's security panel)
- Cross-referencing social media links across all listing platforms for consistency

**LIMITATIONS:**

- The creator wallet address is available only in truncated form (7fYbe...dSZK) from GeckoTerminal. Full address resolution would require direct Solana RPC query or Solscan lookup.

- Transaction-level analysis (individual buy/sell records from the token's first day of trading) was not performed as part of this report. Such analysis would require querying the Solana blockchain directly via RPC or indexer services.

- Solscan.io was not responsive during data collection. Data that would typically be sourced from Solscan was obtained from alternative sources (GeckoTerminal, Messari, DexScreener API).

- Bybit reports a different ATH ($0.00453387 on Feb 13, 2025) than Messari ($0.0153 on Jan 30, 2025). This discrepancy is likely due to different data collection start points across trading venues. The Messari figure, which tracks from the earliest trading venue (Meteora), is used as the primary ATH reference.

## 10. APPENDIX: DATA SOURCE URLs

[1] DexScreener Token Page:
    https://dexscreener.com/solana/8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump

[2] DexScreener API Response:
    https://api.dexscreener.com/latest/dex/tokens/8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump

[3] GeckoTerminal Pool Page:

https://www.geckoterminal.com/solana/pools/4Ry6WroZKCq4mA8cT1Ly613Ag7bvkpU92X2zQk6urg6B

[4] GeckoTerminal Token Page:
https://www.geckoterminal.com/solana/tokens/8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump

[5] Messari Project Page:
https://messari.io/project/bangchain-ai

[6] Bybit Price Page:
https://www.bybit.com/en/price/bangchain-ai/

[7] CoinStats Token Page:
https://coinstats.app/coins/bangchain-ai/

[8] Solscan Token Page:
https://solscan.io/token/8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump

[9] RugCheck Token Page:
https://rugcheck.xyz/tokens/8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump

[10] PRLog Press Release:
https://www.prlog.org/13059738-bangchain-the-next-moonshot-token-launching-with-cutting-edge-ai-technology.html

[11] Raydium Liquidity Pool (Largest Holder):
Solana Address: 5Q544fKrFoe6tsEbD7S8EmxGTJYAKtTVhAW5Q5pge4j1

[12] Solana Wrapped SOL Contract:
So11111111111111111111111111111111111111112

---

VERIFICATION TABLE: COMPLAINT ALLEGATIONS vs. ON-CHAIN DATA

---

```
+--------------------------------+------------------+--------------------+
| ALLEGATION                     | COMPLAINT VALUE  | ON-CHAIN VERIFIED  |
+--------------------------------+------------------+--------------------+
| Token name                     | Bangchain AI     | CONFIRMED          |
| Ticker symbol                  | BANGCHAIN        | CONFIRMED          |
| Blockchain                     | Solana           | CONFIRMED          |
| Minting platform               | pump.fun         | CONFIRMED          |
| Minting date                   | Jan 30, 2025     | CONFIRMED          |
| Total supply                   | 1,000,000,000    | CONFIRMED          |
| Bundled buy percentage         | 15.33%           | CONFIRMED          |
| All-time high price            | ~$0.0153         | CONFIRMED ($0.0153)|
| ATH date                       | Jan 30, 2025     | CONFIRMED          |
| Current price                  | ~$0.0000645      | CONFIRMED (~$0.0001|
| Price decline %                | ~99.6%           | CONFIRMED (99.58%) |
| ATH market cap                 | ~$15,300,000     | CONFIRMED          |
| Current market cap             | ~$64,500         | CONFIRMED (~$63.9K)|
| Associated Twitter             | @prince_of_fakes | CONFIRMED          |
+--------------------------------+------------------+--------------------+
```

All complaint allegations tested against on-chain data are independently
confirmed by publicly available blockchain records and market data platforms.

---

## END OF REPORT

---

**CERTIFICATION: This report was prepared using publicly available on-chain**
data and market information. All sources are cited. Data was retrieved on
March 9, 2026. On-chain data is immutable and independently verifiable by
any party with access to a Solana blockchain explorer or RPC endpoint.

---

# EXHIBIT V

Transcription of Promotional Video
Posted by Emory Andrew Tate III (@Cobratate) on X/Twitter
January 13, 2025
(x.com/Cobratate/status/1878595249825828998)
In which Tate states:
"I decided to put together this hackathon —
unprecedented, never done before —
over a million dollars in prizes"
"I'll be sponsoring everything myself
via fundraiser.com"

*Source: X/Twitter video post by @Cobratate — January 13, 2025*
*Transcription prepared by Plaintiff*

# TRANSCRIPTION OF VIDEO POSTED BY EMORY ANDREW TATE III (@Cobratate)

**Source:** X/Twitter Post — https://x.com/Cobratate/status/1878595249825828998
**Date Posted:** January 13, 2025
**Duration:** Approximately 1 minute 29 seconds
**Speaker:** Emory Andrew Tate III (a/k/a "Andrew Tate," "Cobra Tate," "Top G")
**Transcription Method:** OpenAI Whisper (automated speech recognition)
**Transcription Date:** March 8, 2026

## FULL TRANSCRIPTION:

I'm looking for the Avengers. I'm looking for the best guys in Solana, the best guys in AI. I'm looking for the real trench warriors because I'm putting together an army.

I feel like 2025 is gonna be a fantastic year for crypto once Donald Trump is president of the United States. Bitcoin's gonna go to the moon and the Real World token is launching once we have SEC approval.

Fantastic things are gonna happen and I need soldiers. I see fertile lands ahead and I'm trying to put together a team so we can go and conquer all of it.

So for that reason I decided to put together this hackathon — unprecedented, never done before — over a million dollars in prizes. Because I get a lot of offers in this world: I have access to the top venture capital firms, I have access to celebrities, I have access to all of these fantastic things. And perhaps if only I knew the best of the best guys in crypto, we could revolutionize the entire space — the people who are best at thinking outside the box, doing original projects, doing new things, and building communities. And that's exactly what we're looking for.

I'll be sponsoring everything myself via fundraiser.com. The hackathon begins in three days and will last for two weeks.

And anybody who's prepared to think outside of the box and wants to change their life can join. I'm excited — you should be excited. This is your chance to finally get out the trenches, get yourself a nice army tank, go get a nice house, plunder some village, become a somebody. And if you're interested in doing exactly that, you can join the hackathon via fundraiser.com/hackathon.

## TIMESTAMPED SEGMENTS:

| | |
|---|---|
| [0.0s  -  4.9s] | I'm looking for the Avengers. I'm looking for the best guys in Solana, the best guys in AI. |
| [4.9s  -  8.2s] | I'm looking for the real trench warriors because I'm putting together an army. |
| [8.2s  - 14.0s] | I feel like 2025 is gonna be a fantastic year for crypto once Donald Trump is president of the United States. |
| [14.0s - 18.5s] | Bitcoin's gonna go to the moon and the Real World |

|  | token is launching once we have SEC approval. |
| [19.0s – 23.1s] | Fantastic things are gonna happen and I need soldiers. I see fertile lands ahead. |
| [23.1s – 25.9s] | And I'm trying to put together a team so we can go and conquer all of it. |
| [25.9s – 28.9s] | So for that reason I decided to put together this hackathon — |
| [29.4s – 34.9s] | unprecedented, never done before — over a million dollars in prizes. Because I get a lot of offers in this world: |
| [34.9s – 38.5s] | I have access to the top venture capital firms. I have access to celebrities. |
| [38.5s – 43.7s] | I have access to all of these fantastic things and perhaps if only I knew the best of the best guys in crypto, |
| [43.7s – 49.3s] | we could revolutionize the entire space — the people who are best at thinking outside the box, doing original projects, |
| [49.3s – 53.0s] | doing new things and building communities. And that's exactly what we're looking for. |
| [53.0s – 59.6s] | I'll be sponsoring everything myself via fundraiser.com. The hackathon begins in three days and will last for two weeks. |
| [59.9s – 63.8s] | And anybody who's prepared to think outside of the box and wants to change their life can join. |
| [63.8s – 65.5s] | I'm excited — you should be excited. |
| [65.5s – 69.5s] | This is your chance to finally get out the trenches, get yourself a nice army tank, go get a nice house, |
| [69.5s – 77.6s] | plunder some village, become a somebody. And if you're interested in doing exactly that, you can join the hackathon via fundraiser.com/hackathon. |

---

## KEY EVIDENTIARY STATEMENTS:

---

### 1. PERSONAL SPONSORSHIP CLAIM:
*"I'll be sponsoring everything myself via fundraiser.com."*
— Tate personally claims he will sponsor the entire hackathon, directly tying himself to the prize pool funding obligation.

### 2. PRIZE POOL REPRESENTATION:
*"Over a million dollars in prizes."*
— Direct personal confirmation of the $1,000,000+ prize pool from Tate's own mouth.

### 3. PERSONAL DECISION TO CREATE HACKATHON:
*"I decided to put together this hackathon."*
— Tate claims personal agency in creating the hackathon, not attributing it to any corporate entity.

### 4. REAL WORLD TOKEN REPRESENTATION:
*"The Real World token is launching once we have SEC approval."*
— Tate represents that a "Real World token" is forthcoming,

linking cryptocurrency tokenization to the Real World platform.

### 5. VENTURE CAPITAL ACCESS CLAIM:

*"I have access to the top venture capital firms."*

— Tate claims access to venture capital, connecting to the fundraiser.com "Apply For Investment From Andrew Tate & The War Room" representations.

### 6. HACKATHON TIMING:

*"The hackathon begins in three days and will last for two weeks."*

— Confirms the hackathon timeline from Tate's own statement.

### 7. HACKATHON URL:

*"You can join the hackathon via fundraiser.com/hackathon."*

— Tate personally directs viewers to the hackathon URL.

---

## NOTE ON TRANSCRIPTION ACCURACY:

---

This transcription was generated using OpenAI Whisper (base model). Minor corrections were applied uniformly to both the full transcription and timestamped segments for clarity where the automated transcription contained obvious errors (e.g., "Salana" corrected to "Solana," "authors" corrected to "offers," "Bitcoins that are out of" corrected to "Bitcoin's gonna go to"). The specific corrections listed above are the only modifications made to the automated output. The original video file is preserved as cobratate_hackathon_promo.mp4 for independent verification.

# EXHIBIT W

X/Twitter Post and Reply — January 31, 2025

Bryan Mitchell (@prince_of_fakes) posts screenshot of

the PROJECT SHOWCASE page at fundraiser.com/hackathon/showcase

featuring Bangchain as first-listed project

Emory Andrew Tate III (@Cobratate) replies:

"This product is perfect for the average

crypto trader tbh."

71,400 views · 488 likes · 84 retweets

*Source: x.com/Cobratate/status/1885431561857741088*

*Screenshot captured from X/Twitter*

← **Post**

**Bry.ai** ✔ @prince_of_fakes · Jan 31, 2025

$bangchain fundraiser.com/hackathon/show…

SHOWCASE    PRIZES    SPONSORS    FAQ    REGISTER    TWITTER/X                    FIND YOUR TEAM

+ PROJECT SHOWCASE +

NONE OF THE FEATURED PROJECTS ON THIS PAGE ARE ENDORSED BY THE
HACKATHON G-AI. THEY JUST PARTICIPATED IN THE HACKATHON, THEY CAN TURN
OUT TO BE A SCAM OR SPAM PROJECT. DYOR.

SUBMIT YOUR PROJECT

**BANGCHAIN**

Providing unique realistic adult
experiences, personalized intimacy and a
level of affection that no modern woman
is capable of.

**BROKIEAI**

Voice enabled, no code AI agent builder
made to ease the deployment of custom AI
Agents as an 1 click deployment SaaS
platform within the Solana ecosystem.

**COMING SOON**

This is a placeholder description for a
project. As new projects are featured in
the AI hackathon, they'll appear here
alongside the others.

💬 17        🔁 22        ♡ 107        📊 47K

**Andrew Tate** ✔ 🔳                                    Subscribe
@Cobratate

This product is perfect for the average crypto trader tbh.

12:54 PM · Jan 31, 2025 · **71.4K** Views

💬 63        🔁 84        ❤ 488        🔖 32

Relevant ⌄                                              View quotes ⟩

Post your reply                                        Reply

# EXHIBIT X

Declaration of Bryan Mitchell
In Support of Complaint

*Declarant: Bryan Mitchell*
*Executed: March 4, 2026*

## DECLARATION OF BRYAN MITCHELL
## IN SUPPORT OF COMPLAINT

I, Bryan Mitchell, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

### *Identity*

1. I am the brother of Plaintiff Anthony Mitchell. I am over the age of eighteen and competent to testify to the matters set forth herein. I make this Declaration based on my personal knowledge.

2. My X/Twitter account is @prince_of_fakes. This handle is my pre-existing personal account and predates the Bangchain project and any associated cryptocurrency token.

### *Direct Message from Andrew Tate*

3. On January 30, 2025, I received a direct message on the X/Twitter platform from the verified account of Andrew Tate (@Cobratate). Tate's messages stated: "Hey bro," followed by "Head of hackathon wants to reach out," and "whats your telegram." I provided my Telegram contact information. Tate then replied: "sent you a msg ;)." I preserved a screenshot of these messages at the time they occurred. (See Exhibit S.)

### *Contact by "Issa" on Telegram*

4. Within minutes of Tate's X direct message, I was contacted on Telegram by a person identified as "Issa." Issa stated: "gm," "i'm issa," and "andrew told me to text you." Issa identified himself as "x.com/issathecooker," stated that he "made $DADDY," and claimed to have "handled a lot of very successful CTOs."

5. Issa informed me that my brother's project would be added to the fundraiser.com hackathon showcase, stating: "You've locked your tokens so we will be adding Orifice to the fundraiser.com/hackathon product showcase." ("Orifice" was an alternate working name used during the development of the Bangchain project.) Issa shared a link to the hackathon page, which at the time still displayed the Solana Foundation logo.

### *Issa's Promotional Instructions*

6. Issa then instructed me to: (1) "lock up the rest of [my] tokens"; (2) "announce Twitter spaces" and "do a space in 30 minutes"; (3) discuss "the future of orifice AI, what you guys are doing, what you have done"; and (4) create market excitement. Issa stated: "I'll have Andrew join" the Twitter Space, but instructed: "Don't say andrew's gonna join" and "Just let that come naturally." Issa later provided detailed instructions: "Do the space / Keep recording on / Start space talking about who you are, what this project is / What the future is for your project / Andrew will join mid way through, invite him on, you guys will talk / Then end the space on a high note, make people bullish." (See Exhibit T.)

### Twitter Space

7. I proceeded with the Twitter Space announcement as directed by Issa. The Space experienced technical difficulties and crashed. I preserved screenshots of the Telegram conversation, which include messages from "Tate" to Issa stating: "join his space for 5 mins," "tell him his product is HARAM," "yet efficient," and "it'll be really funny." (See Exhibit T.)

### Bangchain Token

8. On January 30, 2025, an unknown individual minted a cryptocurrency token associated with the Bangchain project name on the Solana blockchain (mint address 8SVVCGzYwnAkDwwvc5fSHZdCenUyhPccnGirWecVpump). I did not mint, create, or authorize the creation of this token. A percentage of the token supply was sent to me by the unknown minter.

9. At Issa's direction, I locked up my token holdings. The token hit its all-time high price on its first day of trading and subsequently declined approximately 99.6% in value, consistent with a pump-and-dump pattern.

10. My X/Twitter handle @prince_of_fakes appears as the associated Twitter account on DexScreener and GeckoTerminal token listings for the Bangchain AI token. I did not set, authorize, or control this association. The unknown minter unilaterally associated my handle with the token listing without my knowledge or authorization.

*Tate's Public Endorsement*

11. On January 31, 2025, I posted a screenshot of the PROJECT SHOWCASE page at fundraiser.com/hackathon/show featuring Bangchain as the first-listed project on my X/Twitter account @prince_of_fakes. Andrew Tate (@Cobratate) publicly replied: "This product is perfect for the average crypto trader tbh." The post received 71,400 views, 488 likes, and 84 retweets. (See Exhibit W.)

*Preserved Evidence*

12. I preserved screenshots of the X/Twitter direct messages from Andrew Tate and the Telegram conversation with Issa at the time they occurred. These screenshots are attached as Exhibits S and T to the Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 4, 2026.


*/s/ Bryan Mitchell*

BRYAN MITCHELL

# EXHIBIT Y

The Real World Subscription Receipts
Emails from New Era Learning
(support@newera learning.net)
(1) November 25, 2022 — Welcome email
confirming Plaintiff's access to The Real World
(2) April 28, 2024 — Subscription receipt
confirming $49.99 monthly payment
Billing descriptor: "UNIVERSITY.COM TRW"

*Source: Email receipts received by Plaintiff*
*from support@newera learning.net*



Subscription Receipt for The Real World Monthly (1714305001324281) Inbox ×

The Real World <support@neweralearning.net>   Unsubscribe                                    Sun, Apr 28, 2024, 4:50 AM
to me ▾

 Logo

## Anthony Mitchell, thank you for your order.

Here is a summary of your recent subscription payment from New Era Learning. If you have any questions or concerns about your order, please reply to this email.

The charge for this purchase will show on your receipt as "UNIVERSITY.COM TRW".

| | |
|---|---|
| Payment # | 1714305001324281 |
| The Real World Monthly | $49.99 |
| Subscription start date | March 28th |
| Next payment date | May 28th |

# EXHIBIT Z

Hackathon Submission Google Form
"Fundraiser.com Hackathon Submission Form"
Official Project Submission form for the
fundraiser.com/hackathon Solana AI Hackathon
Hosted on Google Forms (docs.google.com)
Fields: Project Name, Team Name, Contact Information,
Project Description, Problem Solved, Solana Integration,
AI Technologies, Demo Link, Award Category,
IP Agreement, Eligibility Confirmation
Note: This form does not require a Real World
username or identity verification

*Source: Google Form at*
*docs.google.com/forms/d/e/1FAIpQLScaBXVeVkgRoQFi_78cCVVhpgu9r95DvtoLvlhz9dOjdIzC6Q/viewform*
*accessed via fundraiser.com/hackathon "Submit your project" button*

# Fundraiser.com Hackathon Submission Form

This is the Official Project Submission form for the fundraiser.com/hackathon Solana AI Hackathon.

Check https://t.me/ai_g_hackathon for the official links/users that will message your team if you get chosen to be featured.

inquiry@orifice.store Switch account

✉ Not shared

\* Indicates required question

## Project Name *

Your answer

## Team Name *

Your answer



**Primary Contact Telegram** *

Your answer

**Primary Contact Twitter** *

Your answer

**Primary Contact Email** *

Your answer

**Describe Your Project** *

Your answer

**Problem Your Project Solves** *

*What problem does your project address, and how does it solve it?"*

Your answer

## Solana Blockchain Integration *

*How does your project integrate Solana's blockchain? Describe any tools, SDKs, or features used.*

Your answer

## AI Models/Technologies Used *

*What AI models or technologies are you utilizing, and how are they implemented?*

Your answer

## Link to Project Demo or Prototype *

*Provide a link to your demo video, prototype, or working product (GitHub repo, live demo, etc.).*

Your answer

**Which Award Category Does Your Project Represent? (Optional)**

○ Most F**able Waifu

○ WTF?! But It Works

○ Most Likely to Get Banned from X

○ Real News, Not Fake News AI

○ Get Rich Quick Scheme of the Year

○ Clout Grabber Tool

**Fun Pitch Line**

*Describe your project in one sentence. Make it bold, edgy, or funny!*

Your answer

**Intellectual Property Agreement**                    *

*Do you agree that the project submission remains 100% owned by you or your team?*

| Choose ▼ |
| --- |

**Eligibility Confirmation**                    *

*By submitting, I confirm that I/we meet the eligibility requirements for this hackathon.*

☐ Yes



Submit

Clear form

# EXHIBIT AA

X/Twitter Post by Emory Andrew Tate III
(@Cobratate) — January 12, 2025
"ALL YOU NEED TO GET STARTED"
399K views • 63 retweets • 759 likes
With Tate's reply on January 13, 2025:
"Community note is correct, this hackathon
is run from Fundraiser.com's treasury and
is not affiliated with the Solana foundation."
132K views • 30 retweets • 566 likes

*Source: Plaintiff's screen capture*
*x.com/Cobratate/status/1878595359188070427*
*Post remains live as of the date of filing*



**Post**

Andrew Tate ✓
@Cobratate

Subscribe

ALL YOU NEED TO GET STARTED:

fundraiser.com/hackathon
deck.fundraiser.com
discord.gg/fundraiser

🙇🙇🙇

4:10 PM · Jan 12, 2025 · **399K** Views

💬 79          ↻ 63          ♡ 759          🔖 87

Relevant ⌄                              View quotes ›

Post your reply                              Reply

Andrew Tate ✓ 🔒 @Cobratate · Jan 13, 2025
Community note is correct, this hackathon is run from Fundraiser.com's treasury and is not affiliated with the Solana foundation.

💬 39          ↻ 30          ♡ 566          ⊪ 132K

# EXHIBIT AB

Telegram Channel: "AI-G Hackathon"

128 subscribers

Channel created January 12, 2025

First message links to Tate's X post

and references "the Cobratate team"

*Source: Plaintiff's screen capture*

*t.me/ai_g_hackathon*

*Channel remains live as of the date of filing*

 Telegram

## A AI-G Hackathon
128 subscribers

🔍 ⋯

12 January 2025

Channel created

**Check Tate's official X account for updates: https://x.com/Cobratate/status/1878595359188070427**

This username was *not claimed* by the Cobratate team. I'm an independent dev who claimed this channel to protect against scams.

ONLY IF you are from the Cobratate team, message me @MasterAdamG and I will transfer this channel to you.

 ❤️



X (formerly Twitter)
Andrew Tate (@Cobratate) on X
ALL YOU NEED TO GET STARTED:

https://t.co/GxXjmIMjHL
https://t.co/dpWWfHPHUE
https://t.co/q0UrqM3Nib
👇👇👇

👍 11     ❤️ 4     🔥 2          👁 471 9:22 PM

Join

# EXHIBIT AC

Google Form Header

"Fundraiser.com Hackathon Submission Form"

Describes the contest as

"the fundraiser.com/hackathon

Solana AI Hackathon"

Directs participants to Telegram:

t.me/ai_g_hackathon

*Source: Plaintiff's screen capture*

*Google Form at docs.google.com*

*Form remains live as of the date of filing*

docs.google.com/forms/d/e/1FAIpQLScaBXVeVkgRoQFi_78cCVVhpgu9r95DvtoLvlhz9dOjdIzC6Q/vi...



# Fundraiser.com Hackathon Submission Form

This is the Official Project Submission form for the fundraiser.com/hackathon Solana AI Hackathon.

Check https://t.me/ai_g_hackathon for the official links/users that will message your team if you get chosen to be featured.

EXHIBIT AC